ARGUMENT NOT YET SCHEDULED

APPEAL NO. 23-5062

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES OF AMERICA,                          APPELLEE

v.

PETER K. NAVARRO,                          APPELLANT.

APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

APPENDIX TO APPELLANT'S PRINCIPAL BRIEF

<div style="margin-left:40%">

Stan M. Brand
(D.C. Bar No. 213082)
Stanley E. Woodward, Jr.
(D.C. Bar No. 997320)
BRAND WOODWARD LAW, LP
400 5th Street NW, Suite 350
Washington, DC  20001
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel for Appellant Peter K. Navarro*

</div>

1:22-cv-02292-CKK

# Table of Contents

**Civil Docket Sheet** ......................................................................................**Navarro000001**

**Relevant Record** .........................................................................................**Navarro000004**

  Civil Complaint (ECF 001)...........................................................................**Navarro000004**

  Civil Complaint Exhibit 3 (ECF 001-4)........................................................**Navarro000018**

  Motion for Summary Judgment (ECF 007)....................................................**Navarro000021**

  Statement of Material Facts Not in Dispute (ECF 007-2) ...............................**Navarro000023**

  Motion to Dismiss (ECF 009)......................................................................**Navarro000028**

  Opposition to Motion for Summary Judgment (ECF 011) ...............................**Navarro000039**

  Response to Statement of Undisputed Material Facts (ECF 011-1) ..................**Navarro000053**

  Opposition to Motion for Summary Judgment Exhibit A (ECF 011-2)..............**Navarro000060**

  Reply ISO Summary Judgment and Opposition Motion to Dismiss (ECF 012) .**Navarro000064**

  Reply ISO Motion to Dismiss (ECF 014).......................................................**Navarro000090**

  Order and Judgment (ECF 015)....................................................................**Navarro000102**

  Memorandum Opinion (ECF 016).................................................................**Navarro000103**

  Status Report (ECF 026)..............................................................................**Navarro000125**

USCA Case #23-5062      Document #2025631      Filed: 11/06/2023      Page 3 of 142

RECAP Actions
APPEAL,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
### CIVIL DOCKET FOR CASE #: 1:22-cv-02292-CKK

UNITED STATES OF AMERICA v. NAVARRO          Date Filed: 08/03/2022
Assigned to: Judge Colleen Kollar-Kotelly     Jury Demand: None
Case in other court: USCA, 23-05062           Nature of Suit: 890 Other Statutory Actions
Cause: 44:2107 Presidential Recordings and Materials Act    Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**UNITED STATES OF AMERICA**          represented by    **Alexandra Rachel Saslaw**
*By the U.S. Department of Justice*          U.S. DEPARTMENT OF JUSTICE
                                             1100 L Street NW
                                             Washington, DC 20005
                                             202-514-4520
                                             Email: alexandra.r.saslaw@usdoj.gov
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Elizabeth J. Shapiro**
                                             U.S. DEPARTMENT OF JUSTICE
                                             Civil Division, Federal Programs Branch
                                             1100 L Street, NW
                                             Washington, DC 20530
                                             (202) 514-5302
                                             Fax: (202) 616-8470
                                             Email: Elizabeth.Shapiro@usdoj.gov
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Clifford Lee Reeves , II**
                                             DOJ-CIV
                                             Civil Division, Federal Programs Branch
                                             100 L Street, NW
                                             Washington, DC 20005
                                             202-616-0773
                                             Email: lee.reeves2@usdoj.gov
                                             *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**PETER K. NAVARRO**          represented by    **Stanley Edmund Woodward , Jr.**
                                             BRAND WOODWARD LAW, LP
                                             400 Fifth Street, Northwest
                                             Washington, DC 20001
                                             202-996-7447
                                             Fax: 202-996-0113
                                             Email: stanley@brandwoodwardlaw.com
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Stanley McKennett Brand**
                                             BRAND WOODWARD LAW
                                             3 Pebble Ridge Court
                                             Rockville, MD 20854
                                             202-258-6597
                                             Email: stanleymbrand@gmail.com
                                             *ATTORNEY TO BE NOTICED*

Navarro000001

| Date Filed | # | Docket Text |
|---|---|---|
| 08/03/2022 | 1 **R** | COMPLAINT against PETER K. NAVARRO (Fee Status:Filing Fee Waived) filed by UNITED STATES OF AMERICA. (Attachments: # 1 **R** Civil Cover Sheet, # 2 **R** Exhibit 1, # 3 **R** Exhibit 2, # 4 **R** Exhibit 3, # 5 **R** Exhibit 4, # 6 **R** Exhibit 5)(Reeves, Clifford) (Entered: 08/03/2022) |
| 08/03/2022 | 2 | REQUEST FOR SUMMONS TO ISSUE re 1 **R** Complaint, filed by UNITED STATES OF AMERICA. Related document: 1 **R** Complaint, filed by UNITED STATES OF AMERICA.(Reeves, Clifford) (Entered: 08/03/2022) |
| 08/03/2022 | 3 | NOTICE of Appearance by Elizabeth J. Shapiro on behalf of UNITED STATES OF AMERICA (Shapiro, Elizabeth) (Entered: 08/03/2022) |
| 08/03/2022 | | Case Assigned to Judge Colleen Kollar-Kotelly. (znmg) (Entered: 08/03/2022) |
| 08/03/2022 | 4 | SUMMONS (1) Issued Electronically as to PETER K. NAVARRO. (Attachment: # 1 Notice and Consent) (znmg) (Entered: 08/03/2022) |
| 08/04/2022 | 5 **R** | ORDER ESTABLISHING PROCEDURES FOR CASES ASSIGNED TO JUDGE COLLEEN KOLLAR-KOTELLY. Signed by Judge Colleen Kollar-Kotelly on 08/04/2022. (DM) (Entered: 08/04/2022) |
| 08/10/2022 | 6 **R** | WAIVER OF SERVICE. PETER K. NAVARRO waiver sent on 8/9/2022, answer due 10/8/2022. (Reeves, Clifford) (Entered: 08/10/2022) |
| 09/26/2022 | 7 **R** | MOTION for Summary Judgment by UNITED STATES OF AMERICA. (Attachments: # 1 **R** Memorandum in Support, # 2 **R** Statement of Facts, # 3 **R** Text of Proposed Order)(Reeves, Clifford) (Entered: 09/26/2022) |
| 09/27/2022 | | MINUTE ORDER: The Court is in receipt of Plaintiff's 7 **R** Motion for Summary Judgment. Although the Court notes that Plaintiff's Motion is technically timely pursuant to Federal Rule of Civil Procedure 56(b), the Court must stress that Plaintiff has moved for summary judgment before Defendant has filed an answer or otherwise responded to Plaintiff's complaint. Consistent with the longstanding practice of this jurisdiction, the Court shall defer consideration of any motion for summary judgment until after the filing of Defendant's answer. *See, e.g., First Am. Bank, N.A. v. United Equity, Corp.*, 89 F.R.D. 81, 87 (D.D.C. 1981) (Sirica, J.); *see also* Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2717 (West 2022) (noting common practice of deferring consideration of motion for summary judgment filed early in course of litigation). The 7 **R** Motion for Summary Judgment is therefore **HELD IN ABEYANCE** pending Defendant's response to Plaintiff's complaint and further order of the Court. Defendant shall not file an opposition to the 7 **R** Motion until after the Court sets a briefing schedule for the 7 **R** Motion. Additionally, this minute order should not be construed to bar a motion for preliminary relief pursuant to Federal Rule of Civil Procedure 65. Signed by Judge Colleen Kollar-Kotelly on September 27, 2022. (lcckk1) (Entered: 09/27/2022) |
| 10/11/2022 | 8 | NOTICE of Appearance by Stanley Edmund Woodward, Jr on behalf of PETER K. NAVARRO (Woodward, Stanley) (Entered: 10/11/2022) |
| 10/11/2022 | 9 **R** | MOTION to Dismiss by PETER K. NAVARRO. (Attachments: # 1 **R** Text of Proposed Order)(Woodward, Stanley) (Entered: 10/11/2022) |
| 10/12/2022 | | MINUTE ORDER: The Court is in receipt of Defendant's 9 **R** Motion to Dismiss. Upon review thereof, it appears that the disputes between the parties are purely legal in nature. As such, the Court sets the following briefing schedule. Defendant shall file a separate opposition to the Government's 7 **R** Motion for Summary Judgment on or before **October 21, 2022**. The Government shall file a combined opposition to Defendant's 9 **R** Motion and a reply in support of its 7 **R** Motion for Summary Judgment on or before **November 4, 2022**. Finally, Defendant shall file his reply in support of his 9 **R** Motion on or before **November 11, 2022**. Signed by Judge Colleen Kollar-Kotelly on October 12, 2022. (lcckk1) (Entered: 10/12/2022) |
| 10/12/2022 | | Set/Reset Deadlines: Plaintiff's opposition to 9 **R** due by 11/4/2022. Defendant's Reply to 9 **R** due by 11/11/2022. Defendant's opposition to 7 **R** Motion for Summary Judgment due by 10/21/2022. Plaintiff's Reply to 7 **R** Motion for Summary Judgment due by 11/4/2022. (dot) (Entered: 10/12/2022) |
| 10/21/2022 | 10 **R** | NOTICE of Appearance by Stanley McKennett Brand on behalf of PETER K. NAVARRO (Brand, Stanley) (Entered: 10/21/2022) |
| 10/21/2022 | 11 **R** | Memorandum in opposition re 7 **R** Motion for Summary Judgment filed by PETER K. NAVARRO. (Attachments: # 1 Statement of Facts, # 2 Exhibit A)(Woodward, Stanley) (Entered: 10/21/2022) |
| 11/04/2022 | 12 **R** | REPLY to opposition to motion re 7 **R** MOTION for Summary Judgment filed by UNITED STATES OF AMERICA. (Reeves, Clifford) (Entered: 11/04/2022) |
| 11/04/2022 | 13 **R** | Memorandum in opposition re 9 **R** Motion to Dismiss filed by UNITED STATES OF AMERICA. (Reeves, Clifford) (Entered: 11/04/2022) |

Navarro000002

USCA Case #23-5062      Document #2025631      Filed: 11/06/2023      Page 5 of 142

| Date | Doc | Description |
|---|---|---|
| 11/14/2022 | 14 **R** | REPLY to opposition to motion re 9 **R** MOTION to Dismiss filed by PETER K. NAVARRO. (Woodward, Stanley) (Entered: 11/14/2022) |
| 03/09/2023 | 15 **R** | ORDER granting 7 **R** Motion for Summary Judgment, denying 9 **R** Motion to Dismiss, and entering judgment in favor of Plaintiff. Further action required. See Order for details. Signed by Judge Colleen Kollar-Kotelly on March 9, 2023. (lcckk1) (Entered: 03/09/2023) |
| 03/09/2023 | 16 **R** | MEMORANDUM OPINION re 12 **R** Order. Signed by Judge Colleen Kollar-Kotelly on March 9, 2023. (lcckk1) (Entered: 03/09/2023) |
| 03/22/2023 | 17 **R** | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 15 **R** Order on Motion for Summary Judgment, 16 **R** Memorandum & Opinion by PETER K. NAVARRO. Filing fee $ 505, receipt number ADCDC-9946899. Fee Status: Fee Paid. Parties have been notified. (Woodward, Stanley) (Entered: 03/22/2023) |
| 03/22/2023 | 18 **R** | MOTION to Stay re 15 **R** Order on Motion for Summary Judgment by PETER K. NAVARRO. (Attachments: # 1 Text of Proposed Order)(Woodward, Stanley) (Entered: 03/22/2023) |
| 03/23/2023 | | MINUTE ORDER: The Court is in receipt of Defendant's 18 **R** Motion for Stay Pending Appeal, filed March 22, 2023. Plaintiff shall file its opposition on or before **March 25, 2023 at 10:00 AM ET**, and Defendant shall file his reply on or before **March 26, 2023 at 5:00 PM ET**. The Court briefly notes that, on March 9, 2023, it ordered Defendant to comply with the Court's order to produce a category of documents "forthwith." "Forthwith" means "immediately; without delay." *Forthwith*, Black's Law Dictionary (9th ed. 2009). It would appear that Defendant did not comply with that portion of the order to produce some documents forthwith prior to filing for a stay. Signed by Judge Colleen Kollar-Kotelly on March 23, 2023. (lcckk1) (Entered: 03/23/2023) |
| 03/23/2023 | 19 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 17 **R** Notice of Appeal to DC Circuit Court. (zjm) (Entered: 03/23/2023) |
| 03/23/2023 | | NOTICE OF ERROR re 18 **R** Motion to Stay; emailed to stanley@brandwoodwardlaw.com, cc'd 6 associated attorneys -- The PDF file you docketed contained errors: 1. **Please note the following for future filings; do not refile document**, 2. Counsel is reminded to include the case number in all pleadings. (zjm, ) (Entered: 03/23/2023) |
| 03/24/2023 | | USCA Case Number 23-5062 for 17 **R** Notice of Appeal to DC Circuit Court, filed by PETER K. NAVARRO. (zjm) (Entered: 03/27/2023) |
| 03/25/2023 | 20 **R** | RESPONSE re 18 **R** MOTION to Stay re 15 **R** Order on Motion for Summary Judgment filed by UNITED STATES OF AMERICA. (Shapiro, Elizabeth) (Entered: 03/25/2023) |
| 03/26/2023 | 21 **R** | REPLY to opposition to motion re 18 **R** MOTION to Stay re 15 **R** Order on Motion for Summary Judgment filed by PETER K. NAVARRO. (Woodward, Stanley) (Entered: 03/26/2023) |
| 03/28/2023 | 22 **R** | ORDER denying 18 **R** Motion for Stay Pending Appeal. Signed by Judge Colleen Kollar-Kotelly on March 28, 2023. (lcckk1) (Entered: 03/28/2023) |
| 03/28/2023 | 23 **R** | MEMORANDUM OPINION re 22 **R** Order. Signed by Judge Colleen Kollar-Kotelly on March 28, 2023. (lcckk1) (Entered: 03/28/2023) |
| 03/29/2023 | | MINUTE ORDER: Yesterday, March 28, 2023, the Court denied Defendant's 18 **R** Motion for Stay Pending Appeal. The Court notes that its 15 **R** Order remains in effect, and the parties' joint status report remains due on **April 8, 2023**. Signed by Judge Colleen Kollar-Kotelly on March 29, 2023. (lcckk1) (Entered: 03/29/2023) |
| 03/29/2023 | | Set/Reset Deadlines: Joint Status Report due by 4/8/2023. (dot) (Entered: 04/07/2023) |
| 04/08/2023 | 24 **R** | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Reeves, Clifford) (Entered: 04/08/2023) |
| 04/12/2023 | | MINUTE ORDER: In light of the United States Court of Appeals for the District of Columbia Circuit's April 12, 2023 Order denying a stay pending appeal, Defendant shall produce to Plaintiff the already identified 200-250 Presidential records in his possession on or before **April 14, 2023**. Additionally, the Court adopts the parties' proposed schedule in their 24 **R** Joint Status Report. Defendant shall complete all searches for Presidential records on or before **May 8, 2023**, and the parties shall file another joint status report on or before **May 15, 2023** proposing a schedule and deadlines setting forth the timing and manner by which Defendant will produce the remaining Presidential records in his possession. After review of this forthcoming joint status report, the Court may or may not order a compliance deadline earlier than that proposed by the parties. Signed by Judge Colleen Kollar-Kotelly on April 12, 2023. (lcckk1) (Entered: 04/12/2023) |
| 04/12/2023 | | Set/Reset Deadlines: Joint Status Report due by 5/15/2023. (dot) (Entered: 05/15/2023) |
| 05/15/2023 | 25 | NOTICE of Appearance by Alexandra Rachel Saslaw on behalf of All Plaintiffs (Saslaw, Alexandra) (Entered: 05/15/2023) |

Navarro000003

USCA Case #23-5062      Document #2025631      Filed: 11/06/2023      Page 6 of 142

| 05/15/2023 | 26 R | STATUS REPORT by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A, # 2 R Exhibit B, # 3 Exhibit C)(Saslaw, Alexandra) (Entered: 05/15/2023) |
| --- | --- | --- |
| 05/15/2023 | 27 R | STATUS REPORT by PETER K. NAVARRO. (Woodward, Stanley) (Entered: 05/15/2023) |
| 05/19/2023 | 28 R | ORDER further enforcing 15 R Order and Judgment. Further productions due on or before **May 25, 2023**. Motion to enforce judgment, if necessary, due on or before **May 31, 2023**. See Order for details. Signed by Judge Colleen Kollar-Kotelly on May 19, 2023. (lcckk1) (Entered: 05/19/2023) |
| 05/19/2023 | | Set/Reset Deadlines: Further productions due on or before 5/25/2023. Motion to enforce judgment, if necessary, due on or before 5/31/2023. (dot) (Entered: 05/22/2023) |
| 05/27/2023 | 29 R | Second STATUS REPORT by PETER K. NAVARRO. (Woodward, Stanley) (Entered: 05/27/2023) |
| 05/31/2023 | 30 R | MOTION to Enforce Judgment by UNITED STATES OF AMERICA. (Attachments: # 1 R Exhibit Exhibit A) (Reeves, Clifford) (Entered: 05/31/2023) |
| 06/01/2023 | 31 R | RESPONSE re 30 R MOTION to Enforce Judgment filed by PETER K. NAVARRO. (Woodward, Stanley) (Entered: 06/01/2023) |
| 08/31/2023 | 32 R | ORDER granting in part and holding in abeyance in part 30 R Motion to Enforce Judgment. Sealed notice due on or before **October 15, 2023**. Random selection of records due to Chambers (on flashdrive via hand delivery) on or before **October 15, 2023**. See Order for details. Signed by Judge Colleen Kollar-Kotelly on August 31, 2023. (lcckk1) (Entered: 08/31/2023) |
| 10/16/2023 | 33 | SEALED DOCUMENT filed by PETER K. NAVARRO re 32 R Order on Motion to Enforce Judgment, (This document is SEALED and only available to authorized persons.)(Woodward, Stanley) (Entered: 10/16/2023) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| Transaction Receipt | | | |
| 11/06/2023 13:41:53 | | | |
| **PACER Login:** | marcusp2895 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-02292-CKK |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

Navarro000004

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
  By the U.S. Department of Justice
  1100 L Street NW
  Washington, D.C., 20001

  *Plaintiff*,

  –v.–

PETER K. NAVARRO,
  801 Pennsylvania Avenue NW
  Unit 1021
  Washington, D.C., 20004

  *Defendant.*

Case No. 1:22-cv-2292

## **COMPLAINT**

## **INTRODUCTION**

1.       Defendant Peter K. Navarro was employed by the White House Office in the Executive Office of the President from January 20, 2017, until January 20, 2021.  He was Deputy Assistant to the President and Director of the National Trade Council from his hiring until April 29, 2017, when he was appointed Assistant to the President and Director of the Office of Trade and Manufacturing Policy.  In addition to those responsibilities, in March 2020, then-President Donald J. Trump appointed Mr. Navarro to coordinate the government's use of the Defense Production Act, 50 U.S.C. § 4501 *et seq*., to respond to the COVID-19 pandemic.

2.       The Presidential Records Act (PRA), 44 U.S.C. § 2201 *et seq*., creates a framework for the preservation of certain records, termed "Presidential records" (Presidential records) by the statute, *id*. § 2201(2), created or received by the President, Vice President, and persons who advise and assist them, like Mr. Navarro (Covered Individuals).

1

3.     Subject to conditions and exceptions not relevant here, the PRA defines a Presidential record as a record generated or received by a Covered Individual in the course of assisting with the discharge of the President's official duties.  *See* 44 U.S.C. § 2201(2).  The United States "retain[s] complete ownership, possession, and control of Presidential records." *Id.* § 2202.

4.     The PRA continues to apply when non-official electronic accounts are used to perform official duties.  *See, e.g.*, 44 U.S.C § 2209.  Among other responsibilities, a Covered Individual must copy any Presidential record sent on a "non-official electronic message account" to his official government email account within 20 days, and to otherwise transfer Presidential records received on a non-official account to the National Archives and Records Administration (NARA) at the end of each presidential administration.  *See id.*; *id.* §§ 2202-03.

5.     At the end of a presidential administration, the Archivist of the United States is, under the PRA, required to "assume responsibility for the custody, control, and preservation" of Presidential records and to "make such records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." *Id.*  § 2203.

6.     While serving in the White House, Mr. Navarro used at least one non-official email account—an account hosted by the non-official service ProtonMail—to send and receive messages constituting Presidential records.

7.     Mr. Navarro did not copy each email or message constituting Presidential records that was sent or received on his non-official account or accounts to his official government email account.

8.     Following the end of the Trump Administration, the Archivist, through the General Counsel of the NARA, attempted to contact Mr. Navarro to secure the Presidential records that

Navarro000006

Mr. Navarro had not copied to his government email account. Mr. Navarro did not respond to NARA's communications.

9.    Prior to filing this suit, in an effort to avoid litigation, Department of Justice counsel contacted Mr. Navarro by email and United States mail to secure the Presidential records that Mr. Navarro had not copied to his government email account. Discussions with Mr. Navarro's counsel to secure the return of Presidential records ultimately proved unsuccessful. Mr. Navarro has refused to return any Presidential records that he retained absent a grant of immunity for the act of returning such documents.

10.    Mr. Navarro is wrongfully retaining Presidential records that are the property of the United States, and which constitute part of the permanent historical record of the prior administration.

11.    Mr. Navarro's wrongful retention of Presidential records violates District of Columbia law, federal common law, and the PRA.

12.    Plaintiff asks that the Court (i) order Mr. Navarro to transmit forthwith the wrongfully withheld Presidential records to the United States, and (ii) award all other relief that the Court deems appropriate.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction under 28 U.S.C. § 1345 because this is a "civil action[ ] commenced by the United States" that involves the application of one or more federal statutes, namely, the PRA. The Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this suit includes claims that arise under the laws of the United States.

Navarro000007

14.     This Court has personal jurisdiction over Mr. Navarro because he is domiciled in this judicial district and/or because this suit arises out of or relates to Mr. Navarro's contacts with this district.

15.     Venue is appropriate in this judicial district under both 28 U.S.C. § 1391(b)(1) and § 1391(b)(2).

## PARTIES

16.     Plaintiff, the United States, preserves Presidential records to "assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented." 44 U.S.C. § 2203.  The United States has a right to sue to protect its property interest in Presidential records.  *See, e.g., Wyandotte v. Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) (noting the "general rule that the United States may sue to protect its interests").

17.     Defendant, Mr. Navarro, served as Assistant to the President and Director of the White House Office of Trade and Manufacturing Policy, as well as Deputy Assistant to the President and Director of the White House National Trade Council.  *See* Trump White House, People, Peter Navarro, https://trumpwhitehouse.archives.gov/people/peter-navarro/.  Also, in March 2020, former President Trump appointed Mr. Navarro to be the National Defense Production Act Policy Coordinator.  Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing, March 28, 2020, https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-13/.

## THE PRESIDENTIAL RECORDS ACT

Navarro000008

18.     According to the PRA, the term "Presidential records" means, with certain conditions and exceptions, "documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."  44 U.S.C. § 2201.

19.     The PRA also states that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of this chapter." *Id.* § 2202.

20.     Under the PRA, at the end of a presidential administration, the Archivist of the United States is required to "assume responsibility for the custody, control, and preservation" of Presidential records and "make such records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." *Id.* § 2203.  A President can designate his Presidential records as restricted for up to 12 years.  *Id.* § 2204.  During the restricted period, however, courts, Congress, and the incumbent President may request "special access" to the Presidential records.  *Id.* §§ 2205(2)(A)-(C).

21.     E-mail and other electronic messages, including electronic messages sent and received on non-official electronic message accounts, constitute Presidential records to the same extent as hard copy documents.  *Id.* §§ 2201, 2209.

22.     The PRA provides explicit direction regarding the proper handling of Presidential records sent using non-official electronic accounts:  It requires Covered Individuals to "cop[y] their "official electronic messaging account" when sending a communication using a non-official account or to "forward[] a complete copy" of an email sent on their non-official account to their

Navarro000009

"official electronic messaging account . . . not later than 20 days after the original creation or transmission" of the record. *Id*. §§ 2209(a)(1), (a)(2).

23.     The PRA does not separately address the handling of Presidential records received—as opposed to sent—on a non-official electronic account. *Id*. § 2209. But Presidential records received on a non-official account do not lose their status as Presidential records merely because they exist on a non-official electronic account. *See id*. § 2201 (defining Presidential records as including records "*received* by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President . . . (emphasis added))). And like all other Presidential records, they are the property of the United States, *id*. § 2202, and are required to be turned over to the Archivist upon the end of the administration, *id*. § 2203.

## **FACTUAL BACKGROUND**

24.     In February 2017, the White House Counsel's Office issued a memorandum to White House personnel regarding the use of non-official email accounts to conduct official business, writing: "If you ever send or receive email that qualifies as a presidential record using any other account [i.e., other than the official government account], you must preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days." Memorandum for All Personnel, through White House Counsel Donald F. McGahn II, Feb. 22, 2017 (WHCO Memorandum), at 2 (attached as Exhibit 1). In 2019, after a new White House Counsel was appointed, substantively identical guidance was re-issued under the new Counsel's name.

25.     The WHCO Memorandum states "that presidential records are the property of the United States . . . When you leave EOP employment, you may not take any presidential records with you." *Id*. at 3.

Navarro000010

26.     Mr. Navarro served first as the Deputy Assistant to the President and Director of the National Trade Council, and later as the Assistant to the President and Director of the Office of Trade and Manufacturing Policy.  In these roles, as well as in his role as policy coordinator of the government's use of the Defense Production Act, Mr. Navarro was on "the President's immediate staff" and/or "in a unit or individual of the Executive Office of the President whose function is to advise or assist the President."  44 U.S.C. § 2201.  As such, Mr. Navarro was a Covered Individual.

27.     While serving in the White House, Mr. Navarro used at least one non-official email account to send and receive messages that constitute Presidential records.  The House Select Subcommittee on the Coronavirus Crisis (the Subcommittee) obtained copies of electronic messages from individuals, other than Mr. Navarro, as part of its investigation into the government's response to the coronavirus pandemic, and those messages reflect that Mr. Navarro used a non-official email account, namely, a ProtonMail account, to send and receive Presidential records.  *See* Records Released by Subcommittee (Exhibit 2).

28.     Through the Subcommittee's work, NARA became aware of Mr. Navarro's use of a non-official email account to send and receive Presidential records.  *See* Letter from Gary M. Stern, General Counsel, NARA, to Navarro, Dec. 16, 2021, at 1 (Stern Letter) (Exhibit 3).

29.     NARA's General Counsel wrote a letter to Mr. Navarro.  *Id.*  The letter was sent to the University of California, Irvine, where Mr. Navarro is a professor emeritus in the Paul Merage School of Business.  *See id*; UCI Faculty Profile System, Peter Navarro (available online at https://www.faculty.uci.edu/profile.cfm?faculty_id=2709).

30.     In the letter, Mr. Stern explained that NARA had "conducted a search of the White House emails that [it] received at the end of the Trump Administration and ha[d] no record" of Mr.

7

Navarro000011

Navarro forwarding to his official account any emails he received on his ProtonMail account. *Id.* at 1. Mr. Stern noted that, "[t]here are also multiple instances where you sent emails from your personal account to other White House employees but did not copy or forward them to your official account." *Id.*

31.     After recounting the White House's reminders to its employees about their obligations under the PRA in the WHCO Memorandum, the letter stated that, "it is necessary that you now provide NARA with any Presidential records that reside on your personal electronic messaging accounts." *Id.* at 2. Mr. Stern closed the letter by offering to work with Mr. Navarro to facilitate the transfer of Presidential records to NARA. *Id.*

32.     Mr. Navarro did not respond to the Stern Letter. Declaration of William J. Bosanko, Chief Operating Officer, National Archives and Records Admin., August 3, 2022, ¶ 6 (Bosanko Decl.) (attached as Ex. 4). Nor did he respond to multiple voice messages that Mr. Stern left for him regarding the matter. *Id.*

33.     On June 1, 2022, Department of Justice counsel wrote Mr. Navarro a letter, in an effort to secure the return of the Presidential records without litigation. The letter was emailed to Mr. Navarro, and sent to him via Priority Mail, through the U.S. Postal Service, with delivery completed on June 2, 2022.

34.     The June 1, 2022, letter states, in relevant part:

> Since determining that you conducted official government business as an advisor to President Trump using a private email account, the National Archives and Records Administration (NARA) has repeatedly requested that you provide all electronic mail messages related to your official duties that you created or received using a private email account. To date, you have declined to provide the records.
>
> The Presidential Records Act, 44 U.S.C. § 2201 et seq., establishes that the United States owns records related to the President's official duties, whether or not the records were created or stored on an official

8

Navarro000012

government server. The United States is entitled to recover property that belongs to it, including official government records.

We have been authorized to file a civil action against you in United States District Court to pursue claims for the recovery of wrongfully withheld records. We intend to file the action on or about June 21, 2022. But as is our practice in civil actions of this nature, we are willing to give you an opportunity to resolve this matter without litigation by turning the wrongfully withheld records over to NARA prior to June 21.

*See* Letter from Elizabeth J. Shapiro to Peter K. Navarro, June 1, 2022 (attached as Exhibit 5).

35.     On June 16, 2022, counsel for Mr. Navarro contacted the Department of Justice to advise that they had just been retained by Mr. Navarro as counsel. Mr. Navarro's counsel represented that they had retained a document review and analysis firm to aid them in evaluating the extent to which Mr. Navarro had PRA records in his possession, custody, or control. Bosanko Decl. ¶ 8.

36.     Over the next several weeks, Mr. Navarro's counsel provided periodic updates on the status of their search and analysis process. In order to assist and expedite the search, on July 18, 2022, NARA's General Counsel provided Mr. Navarro's counsel with a list of search terms. NARA requested that Mr. Navarro prioritize the return of any PRA records responsive to those search terms. Bosanko Decl. ¶ 8.

37.     By email dated July 22, 2022, Mr. Navarro's counsel represented that their application of the search parameters that NARA provided had generated over 1,700 documents. Thereafter, on July 25, 2022, Mr. Navarro's counsel estimated that, based on their review of these documents, between 200 and 250 of these 1,700 documents were PRA records. Bosanko Decl. ¶ 9.

Navarro000013

38.     By letter dated July 29, 2022, Mr. Navarro's counsel refused to produce any PRA records to NARA in Mr. Navarro's possession, custody, or control absent a grant of immunity for the act of returning such records.  Bosanko Decl. ¶ 9.

## COUNT I

**Mr. Navarro Has Possession, Custody, and/or Control or Presidential Records, Which Belong to the United States, and, Under District of Columbia Law, Including the Law of Replevin, Should Be Recovered and Delivered to the United States**

39.     The paragraphs above are incorporated and reasserted as if fully set forth here.

40.     Mr. Navarro created and received Presidential records on one or more non-official email and/or electronic messaging accounts, including his ProtonMail account.  Mr. Navarro was a Covered Individual, and he created and/or received emails and/or other electronic messages "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."  44 U.S.C. § 2201

41.     The Presidential records on Mr. Navarro's non-official email account or accounts are the property of the United States.  *Id.* § 2202.

42.     Mr. Navarro did not ensure that his official electronic email account included copies of all Presidential records created or received on one or more non-official email accounts. *See id.* § 2209.  Mr. Navarro has not otherwise provided the Presidential records on his non-official email account and/or electronic messaging accounts to the United States.

43.     Accordingly, Mr. Navarro has unjustly retained property of the United States in the form of Presidential records.  *See* Bosanko Decl. ¶¶ 10-13.  The monetary value of the documents cannot currently be determined because Defendant is the only one with access to the contents of all of the Presidential records on his non-official email and/or electronic messaging accounts.  And

10

Navarro000014

in any event, the primary interest of the United States is in recovering the records and preserving them as required by statute, not in recovering money.[1]

44.     Under the law of the District of Columbia, including the law of replevin, any Presidential records retained by Mr. Navarro should be taken from him and delivered to the United States. *See, e.g.,* D.C. Code 16-3702; *Hunt v. DePuy Orthopaedics, Inc.*, 729 F. Supp. 2d 231, 232 (D.D.C. 2010) (explaining that "[r]eplevin is an action "brought to recover personal property to which the plaintiff is entitled, that is alleged to have been wrongfully taken or to be in the possession of and wrongfully detained by the defendant," and "concluding that, under D.C. law, "[t]he essence of [] a replevin action . . . is the wrongful withholding of the property in question") (cleaned up).

## COUNT II

**Mr. Navarro Has Possession, Custody, and/or Control or Presidential Records Which Belong to the United States and, Under Federal Common Law, Should Be Recovered and Provided to the United States, and the United States Should Be Awarded Damages**

45.     The paragraphs above are incorporated and reasserted as if fully set forth here.

46.     Mr. Navarro was a Covered Individual subject to the requirements of the PRA. 44 U.S.C. § 2201.

47.     Mr. Navarro created and received Presidential records on one or more non-official email and/or electronic messaging accounts, including his ProtonMail account.  The Presidential records on Mr. Navarro's non-official email accounts and/or electronic messaging accounts are the property of the United States. *Id*. § 2202.

---

[1]  Relatedly, the United States cannot estimate the amount of mesne profits and damages, if any, because Defendant is the only one with access to all of the Presidential records on his non-official email and/or electronic message accounts.

Navarro000015

48.     Mr. Navarro did not ensure that his official email account included copies of all Presidential records created or received on one or more non-official email accounts. *See id*. § 2209. Mr. Navarro has not otherwise provided the Presidential records on his non-official email account and/or electronic messaging accounts to the United States.

49.     Accordingly, Mr. Navarro has unjustly retained property of the United States in the form of Presidential records.

50.     Under federal common law, any Presidential records retained by Mr. Navarro should be taken from him and delivered to the United States, and the United States should be awarded damages in an amount to be determined at trial.

## **REQUEST FOR RELIEF**

51.     Wherefore, Plaintiff requests that this Court:

(a)     issue a writ of replevin authorizing the recovery of any Presidential records in the possession, custody, and/or control of Mr. Navarro;

(b)     issue an order requiring Mr. Navarro to cooperate with (i) the official serving and implementing the writ of replevin, or (ii) other similar order, to ensure the return of the Presidential records to the United States;

(c)     award damages to the United States as appropriate;

(d)     award Plaintiff costs and reasonable attorneys' fees incurred in this action; and

(e)     award other relief as the Court deems just.

Navarro000016

Dated: August 3, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

BRIAN D. NETTER
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director
Federal Programs Branch


  /s/ Lee Reeves
LEE REEVES
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs
Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 616-0773
Email: lee.reeves2@usdoj.gov
Counsel for Plaintiff

13

# Exhibit 3



# NATIONAL ARCHIVES

December 16, 2021

Mr. Peter K. Navarro
Professor Emeritus
Paul Merage School of Business
University of California, Irvine
4293 Pereira Drive
338 GSM, Mail Code: 3125
Irvine, CA 92697
By EMAIL

Dear Mr. Navarro:

I write on behalf of the Archivist of the United States, who heads the National Archives and Records Administration (NARA). Under the Presidential Records Act (PRA), at the end of each Presidential Administration, NARA assumes complete custody and control of all Presidential records created and received by the President, the Vice President, and all White House employees during the course the Administration. The PRA also requires that whenever a White House employee creates or receives a Presidential record using a non-official electronic message account, they must copy or forward a complete copy of the records to their official electronic messaging account within 20 days. 44 U.S.C. 2209(a).

It has come to our attention that while you were a White House employee of the Trump Administration, you sometimes carried out official business using a non-official email account, pknavarro@protonmail.com. (See September 14, 2021, Letter to you from Chairman James E. Clyburn, House Select Subcommittee on the Coronavirus Crisis.) The select subcommittee posted multiple examples of emails that meet the definition of Presidential records and were sent to and from your protonmail.com email account, dating from as early as February 2020. We have conducted a search of the White House emails that NARA received at the end of the Trump Administration and have no record of you forwarding any emails from your protonmail.com account to your who.eop.gov account before June 2020. There are also multiple instances where you sent emails from your personal account to other White House employees but did not copy or forward them to your official account.

NATIONAL ARCHIVES *and*
RECORDS ADMINISTRATION

8601 ADELPHI ROAD
COLLEGE PARK, MD 20740-6001
*www.archives.gov*

GARY M. STERN

GENERAL COUNSEL

Suite 3110

t. 301.837.3026

*garym.stern@nara.gov*

The Counsel to President Trump issued a memo on Presidential Records Act Obligations to all White House Personal, which stated the following (emphasis in original):

> **You are required to conduct all work-related communications on your official EOP email account**, except in emergency circumstances when you cannot access the EOP system and must accomplish time sensitive work. Emails and attachments sent to and from your EOP account are automatically archived.
>
> *If you ever send or receive email that qualifies as a presidential record using any other account, you must preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days. After preserving the email, you must delete it from the non-EOP account. **Any employee who intentionally fails to take these actions may be subject to administrative or even criminal penalties**.*
>
> The same rules apply to other forms of electronic communication, including text messages. ***You should not use instant messaging systems, social networks, or other internet-based means of electronic communication to conduct official business without the approval of the Office of the White House Counsel***. If you ever generate or receive presidential records on such platforms, you must preserve them by sending them to your EOP email account via a screenshot or other means. After preserving the communications, you must delete them from the non-EOP platform.

The requirements of the PRA continue to apply even after the President and his staff leave office. Accordingly, it is necessary that you now provide NARA with any Presidential records that reside on your personal electronic messaging accounts.

Please contact me as soon as possible so that we can make appropriate arrangements to transfer the Presidential records that remain in your custody. I would be happy to discuss this issue with you directly. You can reach me on my cellphone at 240-475-2816.

Sincerely,


Gary M. Stern
General Counsel

Navarro000020

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
    By the U.S. Department of Justice
    1100 L Street NW
    Washington, D.C., 20001

        *Plaintiff*,

       –v.–

PETER K. NAVARRO,
    801 Pennsylvania Avenue NW
    Unit 1021
    Washington, D.C., 20004

        *Defendant.*

Case No. 1:22-cv-2292

## MOTION FOR SUMMARY JUDGMENT

Pursuant to D.C. Local Civil Rule 7(a), Plaintiff United States of America hereby moves for summary judgment in the above-captioned matter. In accordance with Local Civil Rule 7(h), a supporting memorandum of law, statement of material facts, and a proposed order accompany this motion.

Dated: September 26, 2022

          Respectfully submitted,

          BRIAN M. BOYNTON
          Principal Deputy Assistant Attorney General

          BRIAN D. NETTER
          Deputy Assistant Attorney General

          ELIZABETH J. SHAPIRO
          Deputy Branch Director
          Federal Programs Branch

    /s/ *Lee Reeves*
LEE REEVES
ALEXANDRA SASLAW
Trial Attorneys
U.S. Department of Justice Civil Division,
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 616-0773
Email: lee.reeves2@usdoj.gov
*Counsel for Plaintiff*

Navarro000022

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
    By the U.S. Department of Justice
    1100 L Street NW
    Washington, D.C., 20001

        *Plaintiff,*

        —v.—

PETER K. NAVARRO,
    801 Pennsylvania Avenue NW
    Unit 1021
    Washington, D.C., 20004

        *Defendant.*

Case No. 1:22-cv-2292

## DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Rule 7(h)(1), Plaintiff United States of America respectfully submits the following statement of material facts not in dispute.

1.    Defendant Peter K. Navarro (Defendant) was employed by the White House Office in the Executive Office of the President from January 20, 2017, until January 20, 2021. *See* Trump White House, People, Peter Navarro, https://trumpwhitehouse.archives.gov/people/peter-navarro/; *Navarro v. Pelosi*, 1:22-cv-01519 (D.D.C.), Compl. ¶ 1 (Preliminary Statement filed by Peter K. Navarro) ("For the four years of the Trump administration, . . . [Mr. Navarro] served as a senior White House advisor to [then-] President Donald John Trump.").

2.    From approximately January 20, 2017, until approximately April 29, 2017, Defendant served as Assistant to the President, Director of Trade and Industrial Policy, and the inaugural head of the White House National Trade Council.   *See* Trump White House, People, Peter Navarro, https://trumpwhitehouse.archives.gov/people/peter-navarro/.

1

Navarro000023

3.      From approximately April 29, 2017 until approximately January 20, 2021, Defendant served as Assistant to the President and Director of the Office of Trade and Manufacturing Policy (OTMP).  *See* Trump White House, People, Peter Navarro, https://trumpwhitehouse.archives.gov/people/peter-navarro/.  "[I]n his role as Director of OTMP, [Defendant] advise[d] the President on policies to increase economic growth, decrease the trade deficit, and strengthen Americas' manufacturing and defense industrial bases."  *Id.*

4.      The Office of Trade and Manufacturing Policy existed within the White House Office. *See* Presidential Executive Order on Establishment of Office of Trade and Manufacturing Policy (Apr. 29, 2017),  https://trumpwhitehouse.archives.gov/presidential-actions/presidential-executive-order-establishment-office-trade-manufacturing-policy/).

5.      In addition to those responsibilities noted in paragraphs 2-3 above, in March 2020, then-President Donald J. Trump appointed Defendant to coordinate the government's use of the Defense Production Act, 50 U.S.C. § 4501 *et seq.*, to respond to the COVID-19 pandemic. *See* Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing (Mar. 28, 2020),  https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-13/.

6.      By virtue of his positions and work described above in paragraphs 1-4, Defendant was on "the President's immediate staff" and/or "in a unit or individual of the Executive Office of the President whose function is to advise or assist the President." 44 U.S.C. § 2201(2).

7.      The Presidential Records Act (PRA), 44 U.S.C. § 2201 *et seq.*, creates a framework for the preservation of certain records, termed "Presidential records" (Presidential records) by the statute, *id.* § 2201(2), created or received by the President, Vice President, and persons who advise and assist them.

2

8.     According to the PRA, the term "Presidential records" means, with certain conditions and exceptions, "documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2).

9.     E-mail and other electronic messages, including electronic messages sent and received on non-official electronic message accounts, constitute Presidential records to the same extent as hard copy documents.  44 U.S.C. §§ 2201, 2209.

10.    The PRA requires the President, Vice President, and "covered employee[s]" to "cop[y]" their "official electronic messaging account" when sending a communication using a non-official account or to "forward[] a complete copy" of an email sent on their non-official account to their "official electronic messaging account  . . .  not later than 20 days after the original creation or transmission" of the record. 44 U.S.C. §§ 2209(a)(1), (a)(2).   "Covered employee[s]" include, *inter alia*, "the immediate staff of the President" and "a unit or individual of the Executive Office of the President whose function is to advise and assist the President."  *Id.* § 2209(c)(1).

11.    In February 2017, the White House Counsel's Office issued a memorandum to White House personnel regarding the use of non-official email accounts to conduct official business, writing: "If you ever send or receive email that qualifies as a presidential record using any other account [i.e., other than the official government account], you must preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days." Compl. Ex. 1 at 2, ECF No. 1-2 (Memorandum for All Personnel, from Deputy White House Counsel Stefan C. Passantino, through Counsel to the President Donald F. McGahn (Feb. 22, 2017)) (WHCO Memorandum)).

3

Navarro000025

12.    The United States "retain[s] complete ownership, possession, and control of Presidential records." 44 U.S.C. § 2202.

13.    At the end of a presidential administration, the Archivist of the United States is, under the PRA, required to "assume responsibility for the custody, control, and preservation" of Presidential records and to "make such records available to the public as rapidly and completely as possible consistent with the provisions of this chapter."  44 U.S.C. § 2203; Compl. Ex. 4 at ¶¶ 2-3, ECF No. 1-5 (Declaration of William J. Bosanko).

14.    While serving in the White House, Defendant used at least one non-official email account—an account hosted by the non-official service ProtonMail—to send and receive messages constituting Presidential records.  *See* Compl. Ex. 2, ECF 1-3 (emails to/from Defendant's ProtonMail account); *accord* Bosanko Decl. ¶ 6.  Some of these emails were obtained by the House Select Subcommittee on the Coronavirus Crisis (the Subcommittee) as part of its investigation into the government's response to the coronavirus pandemic.  *See* Select Subcommittee on the Coronavirus Crisis, Select Subcommittee Releases New Evidence Of Trump Administration Failure To Heed Early Pandemic Warnings: New Documents Show that Peter Navarro and other Trump Administration Advisors Used Private Email Accounts to Communicate about Pandemic Response (Sept. 14, 2021), https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/9.14.21%20Navarro%20Document%20Release.pdf); *see also* Compl. Ex. 2, ECF 1-3.

15.    Defendant did not copy each email or message constituting Presidential records that was sent or received on his non-official account or accounts to his official government email account. Bosanko Decl. ¶ 5.

16.    Defendant continues to have Presidential records in his possession, custody, and/or control.  Bosanko Decl. ¶¶ 6-10 & Attachment A (July 29, 2022 letter from John S. Irving to Gary M. Stern) (acknowledging continued possession, custody, and/or control).

Navarro000026

Dated: September 26, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

BRIAN D. NETTER
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director
Federal Programs Branch


 /s/ Lee Reeves
LEE REEVES
ALEXANDRA SASLAW
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs
Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 616-0773
Email: lee.reeves2@usdoj.gov
Counsel for Plaintiff

5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) ) ) | **Case No. 1:22-cv-02292-CKK** |
| **v.** | ) ) | |
| **PETER K. NAVARRO,** | ) ) | |
| **Defendant.** | ) ) ) | |

## <u>MOTION TO DISMISS</u>

Dr. Peter K. Navarro, by and through the undersigned counsel, and pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure, hereby respectfully requests this Court dismiss

the above-captioned action

### I.   FACTUAL BACKGROUND

Dr. Navarro was one of the longest-tenured members of Donald Trump's Presidential

Administration, serving from January 20, 2017, through January 20, 2021, as the Director of the

National Trade Council and as the Director of the Office of Trade and Manufacturing Policy, as

well as Assistant to the President and the national Defense Production Act Policy coordinator in

furtherance of the United States' response to the coronavirus pandemic.  In these positions, Dr.

Navarro was responsible for coordinating the day-to-day actions of multiple Executive Branch

functions, and for corresponding with the President and other high-level Executive Branch

employees.

On November 18, 2021, the U.S. House of Representatives' Select Subcommittee on the

Coronavirus Crisis subpoenaed Dr. Navarro for testimony and records related to his official

duties with the Trump administration.  Ultimately, that subcommittee rejected Dr. Navarro's

assertion of executive privilege and testimonial immunity and, on December 11, 2021, the

subcommittee's Chairman, Representative James E. Clyburn, wrote Dr. Navarro reiterating the subcommittee's demand for certain records it believed to be within Dr. Navarro's possession, custody, and/or control:  "As explained in my September 14, 2021 letter to you, records previously obtained by the Select Subcommittee indicate that you used a private, encrypted email communications system called ProtonMail to conduct official business while working at the White House."  Days later, on December 16, 2021, a representative for the National Archives and Records Administration ("NARA") surreptitiously informed Dr. Navarro of NARA's belief that Dr. Navarro was in possession, custody, or control of documents subject to the Presidential Record Act of 1978, 44 U.S.C. §§ 2201-2209.

In the meantime, on February 24, 2022, Dr. Navarro was also subpoenaed by the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") for testimony and records.  As with the subcommittee, Dr. Navarro ultimately asserted executive privilege and testimonial immunity with the select committee, which, on March 28, 2022, led to his referral to the Department of Justice for contempt of congress.  Dr. Navarro was thereafter indicted on June 2, 2022. Contemporaneously, on June 1, 2022, an attorney with the Department of Justice's Civil Division Federal Programs Branch contacted Dr. Navarro and informed him that the DOJ was authorized to file suit for "the recovery of wrongfully withheld documents" under the Presidential Records Act.

The timing of these events led Dr. Navarro to reasonably believe that the Executive and Legislative Branches were coordinating their efforts so as to ultimately affect Dr. Navarro's penal interest.  Dr. Navarro outlined his concerns in correspondence to Gary Stern, General Counsel for NARA, on July 29, 2022.  Specifically, Dr. Navarro advised of his request for

Navarro000029

immunity based upon an assertion of the "act of production privilege," which protects the interests of an individual in providing materials in response to a subpoena that may affect the individual's right against self-incrimination.  In response, the United States filed the instant action.  Thus, while the United States' Complaint would suggest that this action concerns a straightforward request for the "return of Presidential records," it is in fact far more complex.

## II.    STATUTORY BACKGROUND

The Presidential Records Act ("PRA") of 1978, 44 U.S.C. §§ 2201-2209, was enacted to officially vest ownership of the President's records to the public, and set forth the requirement of presidential administrations to maintain and preserve certain presidential and vice-presidential information during and after a presidency.  The PRA defines the term *presidential records* as:

> documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. Such term— (A) includes any documentary materials relating to the political activities of the President or members of the President's staff, but only if such activities relate to or have a direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(3)(A).

During an incumbent President's term in office, the PRA provides exclusive responsibility for custody, control, and access to presidential records to that president, while providing the Archivist of the United States ("Archivist") with the right to maintain and preserve these presidential records on behalf of the President.  *Id.* at § 2203(f).  Once the incumbent President's term ends, the Archivist, "assume[s] responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President."  *Id.* at (g)(1).  However, despite strict requirements for maintenance and preservation of presidential records, the PRA is

Navarro000030

entirely silent as to any deadline by which presidential records must be provided to the Archivist; the PRA only provides a timetable for when the Archivist becomes responsible for presidential records of a former President.

The PRA also acknowledges the necessity of presidential records being sent in electronic message form and from non-official email accounts.  44 U.S.C. §§ 2201, 2209.  If presidential records are sent with a non-official account, the President, the Vice President, and Covered Employees are to, "cop[y] an official electronic messaging account of the President, Vice President, or covered employee in the original creation or transmission of the Presidential record or Vice Presidential record[,]" or "forward[] a complete copy of the Presidential or Vice Presidential record to an official electronic messaging account of the President, Vice President, or covered employee not later than 20 days after the original creation or transmission of the Presidential or Vice Presidential record." *Id.* at § 2209(a)(1), (2).  This section of the PRA provides that any intentional violation the subsection outlining the use of non-official email accounts may be the basis of a disciplinary action pursuant to 5 U.S.C. 7501 *et seq*.  The PRA otherwise does not address the consequence of an alleged violation of the Act through the use of non-official email.

### III.   LEGAL STANDARD

Dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is "appropriate when a complaint fails 'to state a claim upon which relief can be granted.'" *Strumsky v. Wash. Post Co.*, 842 F. Supp. 2d 215, 217 (D.D.C. 2012) (quoting Fed. R. Civ. P. 12(b)(6)).  "[A] complaint must contain sufficient factual allegations that, if accepted as true, 'state a claim to relief that is plausible on its face.'"  *United States ex rel. Scott v. Pac. Architects & Eng'rs, Inc.*, 270 F. Supp. 3d 146, 152 (D.D.C. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Though the Court, "must liberally construe the complaint in favor of the plaintiff and must grant the plaintiff 'the benefit of all inferences that can be derived from the facts alleged,' . . . a court need not 'accept as true a legal conclusion couched as a factual allegation.'"  *Chatman v. U.S. Dep't of Def.*, 270 F. Supp. 3d 184, 188 (D.D.C. 2017) (quoting *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 529, 530 (D.C. Cir. 2015)).

## IV.   ARGUMENT

The United States asserts that the PRA requires any presidential records within Dr. Navarro's possession, custody, or control to be provided to the Archivist immediately upon the conclusion of an incumbent president's administration.  *See* Complaint, ¶ 23.  However, this is a clear mischaracterization of the language of the PRA, which provides that that, "the Archivist of the United States shall assume responsibility for. . . the Presidential records of that President." 44 U.S.C. § 2203(g)(1) (emphasis added).  This distinction is important, as the United States bases the entirety of its complaint upon a nonexistent deadline.  The PRA merely puts the onus on the Archivist to account for the maintenance and custody of presidential records of former presidents.  While the PRA may authorize the Archivist to seek records once a presidential administration has concluded, it provides the Archivist with neither with a hard deadline by which to do so nor an enforcement mechanism by which to do so.  *See* Maggie Haberman and Michael S. Schmidt, How Trump Deflected Demands for Documents, Enmeshing Aides, *The New York Times* (Oct. 8, 2022)[1] ("In a conversation in late October or early November of last

---

[1] *Available at* https://www.nytimes.com/2022/10/08/us/politics/trump-documents-lawyers.html.  *See also [insert]*

year, Mr. Stern [General Counsel of the National Archives and Records Administration] . . . acknowledged that the Presidential Records Act did not contain an enforcement mechanism . . . .").

Here, Dr. Navarro has asserted a privilege validly delaying the time within which he must produce the records sought by the Archivist.  The Supreme Court has recognized that the act of producing materials in response to a subpoena or other request implicates an individual's privilege against being compelled to incriminate themselves through testimony, and as such a so-called act-of-production immunity exists.  *See Fisher v. United States*, 425 U.S. 391, 410-11 (1976).  This immunity is based upon an individual's right against self-incrimination enshrined in the Fifth Amendment, and it precludes the government from compelling the production of records which, by implication both acknowledges "the existence of the papers demanded and their possession or control."  *Id. See also In re Grand Jury Subpoena Duces Tecum*, 670 F. 3d 1335, 1339-40 (11th Cir. 2012) (absent a grant of full use and derivative immunity, the government cannot compel a subject to decrypt his computer hard drives when decryption itself would be testimonial).  Moreover, Dr. Navarro is not a custodian of any responsive records such that his production of the same could not be used against him in a criminal proceeding. *See United States v. Dean*, 989 F.2d 1205, 1208-11 (D.C. Cir. 1993).

Absent any requirement within the PRA for presidential records to be produced by a date certain, and given the Dr. Navarro's important interest in protecting his rights under the Fifth Amendment, the United States fails to provide a sufficient justification for this Court to invade Dr. Navarro's constitutionally protected rights and force the production of any records within Dr. Navarro's possession, custody, or control.

Moreover, the United States' claims of replevin fail to state a claim upon which relief can be granted.  Of note, the PRA only places responsibility for the management of such records upon the President.  See 44 U.S.C. § 2203(a) ("*the President shall* take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law." (emphasis added)).

The only affirmative duty placed upon any employee of the President can be found in 44 U.S.C. § 2209, which requires covered employees to either copy an official email of the President, Vice President, or covered employee on the original "creation or transmission" of the record, or to forward such copy to an official email within 20 days after the creation of the record, but only provides that any failure to do so as a basis for an adverse employment action while employed in that government position.  *Id.* at (a)(1)-(2), (b).  The United States, however, seeks to use the Act's very limited applicability to impose on Dr. Navarro duties that exceed the scope of the Act.  Compl. ¶ 48.

Congress purposely did not create an enforcement mechanism for the PRA.  *See Citizens for Responsibility & Ethics in Wash. v. Trump*, 302 F. Supp. 3d 127, 129-30 (D.D.C. 2018) (interpreting Congress's refusal to include an enforcement provision in the PRA and refusal to create a private right of action as a deliberate decision meant to reflect the "legislative balancing" between ensuring that presidential records, "are preserved so that the public would have access to them after the President leaves office[,]" while also, "minimiz[ing] outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive

Navarro000034

branch control over presidential records during the President's term in office."  The Court notes that Congress deliberately "chose not to create a private right of action to enforce [PRA]."); *see also Armstrong v. Bush*, 924 F.2d 289, 290 (D.C. Cir. 1991) (acknowledging Congress's purposeful decision to not include an enforcement mechanism in PRA).

Confronted with the lack of an enforcement mechanism within the statutory framework of the PRA, the United States here seeks to force a production of records by Dr. Navarro through an action in replevin.  Generally, replevin is an action bought for, "recovery of possession of wrongfully taken property and damages incidental to detention."  *See Ellipso, Inc. v. Mann*, 541 F. Supp. 2d 365, 376 n. 5 (D.D.C. 2008) (citing *Wardman-Justice Motors v. Petrie*, 39 F.2d 512, 515 (D.C. Cir. 1930).  *See also Replevin*, BLACK'S LAW DICTIONARY, 2ND ED. ("A personal action ex delicto brought to recover possession of goods unlawfully taken, (generally, but not only, applicable to the taking of goods distrained for rent,) the validity of which taking it is the mode of contesting, if the party from whom the goods were taken wishes to have them back in specie, whereas, if he prefer to have damages instead, the validity may be contested by action of trespass or unlawful distress. The word means a redelivery to the owner of the pledge or thing taken in distress.").

Courts in this Circuit considering a claim of replevin under the D.C. Code look to D.C. law, rather than any federal common law, to determine whether a party has stated a viable replevin claim.  *BMO Harris Bank N.A. v. Dist. Logistics*, LLC, 2021 U.S. Dist. LEXIS 255094 at *7 (D.D.C. Jul. 23, 2021).  In the District of Columbia, replevin is a cause of action, "brought to recover personal property to which the plaintiff is entitled, that is alleged to have been wrongfully taken by or to be in the possession of and wrongfully detained by the defendant[.]  *BMO*, 2021 U.S. Dist. LEXIS 255094 at *7-8 (quoting *Hunt v. DePuy Orthopaedics, Inc.*, 729 F.

Supp. 2d 231, 232 (D.D.C. 2010) (citing D.C. Code § 16-3701))). The D.C. Code however, has very specific pleading requirements and § 16-3702 provides that claim for replevin must state that:

> The plaintiff sues the defendant for (wrongly taking and detaining) (unjustly detaining) the plaintiff's goods and chattels, to wit: (describe them) *of the value of [specified amount of] dollars*. And the plaintiff claims that the same be taken from the defendant and delivered to him; or, if they are eloigned, *that he may have judgment of their value and all mesne profits and damages, which he estimates at [specified amount of] dollars, besides costs.*

D.C. Code § 16-3702 (emphasis added).

The United States first attempts to avoid the requirement of D.C. Code § 16-3702 by asserting, "[t]he monetary value of the documents cannot currently be determined because Defendant is the only one with access to the contents of all of the Presidential records on his non-official email and/or electronic messaging accounts." Compl. ¶ 43. Further, the United States contends that, "the United States cannot estimate the amount of mesne profits and damages, if any, because Defendant is the only one with access to all of the Presidential records on his nonofficial email and/or electronic message accounts." *Id.* at ¶ 43, n. 1. Put differently, the United States concedes that the alleged presidential records at issue do not have a monetary value calculable on their own. Courts in this Circuit have strictly construed the requirements in D.C. Code §§ 16-3702 through 16-3704. *See BMO*, 2021 U.S. Dist. LEXIS 255094 at *7-9 (dismissing an otherwise successful replevin action for failure to strictly adhere to the requirements of D.C. Code §§ 16-3702 through 16-3704 when seeking a writ of replevin).

In addition, while no Court has addressed whether an email is "personal property" under the D.C. statute, Courts in this circuit have interpreted "personal property" to include intangible rights. *See Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 143 (D.D.C. 2008) (denying a replevin claim to recover frequent flyer miles from an airline, because such miles were an intangible right

and thus were not "personal property").  To that end, the United States does not allege that Dr. Navarro has seized and detained the records in question: rather, the Complaint alleges that Dr. Navarro was the proper recipient or creator of these records at the time they were created, and now that the United States has identified them as being emails which Dr. Navarro must turned over, Dr. Navarro has begun to audit his email account to return such documents.  This distinction further demonstrates the inapplicability of replevin as a cause of action.  Based on the information contained herein, the Complaint should be dismissed.

Finally, the United States pleads in the alternative some vague federal common law action of replevin that purportedly requires the return of the alleged emails that are the property of the United States.  See Compl. ¶¶ 39-51.  But the United States does not provide for any specific federal common law it contends applies to Dr. Navarro, and thus its claim must be dismissed as baseless legal conclusions masquerading as factual allegations.

## CONCLUSION

For the foregoing reasons, Dr. Navarro respectfully requests this Court dismiss the instant Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

[SIGNATURE ON NEXT PAGE]

Dated: October 11, 2022                    Respectfully submitted,


       */s/ Stanley E. Woodward, Jr.*
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD LAW, LP
1808 Park Road NW
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel for Defendant Peter K. Navarro*

## <u>CERTIFICATE OF SERVICE</u>

On October 11, 2022, the undersigned hereby certifies that a true and correct copy of the

foregoing was electronically filed and served via the CM/ECF system, which will automatically

send electronic notification of such filing to all registered parties.

*/s/ Stanley E. Woodward, Jr.*

Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD LAW, LP
1808 Park Road, Northwest
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:22-cv-02292-CKK** |
| | ) | |
| **PETER K. NAVARRO,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT PETER K. NAVARRO'S OPPOSITION TO THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

The narrow question before the Court is whether the Presidential Records Act ("PRA"), 44 U.S.C. §§ 2201-2209, provides the United States with any vehicle by which to compel the provision of records it concludes are subject to the Act. The Act, however, provides no such vehicle because Congress did not intend for the United States to utilize the PRA as a weapon as against those persons who become political opponents of the current administration by virtue of their past service. In this case, Dr. Navarro was one of the longest-tenured members of Donald Trump's Presidential Administration, serving from January 20, 2017, through January 20, 2021, as the Director of the National Trade Council and as the Director of the office of Trade and Manufacturing Policy coordinator in furtherance of the United States' response to the coronavirus pandemic. Now, the current administration has weaponized the PRA by seeking to compel his production of records that the United States knows would inculpate him with respect to accusations of willful noncompliance with congressional subpoenas concerning those same records.

## I.    FACTUAL BACKGROUND

The United States provided a list of facts and presented them as, "not in dispute." *See* Defendant's [sic] of Material Facts Not in Dispute, ECF No. 7-2.[1]  The facts propounded by the United States, however, are immaterial to the United States' proffered causes of action.  Rather, the United States' "undisputed" facts present a record that establishes that Dr. Navarro held numerous positions in Donald Trump's White House; was subject to the Presidential Records Act ("PRA"), 44 U.S.C. §§ 2201-2209, to some extent; may or may not currently possess documents that are subject to the PRA; and has taken efforts to engage in an audit of his email to determine if he is actually in possession of "Presidential records" as defined under PRA and provided the United States with frequent updates of the audit process.

The United States also misrepresents the nature of Dr. Navarro's final correspondence before the commencement of this action.  The United States has portrayed Dr. Navarro's actions as the purposeful withholding of documents that belong to the United States in exchange for a grant of immunity. *See* Plaintiff's Memorandum in Support of Motion for Summary Judgment, ECF No. 7-1, at 7.  However, Dr. Navarro's correspondence with the United States clearly does not communicate this.  In contrast, on July 29, 2022, Dr. Navarro, through counsel, informed the United States that the audit for any presidential records that may be in Dr. Navarro's possession was still ongoing.  In addition, Dr. Navarro advised that because of the act-of-production privilege, the production of any such records could inculpate Dr. Navarro in related criminal proceedings.  Indeed, at the time of this representation, Dr. Navarro had been indicted for contempt of congress because he allegedly failed to properly respond to a congressional

---

[1] As a threshold matter, although likely an honest mistake, the United States submitted their statement of material facts but attributed them to "Defendant."

subpoena.  In addition, Dr. Navarro potentially remained the subject of investigation by the

House of Representatives Select Subcommittee to Investigate the Coronavirus Crisis ("the

Subcommittee").  Therefore, Dr. Navarro reasonably believed the production of records to the

United States risked the implication of his Fifth Amendment right against self-incrimination.

The reasonableness of this concern is evidenced by the United States' own admission that this

action resulted from disclosures made by the Subcommittee as to the supposed existence of

Presidential records allegedly contained on Dr. Navarro's personal email.  July 29, 2022

Correspondence attached as Exhibit A.  See also ECF No. 7-1, at 5 ("Through the

Subcommittee's work, NARA became aware of Dr. Navarro's [alleged] use of a non-official

email account to send and receive emails in the course of conducting official business").

     The United States seeks to assert that the PRA creates such an obvious distinction as to

what entails presidential records that should be turned over to the Archivist of the National

Archives and Records Administration ("the Archivist") and that Dr. Navarro pursuing an audit

that lasts longer than roughly a month is unreasonable.  Such an assertion is simply inaccurate

because the statute's definitions are vague and expansive, and require more than simply

searching through and finding a few terms.[2]

     Further, the United States provided its own search terms to Dr. Navarro in an effort to

streamline the audit.  Dr. Navarro included these terms in a subsequent search and did reveal the

potential existence of some Presidential records; but now the United States seeks to claim that

---

[2] See 44 U.S.C. 2201(1)-(3) (providing definitions of terms "documentary material," "Presidential records" and
"personal records").  The only "documentary materials" that must be turned over to the Archivist are "Presidential
records," but even documents that may otherwise be related to the official duties of Presidential staff need not be
produced to the Archivist if they are political activities that do not relate to the carrying out of the President's
constitutional, statutory, or other official or ceremonial duties.  Further, personal records need not be turned over and
are defined as "documentary materials, or any reasonably segregable portion thereof, of a purely private or
nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or
other official ceremonial duties of the President."

Navarro000042

the search run with their specific terms was based on "underinclusive search terms." ECF 7-1, at 8. Effectively, the United States knew that such an audit would take a long time to make determinations as to whether materials actually were presidential records subject to PRA, and when the audit was not complete within two months the United States filed an unnecessary, rushed, and baseless complaint.

## II.   LEGAL STANDARD

The court may grant summary judgment where, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Moore v. Hartman*, 571 F.3d 62, 66, 387 U.S. App. D.C. 62 (D.C. Cir. 2009). A court considering a motion for summary judgment must draw all, "justifiable inferences" from the evidence in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To defeat a motion for summary judgment, the nonmovant must provide, "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

## III.   ARGUMENT

### a.   The Statute Does Not Make Dr. Navarro Responsible for the Management and Custody of Presidential Records, Nor Does it Set a Hard Deadline for When Any Presidential Records Must Be Turned Over

As a threshold matter, the PRA's section on the management and custody of Presidential records primarily applies to only the President and to the Archivist. *See* 44 U.S.C. § 2203(a), (f), (g). The only portion of this section that theoretically may apply to Dr. Navarro states that any documentary materials an employee produces or receives shall be categorized as Presidential

records or personal records upon their creation or receipt and be filed separately. *Id.* at (b).

However, it is still the President that must implement the records management controls, meaning

that Dr. Navarro's statutory duties under this section are basically nonexistent. *Id.* at (a)-(b).

Similarly, the United States' provides no support for its theory that the PRA has any hard

deadline by which records are to be provided to the Archivist. *See* ECF 7-1, at 3 (citing 44

U.S.C. § 2203 for the proposition that, "Presidential records. . . are required to be turned over to

NARA no later than the end of the administration"). The PRA, however, plainly provides no

such deadline: instead, the relevant section states only that once a President leaves office, "the

Archivist of the United States shall assume responsibility for the custody, control, and

preservation of, and access to, the Presidential records of that President [and] [t]he Archivist

shall have an affirmative duty to make such records available to the public as rapidly and

completely as possible consistent with the provisions of this chapter." 44 U.S.C. § 2203(g)(1).

Therefore, any assertion that Dr. Navarro has missed some deadline to turn over documents that

makes his current alleged possession of Presidential records as "wrongful withholding" is

incorrect. As was stated in his Motion to Dismiss, Dr. Navarro remains adamant that he will turn

over any Presidential records in his possession once the audit is complete and any risk that such a

production serves to incriminate him has been alleviated.

> **b. The Statute is Ambiguous, and Most of the Statutory Sections in the PRA Have Not Been Interpreted by a Court**

The United States relies almost exclusively on its own interpretation of the applicability

of 44 U.S.C. 2209, a section of the PRA that no court has ever cited, let alone interpreted. The

section at issue states the following:

> Disclosure requirement for official business conducted using non-official electronic
> messaging accounts. (a) In General.- The President, the Vice President, or a covered

employee[3] may not create or send a Presidential or Vice Presidential record using a non-official electronic message account unless the President, Vice President, or covered employee- (1) copies an official electronic messaging account of the President, Vice President, or covered employee in the original creation or transmission of the Presidential record or Vice Presidential record; or (2) forwards a complete copy of the Presidential or Vice Presidential record to an official electronic messaging account of the President, Vice President, or covered employee not later than 20 days after the original creation or transmission of the Presidential or Vice Presidential record.

2209(a)(1)-(2).  It must be noted that this section only provides that, for *intentional* violations of subsection (a) of 2209 by a covered employee, the only action that may result is a disciplinary action in accordance with subchapter I, II, or V of Chapter 75 of Title 5.  *See id.* at (b).

The United States' reliance on this subsection is problematic for two reasons: first, the United States seeks to assert that this section would have affirmatively required that Dr. Navarro must forward documents he *received* on his personal email from others.  However, the statute in this section only states that the reporting requirements of subsections (a)(1) or (a)(2) must happen if the covered employee uses a non-official electronic message account to "create or send" Presidential records.  The United States has provided no evidence to demonstrate that "create or send" also means "receive", and Section 2201(2) defines Presidential records to include documentary materials "created or received," Congress's choice to not include the term "receive" in Section 2209 at the very least casts ambiguity on whether it applies to when an email is received.  This distinction is important, because the United States alleges that some of his alleged violations of PRA are the receipt of emails on a personal email.  ECF 1 Exhibit 2, at pp. 4-11, 20.

Second, the applicability of section 2209 is unclear, as the section was only added with in 2014 and it has yet to be interpreted by the Courts.  Further, the only reference to any

---

[3] Dr. Navarro concedes that, based on the definitions contained in this section, he is a covered employee subject to this section.  See 2209(c)(1)(A)-(D).

consequence for violating this section is that it may be used as a basis for disciplinary action.  If Dr. Navarro did violate section 2209, it was not intentional, and the United States has produced no evidence to suggest otherwise.  Further, even if it was intentional Dr. Navarro argues that the only purpose for which 2209 can be used is as a basis for discipline of covered federal employees who intentionally fail to follow Section 2209(a)(1)-(2), and Dr. Navarro is no longer a United States employee so he may not be subject to discipline at this time.

Because Section 2209 is entirely vague as to its applicability to emails which were *received* on a personal email account, and as to whether a violation of 2209(a) is intended as anything beyond a basis for disciplinary action, there exist genuine disputes of material fact as to whether any alleged actions Dr. Navarro engaged in were even a violation of PRA.

### c.   Replevin is Not the Proper Action

The United States asserts, again without citing substantive case law, that the action of replevin is clearly the appropriate method for returning the supposed "wrongfully withheld" presidential records.  Setting aside the obvious observation that Congress itself did not include any vehicle by which the United States could seek the return of such records, nearly every single case cited by the United States is either distinguishable from this action or poses more questions than it answers.

The United States cites dicta from *Hunt v. DePut Orthopaedics, Inc.*, 729 F. Supp. 2d 231 (D.D.C. 2010), which ultimately held that the property at issue had been abandoned, and thus could not be subject to wrongful withholding required for a replevin action.  Similarly the United States cites dicta from *United States v. Zook[4]* and *United States v. McElvenny,* for the proposition that replevin is an appropriate action under these facts and circumstances.  In *McElvenny*, 2003

_____

[4] Multiple searches for *United States v. Zook* and the attached case number turned up completely unrelated actions, and the United States did not cite to a year as to which this action occurred.

U.S. Dist. LEXIS 4792 (S.D.N.Y. Mar. 31, 2003), however, the United States sued a private

collector for a map previously owned by President John F. Kennedy.  The court in *McElvenny*

did not analyze replevin or find that it was an appropriate action, and instead denied a motion to

dismiss the action on the basis that President Kennedy's deed was a valid instrument and clearly

demonstrated President Kennedy's intent to provide the map as a gift to the United States United

States.  *McElvenny*, 2003 U.S. Dist. LEXIS 4792, at * 11-12.  Once again, the analytical value of

this case as non-binding dicta that fails to provide any insight into a replevin action is minimal.

The United States' motion for summary judgment is analytically incomplete as to why a

replevin action is an appropriate way for the United States to seek emails that may or may not

exist: even if the United States could prove that Dr. Navarro was willfully withholding United

States property, the cause of action of replevin requires very specific mechanisms which the

United States frankly fails to address or readily admits it does not meet.  As stated throughout

this process, any Presidential records that may be in Dr. Navarro's possession are retained as a

result of an innocent oversight and therefore not willful, and as soon as any Presidential records

are identified and the risk of incrimination is passed, Dr. Navarro will happily turn these

documents over to the Archivist.

Further, as discussed in Dr. Navarro's Motion to Dismiss the Complaint, while the D.C.

Courts have distinguished that replevin applies to personal property, the United States has

provided no case law to suggest that emails are personal property that would subject them to a

replevin action.  Further, there is case law that suggests that personal property is more

complicated than "anything that is not real property."  *See Ficken v. AMR Corp.*, 578 F. Supp. 2d

134, 143 (D.D.C. 2008) (denying a replevin claim for frequent flyer miles from an airline,

because an intangible right was not "personal property").  Without precedent to support the

proposition, the United States asserts that the only distinction that matters in a replevin action is that if an item is not real property, then it is personal property and can be recovered via replevin. ECF 007-1, at 9 n. 4.  Yet, the United States also readily admits that the emails sought do not have the underlying monetary value or mesne profits or damages, and that the records are sought not for any monetary value they may possess.  Complaint, ECF 1, ¶ 43.  *Id.* at ¶ 43 n. 1.  Courts in this District have strictly construed such monetary calculations as a requirement for sustaining a replevin action.  *See BMO Harris Bank N.A. v. Dist. Logistics, LLC*, 2021 U.S. Dist. LEXIS 255094 at *7 (D.D.C. Jul. 23, 2021) (dismissing an otherwise successful replevin action for failure to strictly adhere to the requirements of D.C. Code §§ 16-3702 through 16-3704 when seeking a writ of replevin).

### d.  Federal Common Law is Narrow and Does Not Apply Here to Save the United States' Complaint

The United States' last-ditch effort to save its flawed complaint is based on *Boyle v. United States Techs. Corp.*, 487 U.S. 500 (1988), which the United States argues allows the Court to use federal common law to create a quasi-replevin action.  The United States seeks to portray the use of federal common law as broad when it involves matters of the federal Untied States, however this cuts against the exact language of the court's opinion in *Boyle*: "we have emphasized that federal common law can displace state law in few and restricted instances[,]" and limits such instances to areas where Congress has expressively given the courts power to develop substantive law, and areas where federal common law would be necessary to protect "uniquely federal interests."  *Boyle*, 487 U.S. at 504 (quoting *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)).

The United States cites no case law to suggest that Congress has given the courts power to create law meant to supersede an audit of a former United States employee's emails where the

United States suspects that the employee may have Presidential records subject to the PRA.

Further, the United States only asserts that this complaint involves uniquely federal interests, and

cites that the PRA requires NARA "make [Presidential] records available to the public as rapidly

and completely as possible consistent with the provisions of this chapter."  ECF 7-1, at 10.  Their

arguments makes clear that they are subject to the provisions of 44 USC § 2201-2209 to achieve

their purposes under the PRA, that no case law exists where a court used federal common law to

grant an action under PRA, and that they have nothing beyond their assertion that this complaint

involves uniquely federal interests to such an extent that it would require this Court to effectively

make law to grant the United States the relief sought in the complaint.

### e.   The Act-of-Production Privilege

As has been stated herein, the timing and events of this action, his contempt of congress

indictment, and of the Subcommittee's disclosures led Dr. Navarro to reasonably believe that the

Executive and Legislative Branches were coordinating their efforts so as to ultimately affect Dr.

Navarro's penal interest.  Dr. Navarro outlined his concerns in correspondence to Gary Stern,

General Counsel for NARA, on July 29, 2022.  Specifically, Dr. Navarro advised of his request

for immunity based upon an assertion of the "act of production privilege," which protects the

interests of an individual in providing materials in response to a subpoena that may affect the

individual's right against self-incrimination.  In response, the United States filed the instant

action.  Thus, while the United States' Complaint would suggest that this action concerns a

straightforward request for the "return of Presidential records," it is in fact far more complex.

Here, Dr. Navarro has asserted a privilege validly delaying the time within which he must

produce the records sought by the Archivist.  The Supreme Court has recognized that the act of

producing materials in response to a subpoena or other request implicates an individual's

privilege against being compelled to incriminate themselves through testimony, and as such a so-called act-of-production immunity exists.  *See Fisher v. United States*, 425 U.S. 391, 410-11 (1976).  This immunity is based upon an individual's right against self-incrimination enshrined in the Fifth Amendment, and it precludes the United States from compelling the production of records which, by implication both acknowledges "the existence of the papers demanded and their possession or control."  *Id. See also In re Grand Jury Subpoena Duces Tecum*, 670 F. 3d 1335, 1339-40 (11th Cir. 2012) (absent a grant of full use and derivative immunity, the United States cannot compel a subject to decrypt his computer hard drives when decryption itself would be testimonial).  Moreover, Dr. Navarro is not a custodian of any responsive records such that his production of the same could not be used against him in a criminal proceeding. *See United States v. Dean*, 989 F.2d 1205, 1208-11 (D.C. Cir. 1993).

## CONCLUSION

For the foregoing reasons, Dr. Navarro respectfully requests the Court deny the United States' Motion for Summary Judgment and enter judgement in favor of Dr. Navarro.

[SIGNATURE ON NEXT PAGE]

Dated: October 21, 2022     Respectfully submitted,

            */s/ Stanley E. Woodward, Jr.*
           Stan M. Brand (D.C. Bar No. 213082)
           Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
           Mark N. Nobile (D.C. Bar No. 1780761)
           BRAND WOODWARD LAW, LP
           1808 Park Road NW
           Washington, DC  20010
           202-996-7447 (telephone)
           202-996-0113 (facsimile)
           Stanley@BrandWoodwardLaw.com

           *Counsel for Defendant Peter K. Navarro*

Navarro000051

## <u>CERTIFICATE OF SERVICE</u>

On October 21, 2022, the undersigned hereby certifies that a true and correct copy of the

foregoing was electronically filed and served via the CM/ECF system, which will automatically

send electronic notification of such filing to all registered parties.

> */s/ Stanley E. Woodward, Jr.*
> Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
> BRAND WOODWARD LAW, LP
> 1808 Park Road, Northwest
> Washington, DC  20010
> 202-996-7447 (telephone)
> 202-996-0113 (facsimile)
> Stanley@BrandWoodwardLaw.com

Navarro000052

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:22-cv-02292-CKK** |
| | ) | |
| **PETER K. NAVARRO,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT PETER K. NAVARRO'S RESPONSE TO THE GOVERNMENT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 7(h)(1), Defendant Peter Navarro submits the following response to the Government's Statement of Material Facts.  The government's proffered facts will be provided in regular font accompanied by a number, and Dr. Navarro's response will be accompanied by a letter and bolded:

1.      Defendant Peter K. Navarro (Defendant) was employed by the White House Office in the Executive Office of the President from January 20, 2017, until January 20, 2021. See Trump White House, People, Peter Navarro, https://trumpwhitehouse.archives.gov/people/peter-navarro/; Navarro v. Pelosi, 1:22-cv-01519 (D.D.C.), Compl. ¶ 1 (Preliminary Statement filed by Peter K. Navarro) ("For the four years of the Trump administration, . . . [Mr. Navarro] served as a senior White House advisor to [then-] President Donald John Trump.").

   a.   **Undisputed**

2.      From approximately January 20, 2017, until approximately April 29, 2017, Defendant served as Assistant to the President, Director of Trade and Industrial Policy, and the inaugural head of the White House National Trade Council. See Trump White House, People, Peter Navarro, https://trumpwhitehouse.archives.gov/people/peter-navarro/.

      a. **Undisputed**

3.      From approximately April 29, 2017 until approximately January 20, 2021, Defendant

served as Assistant to the President and Director of the Office of Trade and Manufacturing

Policy (OTMP). See Trump White House, People, Peter Navarro,

https://trumpwhitehouse.archives.gov/people/peter-navarro/. "[I]n his role as Director of OTMP,

[Defendant] advise[d] the President on policies to increase economic growth, decrease the trade

deficit, and strengthen Americas' manufacturing and defense industrial bases." *Id.*

      a. **Undisputed**

4.      The Office of Trade and Manufacturing Policy existed within the White House Office.

*See* Presidential Executive Order on Establishment of Office of Trade and Manufacturing Policy

(Apr. 29, 2017), https://trumpwhitehouse.archives.gov/presidential-actions/presidential-

executive-order-establishment-office-trade-manufacturing-policy/).

      a. **Undisputed**

5.      In addition to those responsibilities noted in paragraphs 2-3 above, in March 2020, then-

President Donald J. Trump appointed Defendant to coordinate the government's use of the

Defense Production Act, 50 U.S.C. § 4501 *et seq.*, to respond to the COVID-19 pandemic. *See*

Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task

Force in Press Briefing (Mar. 28, 2020), https://trumpwhitehouse.archives.gov/briefings-

statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-

press-briefing-13/.

      a. **Undisputed**

Navarro000054

6.      By virtue of his positions and work described above in paragraphs 1-4, Defendant was on "the President's immediate staff" and/or "in a unit or individual of the Executive Office of the President whose function is to advise or assist the President." 44 U.S.C. § 2201(2).

      a.  **Undisputed**

7.      The Presidential Records Act (PRA), 44 U.S.C. § 2201 et seq., creates a framework for the preservation of certain records, termed "Presidential records" (Presidential records) by the statute, id. § 2201(2), created or received by the President, Vice President, and persons who advise and assist them.

      a.  **Undisputed**

8.      According to the PRA, the term "Presidential records" means, with certain conditions and exceptions, "documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2).

      a.  **Undisputed**

9.      E-mail and other electronic messages, including electronic messages sent and received on non-official electronic message accounts, constitute Presidential records to the same extent as hard copy documents. 44 U.S.C. §§ 2201, 2209.

      a.  **Disputed only to the extent that the statute is vague as to how and to what extent it applies to email records, which is discussed in Dr. Navarro's**

**opposition.  Dr. Navarro does not dispute, however, that e-mail and other**

**electronic messages can constitute Presidential records.**

10.    The PRA requires the President, Vice President, and "covered employee[s]" to "cop[y]" their "official electronic messaging account" when sending a communication using a non-official account or to "forward[] a complete copy" of an email sent on their non-official account to their "official electronic messaging account . . . not later than 20 days after the original creation or transmission" of the record. 44 U.S.C. §§ 2209(a)(1), (a)(2). "Covered employee[s]" include, inter alia, "the immediate staff of the President" and "a unit or individual of the Executive Office of then President whose function is to advise and assist the President." *Id.* § 2209(c)(1).

     a.  **Undisputed**

11.    In February 2017, the White House Counsel's Office issued a memorandum to White House personnel regarding the use of non-official email accounts to conduct official business, writing: "If you ever send or receive email that qualifies as a presidential record using any other account [i.e., other than the official government account], you must preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days." Compl. Ex. 1 at 2, ECF No. 1-2 (Memorandum for All Personnel, from Deputy White House Counsel Stefan C. Passantino, through Counsel to the President Donald F. McGahn (Feb. 22, 2017)) (WHCO Memorandum)).

     a.  **Disputed only to the extent that the memorandum interprets the law more**
         **broadly than the language of 44 U.S.C. 2209(a) in that it states that emails**
         **which are received must be forwarded to a government account.**

12.    The United States "retain[s] complete ownership, possession, and control of Presidential records." 44 U.S.C. § 2202.

   a.   **Undisputed**

13.    At the end of a presidential administration, the Archivist of the United States is, under the

PRA, required to "assume responsibility for the custody, control, and preservation" of

Presidential records and to "make such records available to the public as rapidly and completely

as possible consistent with the provisions of this chapter." 44 U.S.C. § 2203; Compl. Ex. 4 at ¶¶

2-3, ECF No. 1-5 (Declaration of William J. Bosanko).

   a.   **Undisputed**

14.    While serving in the White House, Defendant used at least one non-official email

account—an account hosted by the non-official service ProtonMail—to send and receive

messages constituting Presidential records. See Compl. Ex. 2, ECF 1-3 (emails to/from

Defendant's ProtonMail account); *accord* Bosanko Decl. ¶ 6. Some of these emails were

obtained by the House Select Subcommittee on the Coronavirus Crisis (the Subcommittee) as

part of its investigation into the government's response to the coronavirus pandemic. *See* Select

Subcommittee on the Coronavirus Crisis, Select Subcommittee Releases New Evidence Of

Trump Administration Failure To Heed Early Pandemic Warnings: New Documents Show that

Peter Navarro and other Trump Administration Advisors Used Private Email Accounts to

Communicate about Pandemic Response (Sept. 14, 2021),

https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/9.14.21%20Navarro%

20Document%20Release.pdf) ; *see also Compl.* Ex. 2, ECF 1-3.

   a.   **Undisputed.**

15.    Defendant did not copy each email or message constituting Presidential records that was

sent or received on his non-official account or accounts to his official government email account.

Bosanko Decl. ¶ 5.

      a. **Disputed in that the statute is vague as to whether the receipt of emails on a personal account creates a Presidential record and/or whether and to what extent the emails received on Dr. Navarro's email account were ever Presidential records.  An audit is ongoing to determine the emails responsive to NARA's correspondence.**

16.    Defendant continues to have Presidential records in his possession, custody, and/or control. Bosanko Decl. ¶¶ 6-10 & Attachment A (July 29, 2022 letter from John S. Irving to Gary M. Stern) (acknowledging continued possession, custody, and/or control).

      a. **Disputed in that the audit of Dr. Navarro's email is ongoing, so the extent of whether or what Presidential records are in his possession, custody, and/or control is unknown at this time.**

<div align="center">[SIGNATURE ON NEXT PAGE]</div>

<div align="center">6</div>

Dated: October 21, 2022                     Respectfully submitted,

       */s/ Stanley E. Woodward, Jr.*
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD LAW, LP
1808 Park Road NW
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel for Defendant Peter K. Navarro*

Navarro000059

# EXHIBIT A

Navarro000060

![E&W LAW - SOLUTIONS FOR BUSINESS & THE PLANET]

John S. Irving
E&W Law
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
301-807-55670
John.Irving@earthandwatergroup.com

July 29, 2022

Gary M. Stern, Esq.
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, Maryland 20740-6001
Via Email: garym.stern@nara.gov

     Re:    Peter K. Navarro

Dear Mr. Stern:

As discussed on Monday, July 25, we have been actively working to identify records within Mr. Navarro's possession, custody, and/or control that are potentially responsive to NARA's request. As you know, this effort has already involved a substantial investment of time and resources. Specifically, we have now completed the process of creating a forensic image of Mr. Navarro's cell phones and have also completed an extraction of records from Mr. Navarro's personal Protonmail account, all of which we will continue to preserve consistent with our ethical obligations.

During this process, the occurrence of several events causes us to question whether Mr. Navarro's procedural due process rights may be at risk of infringement. As you are aware, Mr. Navarro was first contacted by NARA on or about December 16, 2021, concerning your belief that Mr. Navarro may be in possession, custody, or control of records the subject of the Presidential Records Act, 44 U.S.C. § 2201 *et seq.*

In the meantime, as you are no doubt aware, Mr. Navarro has now been indicted for allegedly having failed to comply with a subpoena issued by the U.S. House Select Committee to Investigate the January 6th Attack on the United States Capitol. Mr. Navarro's response to that subpoena was informed by his interaction with the U.S. House Select Subcommittee on the Coronavirus Crisis, which apparently accepted Mr. Navarro's assertion of executive privilege in that he received no response to his last correspondence with the Subcommittee on December 14, 2021, in which he advised he could not comply with the subpoena due to his obligation to invoke executive privilege.

Several circumstances appear unlikely to be coincidental and give us concern about coordination between various government investigations and the protection of Mr. Navarro's constitutional rights. To start, NARA's initial letter to Mr. Navarro on December 16, 2021, came just one day after the return date for the Coronavirus Select Subcommittee's subpoena for records. We now believe NARA's initial request was precipitated by that Select Subcommittee. Then, on June 1, 2022, just one day prior to the return of the Department's indictment and after more than six months of inaction, Mr. Navarro received correspondence from Elizabeth Shapiro, Deputy

**Office Locations: Washington, DC • Atlanta, GA • Oklahoma City, OK • Tallahassee, FL**

Director of DOJ's Civil Division Federal Programs Branch, informing him of the Department's intent to file suit "for the recovery of wrongfully withheld documents."

Thereafter, on June 26, 2022, Mr. Navarro, though counsel, wrote the Department to request all discoverable materials in his criminal action pursuant to Rule 16 of the Federal Rules of Criminal Procedure and *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  Among other things, Mr. Navarro requested any communications as between the Department and the Coronavirus Select Subcommittee advising that all such communications were both exculpatory and material to Mr. Navarro's defense in that they support his understanding that executive privilege precluded his compliance with the subpoenas of both the Coronavirus Select Subcommittee and the January 6th Select Committee.  Then, *later that day*, the Coronavirus Select Subcommittee renewed its demand that Mr. Navarro comply with its subpoena – the first contact that Mr. Navarro (or his counsel) had had with the Subcommittee since a letter Mr. Navarro sent to the Subcommittee on December 14, 2021.  Further exacerbating our concerns is the fact that the Coronavirus Subcommittee's request was that Mr. Navarro comply with *NARA's* request that Mr. Navarro provide any records in his possession, custody, or control covered by the PRA.  In combination, any suggestion that this series of events is merely coincidental defies reason.

Put simply, we are concerned that the government is using the Presidential Records Act as a discovery tool, not only with respect to Mr. Navarro's ongoing criminal case, but with respect to broader investigations being conducted by both Congress and the Executive Branch.  While we acknowledge Mr. Navarro's obligations under the Presidential Records Act we also must acknowledge the conflict as between the Act and his rights under the Constitution, including the Fifth Amendment.

As you may be aware, the Supreme Court has recognized that the act of producing materials in response to a subpoena or other request implicates an individual's privilege against being compelled to incriminate themselves through testimony.  *See Fisher v. United States*, 425 U.S. 391, 410-11 (1976).  The so-called "act of production privilege" thus precludes the government from compelling the production of records which, by implication both acknowledges "the existence of the papers demanded and their possession or control." *Id.*  Moreover, Mr. Navarro is not a custodian of any responsive records such that his production of the same could not be used against him in a criminal proceeding.  *See United States v. Dean*, 989 F.2d 1205, 1208-11 (D.C. 1993).

Accordingly, in advance of any production of materials responsive to your request, we ask that the Department of Justice provide Mr. Navarro with act-of-production immunity with respect to any such production.  We reiterate our willingness to work with you to ensure Mr. Navarro's compliance with the Presidential Records Act, and we appreciate your prior assistance in providing search parameters to better target relevant information.  We also against confirm that we have forensically preserved Mr. Navarro's records, and they will be available for production when we receive assurances from the government that any such production does not infringe on his fundamental Constitutional procedural rights.

Navarro000062

Very truly yours,

E&W Law

By:   _/s/ John S. Irving_____
        John S. Irving

cc:

Justin Sandberg, Esq.
U.S. Department of Justice
Federal Programs Branch, Civil Division
Washington, D.C. 20530
Via Email: justin.sandberg@usdoj.gov

Lee Reeves, Esq.
U.S. Department of Justice
Federal Programs Branch, Civil Division
Washington, D.C. 20530
Via Email: lee.reeves2@usdoj.gov

John P. Rowley III, Esq.
SECIL Law
Via Email: jrowley@secillaw.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

*Plaintiff,*

–v.–

PETER K. NAVARRO,

*Defendant.*

Case No. 1:22-cv-2292

**PLAINTIFF'S COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY**
**JUDGMENT & OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Navarro000064

## **TABLE OF CONTENTS**

INTRODUCTION......................................................................................................1

ARGUMENT...........................................................................................................2

I.     There Are No Genuine Disputes of Material Fact.................................................2

II.    The United States Is Legally Entitled to the Return of Presidential Records..............................4

       A.    Dr. Navarro's legal arguments regarding his responsibilities under the PRA are irrelevant to this case.........................................................4

       B.    Dr. Navarro's legal arguments regarding his responsibilities under the PRA are also incorrect. ...........................................................5

       C.    The PRA does not permit Dr. Navarro to hold onto Presidential records indefinitely. ...............................................................8

       D.    Replevin is a proper action for the recovery of wrongfully withheld Presidential records....................................................10

       E.    To the extent that the D.C. replevin statute would not permit the recovery of the records, federal common law is available as an alternative.........................15

III.   Defendant's Act of Production Privilege Assertion is Meritless....................................16

       A.    Dr. Navarro fails to carry his burden to establish the requisite elements of the privilege. ................................................................17

       B.    On the merits, Dr. Navarro's claim of privilege fails.........................................18

CONCLUSION.......................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Armstrong v. Bush,*
   924 F.2d 282 (D.C. Cir. 1991).................................................................20

*Armstrong v. Exec. Office of the President,*
   1 F.3d 1274 (D.C. Cir. 1993).................................................................11

*Baltimore City Dep't of Social Servs. v. Bouknight,*
   493 U.S. 549 (1990) .............................................................................20

*Bayview Loan Servicing, LLC v. McNaughton,*
   No. 2:05-cv-254, 2007 WL 2433996 (W.D. Mich. 2007)....................17

*BMO Harris Bank N.A. v. Dist. Logistics, LLC,*
   No. 20-cv-03425, 2021 WL 7448012 (D.D.C. 2021)...........................13

*Bordelon v. Chicago Sch. Reform Bd. of Trustees,*
   233 F.3d 524 (7th Cir. 2000)....................................................................3

*Boyle v. United Techs. Corp.,*
   487 U.S. 500 (1988) .............................................................................15

*Chefs Diet Acquisition Corp. v. Lean Chefs, LLC,*
   No. 14-cv-8467, 2016 WL 5416498 (S.D.N.Y. 2016)..........................12

*Curcio v. United States,*
   354 U.S. 118 (1957) .............................................................................18

*Ficken v. AMR Corp.,*
   578 F. Supp. 2d 134 (D.D.C. 2008).................................................11, 12

*Fisher v. United States,*
   425 U.S. 391 (1976) .........................................................................16, 17

*Grosso v. United States,*
   390 U.S. 62 (1968)...............................................................................20

*Hinson ex rel. N.H. v. Merritt Educ. Ctr.,*
   579 F. Supp. 2d 89 (D.D.C. 2008).........................................................3

*Hoffman v. United States,*
   341 U.S. 479 (1951) .............................................................................17

*Hopkins v. West,*
   229 P.3d 560 (Okl. Civ. App. 2009) ....................................................14

Navarro000066

*In re Grand Jury Subpoena Dated Feb. 2, 2012*
   741 F.3d 339 (2d Cir. 2013) ............................................................20

*In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*
   670 F.3d 1335 (11th Cir. 2012) ...............................................18, 19

*In re Grand Jury Subpoena Duces Tecum Dated October 29, 1992*
   1 F.3d 87 (2d Cir. 1993) ..............................................................19

*In re Grand Jury Subpoena,*
   973 F.2d 45 (1st Cir. 1992) ..........................................................17

*Judicial Watch, Inc. v. Nat'l Archives & Records Admin.,*
   845 F. Supp. 2d 288 (D.D.C. 2012) ...........................................10

*Nixon v. United States,*
   978 F.2d 1269 (D.C. Cir. 1992) ............................................11, 15

*SEIU Healthcare Nw. Training P'ship v. Evergreen Freedom Found.,*
   427 P.3d 688 (Wash. Ct. App. 2018) ..........................................12

*Shapiro v. United States,*
   335 U.S. 1 (1948) .........................................................................20

*United States v. Dean,*
   23 F. App'x 448 (6th Cir. 2001) .................................................18

*United States v. Fridman,*
   974 F.3d 163 (2d Cir. 2020) .................................................16, 18

*United States v. Greenfield,*
   831 F. 3d 106 (2d Cir. 2016) ......................................................19

*United States v. Hubbell,*
   530 U.S. 27 (2000) ......................................................................17

*United States v. McElvenny,*
   No. 02-cv-3027 (S.D.N.Y. 2002) ..........................................10, 11

*United States v. Zook,*
   No. 1:12-cv-01465 (D. Md. 2012) ..............................................10

## Statutes

44 U.S.C. § 2201(2) ..........................................................................4, 6

44 U.S.C. § 2202 .........................................................................5, 11, 20

44 U.S.C. § 2203 ...........................................................................6, 20

44 U.S.C. § 2209 ..........................................................................................6, 7, 8

D.C. Code § 16-3701 ........................................................................................5, 10

D.C. Code § 16–3702 ......................................................................................12, 13

**Rules**

D.D.C. Local Civil Rule 7(h) ................................................................................2

Fed. R. Civ. P. 56(a) ..............................................................................................2

**Legislative Materials**

H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. 2 (1978) ....................................20

**Other Authorities**

66 Am. Jur. 2d Replevin § 1 ................................................................................13

66 Am. Jur. 2d Replevin § 6 ................................................................................12

Black's Law Dictionary (11th ed. 2019) ......................................................11, 13

U.S. Dep't of Justice, *Government Announces Settlement Over Nixon Presidential Papers* (June 12, 2000), https://www.justice.gov/archive/opa/pr/2000/June/336civ.htm ........................................................15

## **INTRODUCTION**

In its Motion for Summary Judgment, the Government argued that Defendant Peter J. Navarro failed to comply with his obligations under the Presidential Records Act (PRA) and that he continues to retain an unknown number of "Presidential records" that belong to the United States. Dr. Navarro does not dispute the core facts underlying the Government's motion. Indeed, Dr. Navarro acknowledges in his opposition that Presidential records belong to the United States, that he served as a Presidential advisor subject to the PRA, that he used at least one non-governmental email account to send and receive messages constituting Presidential records, and that he failed to preserve such emails by forwarding or copying them to his official government email account. And although Dr. Navarro claims that he is unaware of the extent of the Presidential records in his possession, he notably does not deny that he possesses at least certain Presidential records that he has not returned to the United States.

The only disputes are of a legal nature. Dr. Navarro contends that the PRA imposed no duties on him and that the PRA does not entitle the Government to file an action to recover documents. But regardless of whether the PRA imposed specific duties on Dr. Navarro (which it did), it is undisputed that the PRA vests complete ownership, possession, and control of Presidential records in the United States, and thus that any Presidential records in Dr. Navarro's possession belong to the United States. Replevin provides the mechanism for recovering this wrongfully withheld property.

Dr. Navarro further argues that even if he must return the Presidential records in his possession, he need not do so for the foreseeable future because the act of returning such records would constitute self-incrimination in violation of the Fifth Amendment. But Dr. Navarro has not met his burden to demonstrate why producing Presidential records would incriminate him. It would not incriminate Dr. Navarro to confirm that he has Presidential records, not least because he has already admitted that he possesses them. Even were that not the case, the Fifth Amendment does not apply to records that are "vested with a public character" and are required to be maintained by law.

None of the Defendant's arguments defeats the core of the Government's complaint—that Dr. Navarro has wrongfully retained Presidential records that belong to the United States and that the United States is entitled to the return of such records. Accordingly, the Court should reject Dr. Navarro's continued efforts to evade his PRA responsibilities; deny Defendant's Motion to Dismiss; grant the Government's Motion for Summary Judgment; issue a writ of replevin; and order the return of all Presidential records in Dr. Navarro's possession to the United States.

## ARGUMENT

### I.   There Are No Genuine Disputes of Material Fact.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1] Here, there are no material facts in dispute, so the case can be decided as a matter of law. Indeed, shortly after Dr. Navarro filed his Motion to Dismiss, the Court observed that "it appears that the dispute between the parties is purely legal in nature," and Dr. Navarro's subsequent filings confirm that view. Oct. 12, 2022 Minute Order.

The Government's Statement of Material Facts Not in Dispute, ECF No. 7-2 ("SMF") contained sixteen proposed factual statements, twelve of which Dr. Navarro expressly does not dispute. *See* Def.'s Resp. to the Government's Statement of Undisputed Material Facts ¶¶ 1-8, 10, 12-14, ECF No. 11-1 ("SMF Resp."). Of the remaining four, Dr. Navarro provided what amounts to legal objections and quasi-admissions, rather than a claim that a genuine factual dispute exists. SMF Resp. ¶¶ 9, 11, 15-16. In response to certain proposed statements, Dr. Navarro appears to challenge the legal significance of the underlying facts but does not deny those facts. *See, e.g.*, SMF Resp. ¶ 11 (responding to Government's statement that the White House Counsel's Office issued a memorandum containing

---

[1] D.D.C. Local Civil Rule 7(h) requires that each party submitting a motion for summary judgment attach a statement of material facts to which that party contends there is no genuine issue, with specific citations to those portions of the record upon which the party relies in fashioning the statement. *See* LCvR 7(h). As Dr. Navarro correctly concedes, the party opposing such a motion must, in turn, provide "specific facts showing that there is a genuine issue for trial." Def.'s Opp. to the United States' Mot. for S.J. 4, ECF No. 11 ("SJ Opp"); *accord* LCvR 7(h). Where the opposing party fails to discharge this obligation, a court may take all facts alleged by the movant as admitted. *See* LCvR 7(h).

certain language by claiming a dispute "only to the extent that the memorandum interprets the law more broadly than the language of 44 U.S.C. 2209(a)"). In others, Dr. Navarro appears to challenge what constitutes a Presidential record, but that is a question of law. *See, e.g.*, SMF Resp. ¶¶ 9, 15

In response to the Government's statement that "Defendant continues to have Presidential records in his possession, custody, and/or control," Dr. Navarro attempts to evade the question and introduce ambiguity, but his assertions are wholly unsupported by the record. *See* SMF Resp. ¶ 16. But even in that instance, Dr. Navarro does not identify a material dispute of fact. Indeed, Dr. Navarro does not deny that he has *at least some* Presidential records in his possession, custody, or control, nor could he in light of his counsel's prior representations. *See* Compl., Ex. 4, Decl. of William J. Bosanko ¶ 9, ECF No. 1-5 ("Bosanko Decl.") (referencing representations of Dr. Navarro's counsel stating that initial searches for PRA material had generated over 1,700 potentially responsive documents and estimating that between 200 to 250 of those documents were Presidential records); *see also* SMF Resp. ¶ 14 (not disputing the Government's statement that "[w]hile serving in the White House, Defendant used at least one non-official email account . . . to send and receive messages constituting Presidential records"). And although Dr. Navarro equivocates as to "*the extent* of whether or what Presidential records are in his possession, custody, and/or control," the core fact that he has retained at least some number of Presidential records is undisputed. SMF Resp. ¶ 16 (emphasis added). In any event, if Dr. Navarro somehow intended to dispute that he has any Presidential records in his possession, custody, and/or control, he failed to cite any evidence in the record that would support that claim. As such, Dr. Navarro has not identified any factual dispute that would preclude summary judgment in this case. *See Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 579 F. Supp. 2d 89, 91 (D.D.C. 2008) (Kollar-Kotelly, J.) (holding that "so-called 'factual assertions' that are unsupported by citations to accurate record evidence are insufficient to create issues of material fact"); *accord Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 529 (7th Cir. 2000) (A district court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact.").

**II.    The United States Is Legally Entitled to the Return of Presidential Records.**

Dr. Navarro raises a variety of legal arguments regarding the scope and applicability of the PRA, replevin, and federal common law, but none is persuasive. Moreover, none of Dr. Navarro's arguments overcomes the basic fact that any Presidential records in his possession belong to, and must be returned to, the United States.

**A.   Dr. Navarro's legal arguments regarding his responsibilities under the PRA are irrelevant to this case.**

Dr. Navarro spends a substantial portion of his opposition and motion to dismiss arguing that the PRA does not impose an express statutory obligation on him to return Presidential records that he created or received during his tenure as a Presidential advisor and that the PRA does not contain its own enforcement mechanism. *See* Def.'s Opp'n to United States' Mot. for Summ. J. 4-5, ECF No. 11 ("SJ Opp'n"); Def.'s Mot. to Dismiss 7, ECF No. 9 ("MTD"). Dr. Navarro further argues that the PRA lacks any statutory deadline by which he must turn over any Presidential records in his possession, and thus the Government has no legal recourse. SJ Opp'n 5; MTD 5.

But these arguments miss the point. This replevin action is not about whether Dr. Navarro had a specific statutory duty under the PRA and whether he complied with it. Rather, it is about whether the United States is entitled to recover property (in the form of Presidential records) whose ownership is clearly established by the PRA, through a writ of replevin.

As explained in the Government's opening brief, it is beyond dispute that Dr. Navarro currently possesses Presidential records and that these records belong to the United States. *See* Pl.'s Mem. in Support of Mot. for Summ. J. 3-7, ECF No. 7-1 ("SJ Mem."). Under the PRA, "Presidential records" include:

> documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2); *see also* SMF Resp. ¶ 8 (not disputing this definition). This definition plainly encompasses emails and other electronic records sent or received by Dr. Navarro, including those sent

or received on his non-official email account. And the PRA is clear that the United States "retain[s] complete ownership, possession, and control of Presidential records[.]" 44 U.S.C. § 2202; *see also* SMF Resp. ¶ 12 (not disputing this statement). Under the PRA, the United States owns such records from the moment of their creation or receipt.[2]

A writ of replevin—whether issued under D.C. law or federal common law—provides a mechanism for the recovery of personal property that "is alleged to have been wrongfully taken by or to be in the possession of and wrongfully detained by the defendant." D.C. Code § 16-3701; *see also* SJ Mot. 9-11. That the PRA does not contain a separate, express cause of action is therefore irrelevant. The PRA unambiguously establishes that the United States is the rightful owner of the Presidential records that Dr. Navarro admittedly possesses, and under the D.C. replevin statute the United States is entitled to their return.

That simple fact renders most of Dr. Navarro's legal arguments wholly irrelevant, regardless of Dr. Navarro's individual obligations under the PRA, and regardless of whether he complied with them while serving in the White House (which he did not). The United States is not seeking to punish Dr. Navarro's non-compliance with the PRA; it is seeking the return of its wrongfully withheld property through a writ of replevin.

**B. Dr. Navarro's legal arguments regarding his responsibilities under the PRA are also incorrect.**

In addition to being legally irrelevant, Dr. Navarro's legal arguments regarding the PRA are

---

[2] Dr. Navarro seems to challenge this basic principle in his Motion to Dismiss, but his argument is premised on a misrepresentation of the Government's position in this litigation. Specifically, Dr. Navarro argues that the Complaint in this action "alleges that Dr. Navarro was the proper recipient or creator of these records at the time they were created," and suggests that he was only unlawfully in possession of such records once "the United States . . . identified them as being emails which Dr. Navarro must turn[] over." MTD 10. But the Complaint in this action is clear that any records generated or received by Dr. Navarro in the course of assisting with the discharge of the President's official duties—including those created or received on non-official email accounts—are, and always have been, Presidential records, and that the United States "retain[s] complete ownership, possession, and control of Presidential records." Compl. ¶¶ 3-4, ECF No. 1 (quoting 44 U.S.C. § 2202). Thus, far from alleging that Dr. Navarro possessed or owned Presidential records at the time of their creation, the Government has consistently maintained that such records have belonged to the United States since their creation.

factually incorrect. Contrary to Dr. Navarro's claim that his statutory duties under the PRA are "basically nonexistent," SJ Opp'n 5, the PRA is clear that Presidential advisors like Dr. Navarro have an obligation to preserve Presidential records during their tenure so that they can be transferred to NARA at the end of an administration. *See* 44 U.S.C. § 2203(g)(1) ("Upon the conclusion of a President's term in office . . . the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President.").

Indeed, the PRA contains several instructions for how Presidential records should be maintained during a President's tenure. *See, e.g.*, 44 U.S.C. § 2203(b) (requiring the categorization of documentary materials produced or received by Presidential advisors as Presidential records or personal records "upon their creation or receipt"). And 44 U.S.C. § 2209(a) states that a covered employee like Dr. Navarro:

> may not create or send a Presidential . . . record using a non-official electronic message account unless the President, Vice President, or covered employee (1) copies an official electronic messaging account . . . in the original creation or transmission of the Presidential record . . . ; or (2) forwards a complete copy of the Presidential . . . record to an official messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record.

44 U.S.C. § 2209(a)(1)-(2). And although section 2209(a) does not expressly impose such a duty with respect to Presidential records received—as opposed to sent—on a non-official email account, the PRA makes clear that such records are also Presidential records, which must be properly preserved and maintained. *See id.* § 2201(2) (defining Presidential records to include those "created or *received* by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President") (emphasis added); 44 U.S.C. § 2203(a)-(b).[3]

Dr. Navarro tries to evade this responsibility in several ways, but none is availing.

_____

[3] Dr. Navarro does not dispute that a White House Counsel memorandum sent early in Dr. Navarro's tenure expressly extended section 2209(a)'s requirement to copy or forward emails to apply to those emails received on a non-official email account. *See* pages 5-6, *supra. See also* Compl. Ex. 1 at 2, ECF No. 1-2 (instructing White House personnel that "[i]f you ever send *or receive* email that qualifies as a presidential record using any other account . . . , you must preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days.") (emphasis added)).

Navarro000074

First, Dr. Navarro suggests that the United States cannot rely on 44 U.S.C. § 2209 because it has not yet been interpreted by any court, *see* SJ Opp'n 5-7, but this argument has no merit.[4] Dr. Navarro cites no legal authority for the claim that a litigant cannot rely on a statute until it has been previously interpreted by another court. It is self-evident that any statute that has been interpreted by the courts must have been, at one time, "yet to be interpreted by the Courts." *Id.* at 6. That no court has yet had occasion to interpret section 2209 does not change the fact that it is the law, or that this Court is competent to interpret it in the first instance—particularly given that the statute's meaning is clear on its face.

Next, Dr. Navarro contends that section 2209 only applies to intentional violations of this requirement, and that the sole purpose of section 2209 is to authorize discipline against federal employees. SJ Opp'n 7. But that argument conflates section 2209(a), which sets out a general disclosure requirement for covered employees, with section 2209(b), which authorizes disciplinary action. *See* 44 U.S.C. § 2209(a)-(b). Moreover, as explained above, the issue in this case is not Dr. Navarro's failure to comply with the requirements of section 2209(a), but his wrongful possession of, and continued refusal to return, Presidential records to their rightful owner, the United States. For replevin purposes, his intent in detaining or retaining Presidential records is irrelevant.

Finally, Dr. Navarro argues that because he believes the statute to be "vague" or unsettled, "there exist genuine disputes of material fact as to whether any alleged actions Dr. Navarro engaged in were even a violation of the PRA." SJ Opp'n 7. But a question of statutory interpretation is a question of law, not a genuine dispute of material fact.

In any event, as explained above, Dr. Navarro's obligations under the PRA are largely beside the point. The question at issue in this replevin action is straightforward and unambiguous: Has Dr. Navarro retained Presidential records that belong to the United States?  The record in this case makes clear that he has such records, and that the United States is entitled to their return.

---

[4] Jurisprudence on the PRA is understandably sparse, as administrations have generally cooperated with White House lawyers, White House records professionals, and the Archivist to ensure compliance with the PRA since its enactment.

**C. The PRA does not permit Dr. Navarro to hold onto Presidential records indefinitely.**

Dr. Navarro's argument that the PRA lacks any statutory deadline for the return of records is similarly irrelevant and unavailing. As explained above, the Government need not point to any obligation for the return of Presidential records under the PRA, as the Government is not seeking their return under the PRA. Rather, replevin provides a mechanism for the recovery of the United States' wrongfully withheld property. *See* pages 4-5, *supra*. But even setting that aside, Dr. Navarro's argument proves too much.

As an initial matter, Dr. Navarro had no authority to remove Presidential records from the control of the White House in the first place. The PRA contemplates that Presidential records will be preserved throughout the course of an administration and turned over to NARA at the conclusion of such administration.[5] Under the PRA, Presidential records—including those created or received on Dr. Navarro's personal account(s)—belong to the United States from the moment of their creation, and Dr. Navarro should have preserved those records at that time or shortly thereafter, and in all events prior to leaving government service. Dr. Navarro failed to comply with this requirement then, and continues to wrongfully withhold Presidential records now, even though nearly two years have passed since the end of the previous administration.

Having admittedly failed to comply with his preservation obligations under the PRA, Dr. Navarro exacerbates this omission by (1) retaining original Presidential records in his personal custody for which no copy is in the government's custody long after separating from the government; and (2) refusing repeated requests to return them to their rightful owner, the United States. Dr. Navarro now argues that the PRA does not provide a deadline by which records are to be provided to the Archivist. In essence, Dr. Navarro seeks to leverage one derogation of his statutory duty (his failure to preserve Presidential records during his tenure in the White House) to authorize another (his failure to return Presidential records to the Archivist). That simply cannot be reconciled with the PRA. Indeed, even

---

[5] The PRA also contains an express requirement that Presidential records sent from a non-official email account be preserved to an official recordkeeping system either at the time of their creation or within twenty days. *See* 44 U.S.C § 2209(a)(1). It is undisputed that Dr. Navarro failed to comply with this statutory timeframe. *See* SMF Resp. ¶ 15 (not disputing that Dr. Navarro did not copy or forward emails from his non-official email account to his official email account).

Dr. Navarro seems to concede that he must turn over Presidential records to the Archivist.[6] Despite his claim that no such deadline exists, he later argues that he has "asserted a privilege validly delaying the time within which he must produce the records sought by the Archivist." SJ Opp'n 10; *see also* MTD 6.

Even if there were some period of time that the Government must wait before seeking to retrieve its wrongfully retained property—and there is not—that time has clearly elapsed. Although Dr. Navarro maligns the Government's efforts to compel his return of PRA material as "unnecessary" and "rushed," SJ Opp'n 4, the fact of the matter is that, almost two years after he left government service, and despite repeated requests, Dr. Navarro has yet to return a single Presidential record in his possession. Dr. Navarro's complaints are further belied by his uncooperativeness. Dr. Navarro ignored repeated efforts to contact him regarding the return of Presidential records dating as far back as December 2021, responding (via counsel) in June 2022, only after the Department of Justice informed him by certified letter that it had been authorized to file suit seeking the return of Presidential records that Dr. Navarro had unlawfully retained. *See* Bosanko Decl. ¶ 7 (referencing failed attempts to contact Dr. Navarro and Department of Justice pre-suit letter). Hopeful that the parties could resolve their disagreement without litigation, the Department of Justice further refrained from filing suit at Dr. Navarro's request while he retained a document review firm to search his email and his attorneys reviewed potentially responsive documents for Presidential records. The Government ultimately filed suit in August 2022, only after Dr. Navarro refused to return any Presidential records absent a grant of act-of-production immunity. *See* Bosanko Decl., Attachment A. From that point forward, the

---

[6] Dr. Navarro contends that "he will turn over any Presidential records in his possession once the audit is complete and any risk that such a production serves to incriminate him has been alleviated." SJ Opp'n 5. But he offers no estimate of when that time might come, nor any justification for delay in providing records that he has no legal right to possess. Nor does he give any indication that he is currently working toward completing his purported audit. Instead, he has outright refused to produce records already identified as Presidential based on an inapplicable "act of production" privilege. *See* pages 16-20, *infra*. Dr. Navarro's assurance of future cooperation rings hollow, given his persistent refusal to returns the records, not to mention his pending motion to dismiss the Government's Complaint on the grounds that the United States has no legal right to recover records that it legally owns. *See generally* MTD & SJ Opp'n (both seeking the entry of judgment in Defendant's favor and dismissal of the case).

Navarro000077

Government reasonably concluded that Dr. Navarro had no present intention of returning Presidential records and that legal action was therefore appropriate.

### D. Replevin is a proper action for the recovery of wrongfully withheld Presidential records.

As explained above and in the Government's opening brief, replevin authorizes a plaintiff "to recover personal property to which the plaintiff is entitled, that is alleged to have been wrongfully taken by or to be in the possession of and wrongfully detained by the defendant." D.C. Code § 16-3701. That is precisely the purpose of the instant lawsuit, and thus the Government has properly invoked the D.C. replevin statute.[7]

Dr. Navarro appears to suggest that a writ of replevin is not appropriate where the wrongful possession is the "result of an innocent oversight and therefore not willful," but he offers no legal support for that claim. SJ Opp'n 8. To begin and setting aside his claim—belied by the record—that his repeated failure to engage with NARA and return the wrongfully held records was "innocent" and "not willful," Dr. Navarro's mental state is irrelevant. As noted previously, the United States need not show that Dr. Navarro's taking or continued possession of Presidential records was willful or malicious. Rather, the Government need only show that the Presidential records are in the possession of and wrongfully detained by the defendant. Regardless of Dr. Navarro's intentions, his possession

---

[7] Dr. Navarro suggests that the Government improperly relied on "dicta" from *United States v. Zook*, and *United States v. McElvenny*, but Dr. Navarro misunderstands the Government's point. The Government cited these cases as examples of cases "[w]here, as here, a party has wrongfully detained property belonging to the United States [and] the United States has sued for the return of the property." SJ Mem. 9; *see also* Compl. ¶ 1, ECF No. 1, *United States v. Zook*, No. 1:12-cv-01465 (D. Md. May 15, 2012) ("This is a civil action for declaratory judgment and ancillary relief, both to declare that a historic pardon . . . is a record belonging to the United States and to order Defendant to return the same forthwith to the possession of the United States by surrender to the National Archives."); *see also* Mem. of Law in Support of the Application of the United States of America for a Temporary Restraining Order & a Preliminary Injunction, and For Related Relief at 19, ECF No. 6, *United States v. McElvenny*, No. 02-cv-3027 (S.D.N.Y. Apr. 22, 2002) (arguing that "[t]he validity of the Government's right to the Map and the Meredith Documents is governed by New York replevin law"). In each of these cases, the courts never had occasion to decide whether replevin was a proper cause of action—one case appears to have been resolved informally and the other resulted in judgment on the pleadings after the defendant failed to dispute the allegations in the Government's complaint. *See* Order, ECF No. 10, *United States v. Zook*, No. 1:12-cv-01465 (D. Md. Aug. 16, 2012). The United States District Court for the District of Columbia has cited *McElvenny* as an example of the government initiating legal action to recover wrongfully withheld Presidential records. *See Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 845 F. Supp. 2d 288, 302 (D.D.C. 2012).

of Presidential records belonging to the United States is "wrongful," insofar as he is not the owner of those records and has resisted the United States' efforts to secure the return of its property. An individual may wrongfully possess something even if he does so unintentionally. *See Wrongful*, Black's Law Dictionary (11th ed. 2019) (defining "wrongful" to include "contrary to law" or "unlawful").

Of course, even if Dr. Navarro's initial taking and retention of Presidential records was unintentional, he has been aware of this purported "oversight" since at least December 2021. Yet, he has refused to return a single Presidential record to the United States. Dr. Navarro's continued retention of Presidential records at this point is plainly willful.

Dr. Navarro further argues that Presidential records are not subject to replevin law because they are not personal property, but that argument also fails. "Personal property" is the complement to "real property," and it is well-established that personal property encompasses "[a]ny moveable or intangible thing that is subject to ownership and not classified as real property." *Property*, Black's Law Dictionary (11th ed. 2019).

Presidential records plainly fall into this broad definition, whether they are physical objects (like the map sought in *United States v. McElvenny*) or electronic records (like the emails sought in this case).[8] Dr. Navarro's sole support for his argument to the contrary is a district court case finding that airline frequent flyer miles are not personal property, *see* SJ Opp'n 8 (citing *Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 143 (D.D.C. 2008)); MTD 9-10 (same). But frequent flyer miles are readily distinguishable from Presidential records. In *Ficken*, the court found that frequent flyer miles "amounted to credit with the airline" and thus represented an "intangible right" rather than "personal property." 578 F. Supp. 2d at 143. Presidential records, by contrast, are not credits issued by a third-party, but personal property

---

[8] In *Nixon v. United States,* the D.C. Circuit —prior to the enactment of the PRA—held that presidential materials were the President's personal property. 978 F.2d 1269, 1284 (D.C. Cir. 1992). Of course, the passage of the PRA in 1978 changed the ownership of Presidential records—instead of the personal property of the president, they became the personal property of the United States. *See* 44 U.S.C. § 2202. But this change in ownership did not change their fundamental character as personal property. While the records at issue in *Nixon* were analog in nature, there is no question that under *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1283 (D.C. Cir. 1993), emails are records under the Presidential Records Act (as well as the Federal Records Act), and therefore constitute personal property.

wholly owned by the United States. To the extent that Dr. Navarro intends to suggest that the records sought here are not personal property solely because they exist in electronic rather than physical format, that is a distinction without a difference. D.C.'s replevin statute applies to all personal property, with no distinction for whether that property exists in hard copy or an electronic database. *See* 66 Am. Jur. 2d Replevin § 6 ("Replevin is the proper remedy, in most jurisdictions, to recover the possession of every kind of personal property to which the plaintiff has a right to present or immediate possession. A replevin statute may not distinguish between tangible and intangible property."). Courts interpreting replevin statutes in other jurisdictions have found that electronically stored information constitutes personal property subject to a valid replevin action. *See, e.g., SEIU Healthcare Nw. Training P'ship v. Evergreen Freedom Found.*, 427 P.3d 688, 696 (Wash. Ct. App. 2018) (holding that a replevin statute applies to electronically stored data because "[t]he question is whether the property may be taken back from the defendant and returned to the plaintiff" and "[e]lectronic data can be both taken and returned"); *Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, No. 14-cv-8467, 2016 WL 5416498, at *7 (S.D.N.Y. Sept. 28, 2016) (holding that a replevin claim for an electronically-stored customer list can survive summary judgment).

Finally, Dr. Navarro insists that the Government has not stated a viable replevin claim because it has not plead the precise value of the Presidential records at issue. *See* MTD 8-9; SJ Opp'n 8-9. This argument fails for several reasons.

First, Dr. Navarro has not cited any support for the proposition that Courts must dismiss replevin actions whenever the plaintiff does not plead specific monetary damages—information that becomes relevant only when the property at issue cannot be returned to the plaintiff and the remedy sought is monetary damages—and imposing such a requirement would serve no purpose. When, as is the case here, the remedy sought is return of the withheld property, the monetary value of the property is irrelevant. D.C. Code § 16–3702 specifies that a replevin plaintiff must demand either of two remedies: "[that the property] be taken from the defendant and delivered to him; *or, if they are eloigned*,[9]

---

[9] To eloign is defined as "[t]o remove (a person or property) from a court's or sheriff's jurisdiction [or] [t]o remove to a distance; conceal." *Eloign*, Black's Law Dictionary (11th ed. 2019).

that he may have judgment of their value and all mesne profits and damages, which he estimates at
_____ dollars, besides costs." D.C. Code § 16–3702 (emphasis added).

The statute's use of the disjunctive "or" demonstrates that monetary value of property only becomes relevant when the property cannot be returned to the plaintiff, and compensation is the sole available remedy. This is consistent with the common law tradition that "[t]he primary relief sought in a replevin is the return of the identical property, and damages are merely incidental." 66 Am. Jur. 2d Replevin § 1. Damages are available as an alternative replevin remedy when return of the property is not possible. Return of the property is not only possible here, Defendant himself has represented that his return of Presidential records will be forthcoming "once the audit is complete and any risk that such a production serves to incriminate him has been alleviated." SJ Opp'n 5. An estimation of the documents' value is therefore legally unnecessary under the D.C. replevin statute. All this Court need do is order Dr. Navarro to produce the Presidential records themselves, whatever their value.

The instant matter is readily distinguishable from the case cited by Defendant, where the court denied default judgment in a replevin action related to equipment. SJ Opp'n 9 (citing *BMO Harris Bank N.A. v. Dist. Logistics, LLC*, No. 20-cv-03425, 2021 WL 7448012, at *4 (D.D.C. Jul. 23, 2021)). In denying a default judgment, the Court cited several issues with the pleadings, the first of which being *both* that the bank did not state the value of the equipment *and* that the bank failed to state that the equipment should be taken and delivered to it. *Id.* at *9. In other words, the complaint in *BMO Harris* failed because the bank failed to plead a demand for either of the two remedies provided under D.C.'s replevin law. Had BMO pleaded that it was seeking return of the equipment, the Court presumably would have allowed the case to proceed without a damages estimate, because such estimate would not have been necessary. The Court would have had an appropriate replevin remedy to provide—return of the withheld property. Here, by contrast, the United States has requested that the withheld emails be taken and delivered to it, making a damages calculation unnecessary. *Cf. Hopkins v. West*, 229 P.3d 560, 565 (Okl. Civ. App. 2009) (reversing a trial court's decision to dismiss a replevin action for failure to plead and prove the monetary value of withheld items where the plaintiff was seeking possession of the items, and therefore was not required to specify their monetary value).

Navarro000081

Moreover, the property at issue in *BMO Harris* differs greatly from the property at issue here in a key respect—in *BMO Harris*, the personal property at issue had a value that was readily ascertainable, and thus there was no reason the Plaintiff could not include an estimate of such value in its Complaint. Here, by contrast, the United States cannot accurately determine the monetary value of the records at issue without information that is exclusively in the Defendant's control—namely, the volume and contents of the withheld records. Thus, to require the Government to estimate the monetary value of the property at issue would effectively be to deny the United States the ability to recover the Presidential records at issue unless or until Dr. Navarro provided sufficient information for the Government to estimate the value of such records, effectively preventing the United States from pursuing the recovery of its rightful property.

On the valuation issue, Dr. Navarro misrepresents the Government's position, incorrectly asserting that the Government "readily admits" that the Presidential records sought "do not have the underlying monetary value or mesne profits or damages." SJ Opp'n 9; *see also* MTD 9 (claiming that "the United States concedes that the alleged presidential records at issue do not have a monetary value calculable on their own"). The lack of a statutory requirement aside, it makes little sense to require the Government to plead the value of the Presidential records at issue here because only Dr. Navarro is in a position to know the quantity of Presidential records he possesses. For that reason, the United States has never taken the position that the records it seeks to recover lack monetary value—instead, it explained that "[t]he monetary value of the documents cannot currently be determined because Defendant is the only one with access to the contents of all of the Presidential records" at issue. Compl. ¶ 43, ECF No. 1.

At any rate, the notion that Presidential records have monetary value is not a new one. Prior to the enactment of the PRA, former President Richard Nixon sued the government seeking compensation for records seized after his resignation in 1974. In 1992, the D.C. Circuit concluded that President Nixon had a compensable property interest in such records, and it remanded to the district court "for a determination of the compensation due." *Nixon v. United States*, 978 F.2d 1269, 1270 (D.C. Cir. 1992). After a five-month trial regarding the value of the records at issue—which at one point

Nixon's estate claimed was over $200 million—the Government eventually agreed to pay a settlement of $18 million. *See* U.S. Dep't of Justice, *Government Announces Settlement Over Nixon Presidential Papers* (June 12, 2000), https://www.justice.gov/archive/opa/pr/2000/June/336civ.htm.

In this case, the monetary value of the Presidential records at issue likely turns on the volume and contents of those records. The overall value of the Presidential records at issue in this case could vary based on whether Dr. Navarro is in possession of, for example, 200 records or 2,000 records. And it is easy to imagine that certain Presidential records might command a higher value than others, depending on their subject matter. Of course, the United States has been clear that its primary interest "is in recovering the records and preserving them as required by statute, not in recovering money." Compl. ¶ 43. But that does not render the records valueless. It simply recognizes that the United States has an interest in these records beyond their monetary value.

For the foregoing reasons, the United States' inability to plead a specific monetary value for the Presidential records that it seeks to recover does not foreclose a writ of replevin under D.C. law.

## E. To the extent that the D.C. replevin statute would not permit the recovery of the records, federal common law is available as an alternative.

Even if the United States were precluded from recovering Presidential records under the D.C. replevin statute, federal common law provides an alternative. As explained in the Government's opening brief, federal common law is available where, as here, there is a "uniquely federal interest" and where there is "a significant conflict . . . between an identifiable federal policy or interest and the operational of state law, or the application of state law would frustrate specific objections of federal legislation." SJ Mem. 9-10 (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988)).

Dr. Navarro does not and cannot deny that there is a uniquely federal interest in the United States' retention and preservation of Presidential records, or that the application of state law (in the event it prevented the United States from recovering the records at issue in this case) would frustrate specific objectives of the PRA. Instead, Dr. Navarro merely points out that there is no case law specifically invoking federal common law in these precise circumstances. *See* SJ Opp'n 9-10. The lack of case law on point likely reflects that the Government is commonly able to secure the return of

Presidential records without resort to litigation. It is of no moment here, however, because there is also no case law prohibiting the use of federal common law to permit the recovery of unlawfully retained Presidential records. Again, that there is not a case involving the same exact facts as this one does not render it beyond the power of this court to address. And, as the United States has already shown, federal common law provides another basis for issuing a writ of replevin here if recovery is not permissible under D.C.'s replevin statute. *See* SJ Mem. 9-10.

## III.    **Defendant's Act of Production Privilege Assertion is Meritless.**

Dr. Navarro ultimately resists returning records that he acknowledges do not belong to him by arguing that he "has asserted [the act of production privilege] validly delaying the time within which he must produce the records sought by the Archivist." SJ Opp'n 10. The "act of production" privilege stems from the Fifth Amendment's protection against self-incrimination. Because producing documents "tacitly concedes the existence of the papers demanded and their possession or control by the [party invoking the privilege as well as the party's] belief that the papers are those described in the subpoena," courts have concluded that the act of production could, in some cases, communicate incriminatory statements. *United States v. Fridman*, 974 F.3d 163, 174 (2d Cir. 2020). The applicability of the act of production privilege defies categorization; it inherently turns on the "facts and circumstances of [a] particular case[]." *Fisher v. United States*, 425 U.S. 391, 409-11 (1976).

This Court should reject this purported privilege claim outright. Other than a conclusory, self-serving assertion that the act-of-production privilege applies, Dr. Navarro has made no effort to meet his burden to show why the act of returning Presidential records would constitute impermissible testimonial self-incrimination, or otherwise meet the baseline requirements of a Fifth Amendment privilege. His mere say-so does not unlock a Fifth Amendment defense. Even if Dr. Navarro had a theory for why the act of returning the Government's documents would be inculpatory, the Government's prior knowledge, and Dr. Navarro's prior concessions, render any testimonial implication from Dr. Navarro's production a "foregone conclusion" to which the Fifth Amendment provides no defense. *Fisher*, 425 U.S. at 411. The public nature of "Presidential records" and NARA's statutory role in obtaining and preserving them also precludes Dr. Navarro's privilege assertion: The

Fifth Amendment does not apply where, as here, the records in question are "vested with a public character" and are required to be maintained by law. *United States v. Hubbell*, 530 U.S. 27, 35 (2000) ("[T]he fact that incriminating evidence may be the byproduct of obedience to a regulatory requirement, such as filing an income tax return, maintaining required records, or reporting an accident, does not clothe such required conduct with the testimonial privilege.") (internal citations omitted). Here, the PRA requires the return of records that Mr. Navarro admits that he possesses, but which belong to the United States. Under these circumstances, requiring the production of documents that belong to the United States does not implicate the Fifth Amendment right against self-incrimination. *Accord Hubbell*, 530 U.S. at 35-37.

### A. Dr. Navarro fails to carry his burden to establish the requisite elements of the privilege.

Although Dr. Navarro asserts that he "reasonably believed that the production of records to the United States risked the implication of his Fifth Amendment right against self-incrimination," SJ Opp'n 3, he "is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified[.]" *Hoffman v. United States*, 341 U.S. 479, 486 (1951) (citation omitted).

As the party seeking to invoke the act of production privilege, Dr. Navarro bears the burden to demonstrate its applicability. *In re Grand Jury Subpoena*, 973 F.2d 45, 50 (1st Cir. 1992). But Dr. Navarro provides no evidentiary or factual support for his privilege assertion; his claim is pure *ipse dixit*. Dr. Navarro's privilege assertion therefore fails outright. *Bayview Loan Servicing, LLC v. McNaughton*, No. 2:05-cv-254, 2007 WL 2433996, *2 (W.D. Mich. 2007) ("The party does not discharge the burden simply by asserting that he will incriminate himself by producing the documents."). In *Bayview Loan Servicing*, for example, the court rejected the claimant's act of production privilege claim based on a "'disorganized array of documents,' along with only a general blanket assertion of fifth amendment privilege." *Id.* at *3 (quoting *United States v. Dean*, 23 F. App'x 448, 450 (6th Cir. 2001)). The record here does not even have that—it contains nothing. Dr. Navarro has made no attempt to explain why his production of any or all of the PRA records he has improperly retained would incriminate him,

given that (i) the United States already knows that he has Presidential records; *see* Compl., Ex. 3, ECF No. 1-4 (December 16, 2021 Letter from Gary M. Stern, NARA General Counsel, to Dr. Peter J. Navarro (referencing Dr. Navarro's use of a private email account to conduct official business)) & Compl., Ex. 2, ECF No. 1-3 (providing specific examples of missing documents); and (ii) Dr. Navarro has previously acknowledged that he has them. *See* Bosanko Decl. ¶ 9 (referencing representations of Dr. Navarro's counsel in July 29, 2022 correspondence acknowledging Dr. Navarro's possession of hundreds of Presidential records). It bears emphasizing that Dr. Navarro has to date declined to produce even a single Presidential record in his possession, though he evidently has at least hundreds. *See id.* This disparity renders Dr. Navarro's wholesale lack of evidentiary support for his privilege assertion particularly significant. Because Dr. Navarro has failed to demonstrate the requisite nexus between his act of producing Presidential records in his possession and the ostensible criminal jeopardy that he claims would result from that production, his act of production privilege assertion must fail.

### B. On the merits, Dr. Navarro's claim of privilege fails.

Even setting aside Dr. Navarro's threshold failure of proof, his privilege assertion is fatally deficient as a matter of law. For this "narrow" privilege to apply, *Fridman*, 974 F.3d at 174, Dr. Navarro must demonstrate that his return of Presidential records would involve compelled testimonial self-incrimination in violation of the Fifth Amendment. Dr. Navarro does not and cannot meet this burden.

The act of production is "testimonial" for Fifth Amendment purposes only if such production would "compel[] the individual to use 'the contents of his own mind' to explicitly or implicitly communicate some statement of fact." *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1345–46 (11th Cir. 2012) (citing *Curcio v. United States,* 354 U.S. 118, 128 (1957)). That testimonial aspect is lacking. The Fifth Amendment is not implicated where—as here—the Government "already knew of the materials[]" "at the time it sought to compel the act of production, . . . thereby making any testimonial aspect a 'foregone conclusion.'" *Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d at 1346. Where the Government has prior knowledge of the records sought, the Fifth Amendment is not implicated "even if the act [of production] conveys a fact regarding the existence or location, possession, or authenticity of the subpoenaed materials[.]" *Id.* As NARA's

communications with Dr. Navarro dating back to December 2021 make clear, NARA has long known that Dr. Navarro had (and continues to have) Presidential records in his possession related to his service as a White House advisor. Accordingly, there can be no dispute that the Government has prior knowledge of the material. In fact, it was that prior knowledge that led NARA to initiate efforts to recover documents that Dr. Navarro had on his private email.

It is immaterial that the Government cannot determine the precise number of Presidential records that Dr. Navarro has retained. To fulfill this prior knowledge requirement, the Government "need not demonstrate perfect knowledge of each specific responsive document." *United States v. Greenfield*, 831 F. 3d 106, 116 (2d Cir. 2016). Rather, the Government "must establish its knowledge only 'with reasonable particularity.'" *Id.* (quoting *In re Grand Jury Subpoena Duces Tecum Dated October 29, 1992*, 1 F.3d 87, 93 (2d Cir. 1993). In light of the Government's extensive efforts to recover the Presidential records in Dr. Navarro's possession prior to seeking a writ of replevin, there can be no serious question that the Government adequately described the materials it seeks. *See* Compl., Ex. 3, ECF No. 1-4 (referencing Dr. Navarro's use of a private email account to conduct official business) & Compl. Ex. 2, ECF No. 1-3 (providing specific examples of missing documents). Because any resulting testimonial aspects of Dr. Navarro returning Presidential records are therefore a "foregone conclusion," Dr. Navarro cannot meet his burden to show that the act of returning Presidential records would violate the Fifth Amendment.

Finally, even if Dr. Navarro's production of Presidential records were deemed testimonial, the records sought here would fall entirely outside the ambit of the Fifth Amendment. As the Supreme Court has recognized, the Fifth Amendment is not violated when the Government is allowed "to gain access to items or information vested with [a] public character." *Baltimore City Dep't of Social Servs. v. Bouknight,* 493 U.S. 549, 557 (1990). This "required records exception" "abrogates the protection of the [Fifth Amendment] privilege for a subset of those documents that must be maintained by law." *In re Grand Jury Subpoena Dated Feb. 2, 2012,* 741 F.3d 339, 344 (2d Cir. 2013) (citing *Shapiro v. United States,* 335 U.S. 1, 68 (1948)). Central to the analysis is whether the "records themselves must have assumed 'public aspects' which render them at least analogous to public documents." *In re Grand Jury*

*Subpoena Dated Feb. 2, 2012*, 741 F.3d at 345 (citing *Grosso v. United States*, 390 U.S. 62, 67-68 (1968)). The documents here, of course, are not merely "analogous to public documents," they *are* public documents as defined by the PRA. 44 U.S.C. § 2202 ("The United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of this chapter."). Upon conclusion of a President's term of office, the Archivist of the United States "shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." 44 U.S.C. § 2203(g)(1). "The Archivist shall have an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." *Id.* Dr. Navarro's arguments, if accepted, would render it impossible for the Archivist to fulfill his statutory obligations under the PRA, and would frustrate the statute's purpose of "ensur[ing] the preservation of presidential records for public access after the termination of a President's term in office." *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991) (citing H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. 2 (1978)). For all of the foregoing reasons, Dr. Navarro's act-of-production privilege assertion is wholly without merit.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss, grant Plaintiff's Motion for Summary Judgment, and issue a writ of replevin ordering the return of all Presidential records in Dr. Navarro's possession to the United States.


Dated: November 4, 2022                          Respectfully submitted,

                                                 BRIAN M. BOYNTON
                                                 Principal Deputy Assistant Attorney
                                                 General

                                                 BRIAN D. NETTER
                                                 Deputy Assistant Attorney General

                                                 ELIZABETH J. SHAPIRO
                                                 Deputy Branch Director
                                                 Federal Programs Branch

_/s/ Lee Reeves_
LEE REEVES
ALEXANDRA SASLAW
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs
Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 616-0773
Email: lee.reeves2@usdoj.gov

_Counsel for Plaintiff_

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Case No. 1:22-cv-02292-CKK** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |

**DEFENDANT'S REPLY IN SUPPORT OF**
**<u>MOTION TO DISMISS</u>**

The Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§ 2201-2209, is a statute that

is notoriously considered vague and "toothless," and the relief sought by the United States here

has been granted only in the most extraordinary of circumstances.  *See* Sara Worth, *Trump and*

*the Toothless Presidential Records Act*, YALE LAW SCHOOL MEDIA FREEDOM AND INFORMATION

ACCESS CLINIC (Mar. 11, 2019),[1] (outlining the limited nature of the PRA and its clear statutory

intent to bind the president for record keeping responsibilities).  *See also CREW v. Trump*, No.

1:17-cv-01228 (D.D.C. 2017) (holding that any relief granted under PRA is limited and requires

a showing of clear and indisputable harm), *aff'd* 924 F. 3d 602 (D.C. Cir. 2019).  Dr. Navarro

has no interest in indefinitely retaining any records he may possess that fall within the ambit of

the PRA, but reiterates that the Act itself does not provide the relief the United States seeks.

### I.    The Statutory Provisions of the Presidential Records Act Are Relevant to This Action

As a threshold issue, the United States seeks to portray statutory arguments contained in

Dr. Navarro's Motion to Dismiss and his Opposition to the Motion for Summary Judgment as

---

[1] Available at https://law.yale.edu/mfia/case-disclosed/trump-and-toothless-presidential-records-act.

irrelevant to the issue before the Court.  Reply at 4 (Nov. 4, 2022) (ECF No. 13).[2]  This assertion

is inaccurate; the United States seeks to use an ambiguous statute to grant broad relief that a

reading thereof does not provide.  *See generally* Complaint ¶ 51 (Aug. 3, 2022) (ECF No. 1)

(seeking a writ of replevin authorizing the recovery of any presidential records in the possession,

custody, and/or control of Dr. Navarro, an order requiring Dr. Navarro implement a writ of

replevin or other similar order, award the United States damages, award the United States costs

and attorneys' fees, and any other relief the Court deems just).  The limited nature of the PRA is,

at its core, a basis for dismissing the Complaint for a failure to state a claim.

The United States completely abandons any theory of relief encapsulated within the PRA

and instead asserts:  1) that the PRA created a hard deadline for Dr. Navarro to turn over certain

presidential records once Donald Trump's tenure in the White House ended, if such documents

remained in his control; 2) that the PRA explicitly states that personal email accounts cannot be

used to receive and send presidential records and that such section creates a cause of action for

the United States if such procedures were not followed; and 3) replevin and/or federal common

law can be used under the PRA to retrieve alleged presidential records in a person's control.  *See*

Compl. ¶¶ 39-50 (outlining the United States' non-official email account and replevin/federal

common law claims).  *See also* Motion for Summary Judgment, at 3 (Sep. 26, 2022) (ECF No.

7.1) (claiming that the PRA creates a deadline for when presidential records "are required to be

turned over to NARA no later than the end of the [presidential] administration.").  Each of the

---

[2]        Pursuant to the Court's briefing schedule order, the United States submitted a combined Reply in Support of its Motion for Summary Judgment and Opposition to Dr. Navarro's Motion to Dismiss.  Also pursuant to the Court's briefing schedule order, Dr. Navarro's instant submission is limited to a reply in support of his Motion to Dismiss.  However, the United States does not clearly delineate whether assertions are made only as to a Reply in Support of the Motion for Summary Judgment, in Opposition to Dr. Navarro's Motion to Dismiss, or both.  Counsel for Dr. Navarro therefore has endeavored to address only those issues raised in Dr. Navarro's Motion to Dismiss, but notes the challenge in so doing as a result of the lack of specific delineation by the United States.

Navarro000091

issues with these arguments was discussed in Dr. Navarro's Motion to Dismiss.  *See* Motion to Dismiss at 3-10 (Oct. 11, 2022) (ECF No. 9).  To summarize: the PRA does not create an explicit deadline for when to turn over documents; rather it states that at the end of a president's tenure the Archivist of NARA, "assume[s] all responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President."  44 U.S.C. 2201(g)(1).  The PRA does not state that all emails on a personal email account that may be presidential records must be preserved, only those that a covered employee, "send[s]"  from, or, "create[s]," on that email account.  44 U.S.C. 2209(a).  Further, failure to follow 44 U.S.C. 2209(a) does not seem to provide the United States with a cause of action; rather, it states that intentional violations of such provision can be used as a basis for an adverse personnel action.  *Id.* at (b).  Nowhere else has this statute ever been interpreted, and never has it been interpreted to create any cause of action.  Finally, the statute is silent as to any enforcement provision.  Yet the United States has consistently asserted as a matter of right they are entitled to replevin or federal common law under the PRA.

The United States' claim that these statutory ambiguities and inconsistencies are wholly irrelevant is incorrect, because unless the Court accepts the United States' assertions of the broad implied provisions that cannot be found anywhere in the PRA, then the United States has failed to state a claim upon which relief can be granted and the Complaint must be dismissed.  As stated in the Motion to Dismiss, the Court must determine that the United States has pleaded facts that, "[include] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See United States ex rel. Scott v. Pac. Architects & Eng'rs, Inc.*, 270 F. Supp. 3d 146, 152 (D.D.C. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2007)).  However, the Court need not, "accept as true a legal conclusion

couched as a factual allegation." *Chatman v. U.S. Dep't of Def.*, 270 F. Supp. 3d 184, 188

(D.D.C. 2017) (quoting *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 529-30 (D.C.

Cir. 2015)).

      Ultimately, the United States has not met this standard to survive a motion for summary

judgment: the United States has alleged that Dr. Navarro *might* have presidential records subject

to the PRA, and then has used this "might" to argue that Dr. Navarro's alleged possession of

these records violated a nonexistent deadline.  Motion for Summary Judgment, at 3 (Sep. 26,

2022) (ECF No. 7.1).  The United States then argues that because Dr. Navarro *might* have used a

personal email to send or receive some emails during his tenure in the White House, this clearly

violates a vague and uninterpreted section of the PRA.  Compl. ¶ 4.  The United States then

argues without providing any support that, even though this section of the PRA only includes a

very limited disciplinary provision, that it actually provides them with an expansive cause of

action.  *Id*. at ¶¶ 39-50 ("[Dr.] Navarro created and received Presidential records on one or more

non-official email. . . did not ensure that his official electronic email account included copies of

all presidential records created or received on one or more non-official email accounts. . .

[a]ccordingly, [Dr.] Navarro has unjustly retained property of the United States in the form of

Presidential records.").  The United States also represents that even though this section they rely

on does not include the term "received," it clearly applies to emails received on a personal email

because a different section of the PRA uses the term "received" in a different context.  Motion

for Summary Judgment, at 6-7 (Sep. 26, 2022) (ECF No. 7.1). Finally, the United States argues

that because Dr. Navarro ultimately missed a nonexistent deadline and violated a nonexistent

duty, the United States is now unquestionably owed replevin or federal common law through a

nonexistent enforcement mechanism of the PRA.  *See id.* at p. 4, 7, 10, 12-13 (arguing that the

applicability of replevin to intangible emails is clearly the proper cause of action based on the

fact that, in unrelated cases from other districts like *Zook* and *McElvenny*, the United States has

pled that a writ of replevin for the return of the United States's physical property was proper).

Further, the United States has failed to address the issue that replevin requires the wrongful

withholding of "personal property."  While the United States contends that D.C. defines personal

property as anything that is not real property, there is case law that suggests that intangible

property, like emails, are not personal property and thus would not be subject to a replevin

action.  *See Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 143 (D.D.C. 2008) (denying a replevin

action for intangible rights like frequent flyer miles, despite frequently flyer miles clearly not

being real property).

Ultimately, the representations made in the United States' Compliant have amounted to

numerous conclusory statements in search of a nonexistent legal remedy.  As such, the Court

should dismiss the United States' complaint for failure to state a claim upon which relief can be

granted.[3]

## II.    Dr. Navarro Does Not Seek to Hold Onto Any Presidential Records Indefinitely

The United States has based a portion of their argument on a claim that Dr. Navarro seeks

to indefinitely hold on to any presidential records that are in his possession.  Reply at 13 (Nov. 4,

---

[3]    It is Dr. Navarro's position that this action is not necessary and/or not appropriate under the PRA, and that is the sole reason why Dr. Navarro files the underlying Motion to Dismiss.  Dr. Navarro has never once contended that any presidential records in his possession are actually his property rather than the United States'.  As the United States has been informed throughout this process, Dr. Navarro intends to turn over any presidential records as soon as any presidential records are identified through the audit and as soon as the potential incrimination issues are resolved.  The United States has implied a more nefarious purpose for Dr. Navarro's seeking this motion to dismiss, or at the very least implied Dr. Navarro's filing of a Motion to Dismiss demonstrates that he is not acting in good faith, which Dr. Navarro ardently denies.  Reply at 9 n.6 (Nov. 4, 2022) (ECF No. 13) ("Dr. Navarro's assurance of future cooperation rings hollow, given his persistent refusal to returns [*sic*] the records, not to mention his pending motion to dismiss the Complaint on the grounds that the United States has no legal right to recover the records that it legally owns.").

2022) (ECF No. 13)  However, this misstates Dr. Navarro's position on any records in his possession: Dr. Navarro must identify any presidential records in his possession before he is able to turn them over, unless the United States now seeks to represent that all emails in his personal account are presidential records.  *See* July 29, 2022 Letter from Dr. Navarro to NARA General Counsel (ECF No. 1-5) ("As discussed on Monday, July 25, we have been actively working to identify records within Mr. Navarro's possession, custody, and/or control that are potentially responsive to NARA's request.  As you know, this effort has already involved a substantial investment of time and resources.  Specifically, we have now completed the process of creating a forensic image of Mr. Navarro's cell phones and have also completed an extraction of records from Mr. Navarro's personal Protonmail account, all of which we will continue to preserve consistent with our ethical obligations.").  While the United States has alleged the existence of hundreds of presidential records in Dr. Navarro's personal email, Dr. Navarro's audit has not revealed anywhere near that amount.  Reply at 18 (Nov. 4, 2022) (ECF No. 13).  Even still, the term "presidential records" does have its limits, meaning that even if the audit were to identify documents which respond to terms identified by the firm and/or the United States, the decision still must be made as to whether those documents are actually responsive before they are turned over.

　　　While the ongoing audit has revealed some documents that may be presidential records pursuant to the PRA, the United States has consistently made the claim that the current results of the audit are incomplete because the terms used in the audit were underinclusive, even though the United States acknowledges that counsel for Dr. Navraro used NARA's proposed search terms.  *See* Gov. Motion for Summary Judgment, at pp. 7-8 (alleging that Dr. Navarro acknowledged possessed at least 200 presidential records, and claiming this number was "based

only on underinclusive search terms."  However, in a previous portion of the motion, the United

States stated that the supposedly underinclusive search terms were provided by NARA; counsel

for Dr. Navarro stated that a review of the results revealed that most of the documents were

definitely not presidential records, and the remaining 200 would need to be reviewed for

responsiveness).  The United States knew that Dr. Navarro was conducting this audit, as Dr.

Navarro provided consistent updates as the audit progressed, but still filed this unnecessary

action.[4]  The United States seeks to have it both ways: it seeks to have Dr. Navarro turn over all

documents in his possession as soon as is physically possible, but it also seeks to have Dr.

Navarro not take the time required to actually identify what documents in his possession, if any,

are presidential records.

Dr. Navarro requests that, if the Court does grant the United States the relief that it seeks,

that the Court also set a reasonable schedule for finishing the email audit in such a way that

would allow Dr. Navarro to identify and turn over only the emails that may or may not be in his

possession that are presidential records under the PRA, which may be a time-consuming process.

The fact that the PRA does not set any deadline for conducting this audit only demonstrates

further the reasonableness of this request.

### III.   The Act of Production Privilege is Proper

As it relates to the act-of-production privilege, the United States once again takes two

separate positions: the United States seeks to portray that it is impossible for Dr. Navarro to be

prosecuted for producing any presidential records that may be in his possession, which would

mean he has no act of production privilege, while also claiming that any documents that may be

---

[4]      The United States has alleged that Dr. Navarro stopped providing them updates as to the audit.
*See* Reply at 9 n.6 (Nov. 4, 2022) (ECF No. 13) ("Nor does [Dr. Navarro] give any indication that he
is currently working toward completing his purported audit.").  However, these updates only ceased once
the United States filed the instant Complaint.

in Dr. Navarro's possession are "wrongfully withheld" from the United States, implying that the United States believes that Dr. Navarro has acted in such a way that they could pursue a future indictment for keeping their own property away from them. This incompatible dichotomy demonstrates exactly why Dr. Navarro has an act-of-production privilege and would explain any sort of potential hesitation that has kept Dr. Navarro from producing any documents that may be in his possession:[5] the United States clearly feels that Dr. Navarro has infringed upon their rights to the alleged presidential records, and their word alone that Dr. Navarro would not face prosecution does not prevent these government officials, or other government officials, from indicting Dr. Navarro for their perceived belief that he allegedly wrongfully retained documents or for the material contained with the documents in the future.

Ultimately, if the United States actually does not intend to indict Dr. Navarro based on the actions alleged in this Complaint, the United States should without controversy agree to provide Dr. Navarro with immunity relating to any documents that the United States believes Dr. Navarro has wrongfully withheld. Otherwise, Dr. Navarro intends to fully litigate the issue of the act of production privilege, an issue upon which he is confident he would succeed. Such immunity would go a long way in resolving this issue without needing to involve the court further.

## IV.   The Lack of Binding Case Law Precludes a Motion for Summary Judgment

The United States has sought to portray the lack of binding case law interpreting the PRA as something that should be brushed off and ignored. However, the fact remains that in seeking summary judgment, the United States has an extremely high burden to establish that there are no

---

[5]     As stated herein and in prior pleadings, Dr. Navarro intends to turn over documents that are properly identified as "presidential records" once they are accurately identified through the audit and once the issue of potential self-incrimination has been litigated and resolved.

disputes as to material facts and that they are owed judgment as a matter of law.[6]  Frankly, the

United States' claim that a statute that does not say a large portion of what the United States

argues should make their claim that they are owed judgment pre-trial is unconvincing, and it is

even less convincing to see that they are unable to cite any case law to support they are owed a

judgment pre-trial.  As such, the Court should very clearly deny the United States' motion for

summary judgment for the United States' inability to establish the high burden required to grant

a summary judgment.

## CONCLUSION

For the reasons contained herein, the Court should deny the United States' motion for

summary judgment and grant Dr. Navarro's motion to dismiss the complaint.  The United States

has argued a thin factual case and provided no statutory provisions or case law which support

their representation that the Court can even issue a writ of replevin or use federal common law

under the PRA to force Dr. Navarro to turn over the presidential records alleged to be in his

possession.  Even if it could, it would take Dr. Navarro time to complete the audit that is already

in process to identify what presidential records, if any, he would have to turn over.  Further, if

any documents are been identified by the audit and the potential issue of self-incrimination that

creates Dr. Navarro's act-of-production privilege has been resolved, Dr. Navarro fully intends to

turn over such documents to the United States.

In the alternative and to expedite this process, this Court should order that the United

States issue an immunity order to Dr. Navarro which would preclude them from using the

---

[6]      Dr. Navarro opposes the United States' claim that there are no material facts that are disputed.
The record of facts that the United States provided is not a complete record of facts at issue.  However,
because the rules and the Court's scheduling order make clear that this response is only supposed to be a
reply in support of a motion to dismiss, Dr. Navarro will not press this matter further than what is on the
record in his opposition to the motion for summary judgment.

Navarro000098

production of these documents in any future criminal proceedings against Dr. Navarro.  While
the United States has represented that they have no intent to pursue an indictment for these
documents, their word alone does not prevent them from turning around in the future and
pursuing an indictment.  Further, the United States has been very aggressive in pursuing criminal
indictments against members of the Trump administration, which highlights why Dr. Navarro
reasonably fears prosecution for what ultimately amounts to an honest mistake, if any such
presidential records are even in his possession.  Otherwise, Dr. Navarro intends to fully litigate
the issue of act of production privilege in the Court before he turns over any presidential records
that may or may not be in his possession that the United States may seek to use as the basis for a
future indictment.

[SIGNATURE ON NEXT PAGE]

Dated: November 14, 2022                    Respectfully submitted,

                                            _____/s/ Stanley E. Woodward, Jr._____
                                            Stan M. Brand (D.C. Bar No. 213082)
                                            Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
                                            Mark N. Nobile (D.C. Bar No. 1780761)
                                            BRAND WOODWARD LAW, LP
                                            1808 Park Road NW
                                            Washington, DC  20010
                                            202-996-7447 (telephone)
                                            202-996-0113 (facsimile)
                                            Stanley@BrandWoodwardLaw.com

                                            *Counsel for Defendant Peter K. Navarro*

## <u>CERTIFICATE OF SERVICE</u>

On November 14, 2022, the undersigned hereby certifies that a true and correct copy of

the foregoing was electronically filed and served via the CM/ECF system, which will

automatically send electronic notification of such filing to all registered parties.

*/s/ Stanley E. Woodward, Jr.*

Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
Brand Woodward Law, LP
1808 Park Road, Northwest
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>            Plaintiff,<br><br>      v.<br><br>PETER K. NAVARRO,<br>            Defendant. | Civil Action No. 22-2292 (CKK) |

**ORDER AND JUDGMENT**
(March 9, 2023)

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED**, that Defendant's [9] Motion to Dismiss is **DENIED**.  It is further

**ORDERED**, that Plaintiff's [7] Motion for Summary Judgment is **GRANTED**.  It is further

**ORDERED**, that Defendant shall produce to Plaintiff the 200 to 250 documents that his counsel has identified as Presidential records **forthwith**.  It is further

**ORDERED**, that, on or before **thirty days** after the entry of this Order, the parties shall MEET AND CONFER to discuss the search terms and methodology used, or to be used, to unequivocally identify Presidential records in Defendant's possession. If the parties reach agreement on the search terms and methodology, their implementation to identify records should thereafter proceed, and all Presidential records identified thereby shall be expeditiously produced.  Once the records search and production have been completed, Plaintiff shall file a notice indicating that the judgment entered herein has been satisfied.  If, however, the parties fail to reach agreement on search terms and methodology, the parties shall, no later than **seven days** after their meet-and-confer, file a joint status report explaining how they intend the Court to enforce the judgment entered herein.

**SO ORDERED**.

Date:  March 9, 2023

_____
            /s/
COLLEEN KOLLAR-KOTELLY
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　Plaintiff,<br><br>　　　v.<br><br>PETER K. NAVARRO,<br>　　　　Defendant. | Civil Action No. 22-2292 (CKK) |

## MEMORANDUM OPINION
(March 9, 2023)

The United States has sued Defendant Peter K. Navarro ("Defendant" or "Dr. Navarro"), formerly Deputy Assistant to then-President Donald J. Trump, for the return of public records belonging to the United States. The Court agrees with the United States that there can be no dispute of material fact that Navarro retains such records, nor any legal dispute that the District of Columbia replevin statute, D.C. Code § 16-3702, provides a cause of action for their return. Accordingly, upon consideration of the briefing,[1] the relevant legal authorities, and the entire record, the Court **GRANTS** the United States' [7] Motion for Summary Judgment and **DENIES**

---

[1] The Court mainly considered:

- Plaintiff's Memorandum in Support of Motion for Summary Judgment ("MSJ"), ECF No. 7-1;
- Defendant's Motion to Dismiss ("MTD"), ECF No. 9;
- Defendant's Opposition to the United States' Motion for Summary Judgment ("MSJ Opp."), ECF No. 11;
- Plaintiff's Combined Reply in Support of Motion for Summary Judgment & Opposition to Defendant's Motion to Dismiss ("MTD Opp."), ECF No. 12;
- Defendant's Reply in Support of Motion to Dismiss ("MTD Repl."), ECF No. 14; and
- Plaintiff's Statement of Undisputed Material Facts ("SMF"), ECF No. 7-2,

In an exercise of its discretion, the Court has concluded that oral argument would not assist in the resolution of this matter.

Navarro000103

Defendant's [9] Motion to Dismiss.  The Court further fashions injunctive relief that requires immediate compliance that the Court will oversee.

## I.  BACKGROUND

### A.  Factual and Procedural Background

This matter arises under the Presidential Records Act ("PRA") of 1978, 44 U.S.C. §§ 2201-2209, and the District of Columbia replevin statute, D.C. Code § 16–3702. The United States initiated suit against Defendant Peter K. Navarro seeking the return of certain emails created and/or received by him in a personal, encrypted email account that that he used in connection with his duties as a federal employee and adviser to the President of the United States.  Dr. Navarro was employed by the White House in the Executive Office of the President from January 20, 2017 until January 20, 2021. He was Deputy Assistant to the President and Director of the National Trade Council from his hiring until April 29, 2017, when he was appointed Assistant to the President and Director of the Office of Trade and Manufacturing Policy.  In addition to those responsibilities, in March 2020, then-President Trump appointed Dr. Navarro to coordinate the government's use of the Defense Production Act, 50 U.S.C. § 4501 et seq., to respond to the COVID-19 pandemic. SMF ¶¶ 1-5.

Under the PRA, a Presidential record is a record generated or received by a covered employee[2] in the course of assisting with the discharge of the President's official duties. *See* 44 U.S.C. § 2201(2).  Among other responsibilities, a covered employee must copy any Presidential record sent on a "non-official electronic message account" to his official government email

---

[2] For purposes of section 2209, "covered employee" means the immediate staff of the President or the Vice President, "a unit or individual of the Executive Office of the President whose function is to advise and assist the President," or "a unit or individual in the Office of the Vice President whose function is to advise and assist the Vice President." 44 U.S.C. § 2209(c)(1).

2

account within 20 days, and to otherwise transfer Presidential records received on a non-official account to the National Archives and Records Administration ("NARA") at the end of each presidential administration. *See id.* § 2209*; id.* §§ 2202-03. At the end of a Presidential administration, pursuant to the PRA, the Archivist of the United States is required to "assume responsibility for the custody, control, and preservation" of Presidential records and to "make such records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." *Id.* § 2203. The PRA differentiates "Presidential records" from "personal records," defining "personal records" as "all documentary materials, or any reasonably segregable portion thereof, of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." *Id.* § 2201 (3).

It is undisputed that Dr. Navarro was a covered employee under the statute. SMF ¶ 6. Therefore, under the PRA, the United States "retain[s] complete ownership, possession, and control of Presidential records" generated or received by him in the course of assisting with the discharge of the President's official duties. *See* 44 U.S.C. §§ 2201(2), 2202.

There is no issue with regard to Dr. Navarro's official email accounts. However, while serving in the White House, Dr. Navarro used at least one non-official email account—an account hosted by the encrypted email service Proton Mail—to send and receive messages constituting Presidential records. SMF ¶ 14. E-mail and other electronic messages, including electronic messages sent and received on non-official electronic message accounts, constitute Presidential records to the same extent as hard copy documents. 44 U.S.C. §§ 2201, 2209. The PRA is explicit with regard to Presidential records generated by non-official electronic accounts: It requires the President, the Vice President, and Covered Employees to "cop[y] their official electronic

Navarro000105

messaging account" when sending a communication using a non-official account or to "forward[]
a complete copy" of an email sent on their non-official account to their "official electronic
messaging account . . . not later than 20 days after the original creation or transmission" of the
record. *Id.* § 2209(a)(1)-(2).

In February 2017, the White House Counsel's Office issued a memorandum to White
House personnel regarding the use of non-official email accounts to conduct official business,
which outlined the obligations of White House personnel under the PRA. The memorandum read,
in part: "If you ever send or receive email that qualifies as a [P]residential record using any other
account [*i.e.,* other than the official government account], you must preserve that email by copying
it to your official EOP email account or by forwarding it to your official email account within
twenty (20) days." SMF, ¶ 6; Compl. Ex. 1 at 2, ECF 1-2 (Memorandum for All Personnel, from
Deputy White House Counsel Stefan C. Passantino, through Counsel to the President Donald F.
McGahn (Feb. 22, 2017) ("WHCO Memorandum")).   The memorandum also confirmed "that
[P]residential records are the property of the United States . . . When you leave EOP employment,
you may not take any presidential records with you." *Id.* at 2.

Dr. Navarro did not copy each email or message constituting Presidential records that was
sent or received on his non-official account to his official government email account; he retained
at least some of them in his personal email account.  SMF ¶ 15. Moreover, when NARA learned
of the personal account and requested that Dr. Navarro provide it with such Presidential records as
he retained in his personal email account, Dr. Navarro ignored NARA's repeated requests.  With
no response to NARA's entreaties, the Department of Justice wrote him to request return of the
records and advise him that failing such provision, suit would be brought against him.  Only at that
juncture did he even engage with the Department of Justice with regard to his email account.

4

On June 16, 2022, counsel for Dr. Navarro contacted the Department of Justice and represented that they had retained a document review and analysis firm to aid them in evaluating the extent to which Dr. Navarro had PRA records in his possession, custody, or control. Compl. Ex. 4 at 1, ECF No. 1-5, Declaration of William J. Bosanko ("Bosanko Decl.") ¶ 8. Over the next several weeks, Dr. Navarro's counsel provided periodic updates on the status of their search and analysis process. In order to assist and expedite the search, on July 18, 2022, NARA's General Counsel provided Dr. Navarro's counsel with a list of search terms. NARA requested that Dr. Navarro prioritize the return of any PRA records responsive to those search terms.

By email dated July 22, 2022, Dr. Navarro's counsel represented that their application of the search parameters that NARA provided had generated over 1,700 documents. Thereafter, on July 25, 2022, Dr. Navarro's counsel estimated that, based on their review of these documents, between 200 and 250 of these 1,700 documents were PRA records. Bosanko Decl. ¶ 9. By letter dated July 29, 2022, Dr. Navarro's counsel refused to produce any PRA records to NARA absent a grant of immunity for the act of returning such records. Bosanko Decl. ¶ 9. This lawsuit was filed thereafter.

In brief, as detailed above, the United States' Complaint asserts that by virtue of his employment Dr. Navarro fell under the PRA, and that his personal email contains Presidential records that he has refused to provide. The Complaint contains two alternative claims for relief, first under the D.C. replevin statute, pursuant to Fed. R. Civ. P. 64, and, alternatively, under federal common law of replevin. Compl., ECF No. 1, ¶¶ 39-50. Both claims seek the return of Presidential records that belong to the United States and that have been wrongfully detained by Dr. Navarro. *Id.*

Navarro000107

### B.  Material Facts Not in Dispute

Pursuant to LCvR 7(h), each party submitting a motion for summary judgment must attach a statement of material facts to which that party contends there is no genuine issue, with specific citations to those portions of the record upon which the party relies in fashioning the statement. The party opposing such a motion must, in turn, provide "specific facts showing that there is a genuine issue for trial." *Id.* Where the opposing party fails to provide specific relevant facts in dispute, discharge this obligation, the Court may take all facts alleged by the movant as admitted. *Id.*

The Government's Statement of Material Facts Not in Dispute, ECF No. 7-2, contained sixteen proposed factual statements. Dr. Navarro expressly does not dispute twelve. *See* Def.'s Resp. to the Government's Statement of Undisputed Material Facts ¶¶ 1-8, 10, 12-14, ECF No. 11-1 ("SMF Resp.").

The Court will proceed to analyze the four disputed statements to determine whether they adduce "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

1. SMF No. 9 states:

"E-mail and other electronic messages, including electronic messages sent and received on non-official electronic message accounts, constitute Presidential records to the same extent as hard copy documents. 44 U.S.C. §§ 2201, 2209."

Dr. Navarro responded: "Disputed only to the extent that the statute is vague as to how and to what extent it applies to email records, which is discussed in Dr. Navarro's opposition. Dr. Navarro does not dispute, however, that e-mail and other electronic messages can constitute Presidential records." SMF Resp. at 3-4.

Navarro000108

Dr. Navarro does not take issue with the core factual statement that "e-mail and other electronic messages can constitute Presidential records." His "dispute" seems to reduce to a general legal objection to the statute's specificity. Therefore, the core statement must be considered undisputed.

2. SMF No. 11 states:

"In February 2017, the White House Counsel's Office issued a memorandum to White House personnel regarding the use of non-official email accounts to conduct official business, writing: "If you ever send or receive email that qualifies as a presidential record using any other account [i.e., other than the official government account], you must preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days." Compl. Ex. 1 at 2, ECF No. 1-2 (Memorandum for All Personnel, from Deputy White House Counsel Stefan C. Passantino, through Counsel to the President Donald F. McGahn (Feb. 22, 2017)) (WHCO Memorandum))."

Dr. Navarro responded: "Disputed only to the extent that the memorandum interprets the law more broadly than the language of 44 U.S.C. 2209(a) in that it states that emails which are received must be forwarded to a government account." SMF Resp. at 4.

Dr. Navarro again tenders a legal objection. He disputes only that the direction he received is, in his view, broader than the statute. He does not dispute that the memorandum, as quoted, was issued. This fact of its issuance and receipt, as quoted, must also be considered as undisputed.

3. SMF No. 15 states:

"Defendant did not copy each email or message constituting Presidential records that was sent or received on his non-official account or accounts to his official government email account. Bosanko Decl. ¶ 5."

Navarro000109

Dr. Navarro responded: "Disputed in that the statute is vague as to whether the receipt of emails on a personal account creates a Presidential record and/or whether and to what extent the emails received on Dr. Navarro's email account were ever Presidential records. An audit is ongoing to determine the emails responsive to NARA's correspondence." SMF Resp. at 6.

Dr. Navarro does not respond in any substantive way to the Plaintiff's statement. Indeed, he does not deny the asserted fact. Rather, he objects to whether the statute can or does classify the records in his personal email account, and then evades the question by adverting to an audit that was partially completed but apparently still ongoing. Absent a denial of the stated fact, the Court must consider the fact undisputed.

4.  SMF No. 16 states:

"Defendant continues to have Presidential records in his possession, custody, and/or control. Bosanko Decl. ¶¶ 6-10 & Attachment A (July 29, 2022 letter from John S. Irving to Gary M. Stern) (acknowledging continued possession, custody, and/or control)."

Dr. Navarro responded: "Disputed in that the audit of Dr. Navarro's email is ongoing, so the extent of whether or what Presidential records are in his possession, custody, and/or control is unknown at this time." SMF Resp. at 6.

The Court again notes that this is not a denial of the stated fact, but an evasion. Dr. Navarro merely contends that because of the ongoing audit, notwithstanding the results of its initial search, he cannot say whether or what Presidential records are in his possession, custody and/or control. Nonetheless in view of the entire record, it is quite clear that this is an effort artificially to create a dispute where there is no factual basis for one. The Court considers the admission of Dr. Navarro's counsel, that 200 to 250 emails constituting Presidential records were discovered out of 1,700 potentially responsive documents in the initial email search, as evidencing the fact that Dr. Navarro

8

has Presidential emails in his possession.[3]  Bosanko Decl. ¶ 9, ECF No. 1-5.

Therefore, notwithstanding the efforts to create disputed facts and avoid the consideration of summary judgment, the Court considers the facts to be undisputed, as discussed above.

## II.     LEGAL STANDARDS

### A.  Summary Judgment

The Court may grant summary judgment where, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

"Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

---

[3] Statements and arguments by Dr. Navarro's counsel make plain, beyond his counsel's explicit admission, that his personal emails contain records responsive to the requests by NARA and by the Department of Justice, but that they are withheld for other reasons. *See, e.g.,* MTD at 6 ("Dr. Navarro has asserted a privilege validly delaying the time within which he must produce *the records sought by the Archivist*" (emphasis added)).

Navarro000111

586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

**B.  Motion to Dismiss for Failure to State a Claim**

Dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is "appropriate when a complaint fails 'to state a claim upon which relief can be granted.'" *Strumsky v. Wash. Post Co.*, 842 F. Supp. 2d 215, 217 (D.D.C. 2012) (quoting Fed. R. Civ. P.12(b)(6)). "[A] complaint must contain sufficient factual allegations that, if accepted as true, 'state a claim to relief that is plausible on its face.'" *United States ex rel. Scott v. Pac. Architects & Eng'rs, Inc.*, 270 F. Supp. 3d 146, 152 (D.D.C. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994).

**III.    DISCUSSION**

**A.  Presidential Records Act**

1.  PRA's Requirements

In opposing summary judgment and moving to dismiss, Dr. Navarro argues that the PRA does not impose an express statutory obligation on him to return Presidential records that he

Navarro000112

created or received during his tenure as a Presidential advisor, and that the PRA does not contain

its own enforcement mechanism, therefore precluding the writ of replevin sought by the United

States.  *See* MSJ Opp. at 4-5; MTD at 7.  Dr. Navarro further argues that the PRA lacks any

statutory deadline by which he must turn over any Presidential records in his possession, and

therefore the Government has no legal recourse. MSJ Opp. at 5; MTD at 5.  These arguments

ignore or contravene the statute's purpose, framework and provisions.

 Dr. Navarro contends that he has no statutory duties under the PRA, *see* MSJ Opp. at 5.

This position would defeat the entire purpose of the statute, *i.e.*, to ensure that Presidential records,

as defined, are collected, maintained and made available to the public. 44 U.S.C. §§ 2201-2203.

The PRA makes plain that Presidential advisors such as Dr. Navarro are part and parcel of the

statutory scheme in that they are required to preserve Presidential records during their tenure so

that they can be transferred to NARA at the end of an administration. *See* 44 U.S.C. § 2203(g)(1)

("Upon the conclusion of a President's term in office . . . the Archivist of the United States shall

assume responsibility for the custody, control, and preservation of, and access to, the Presidential

records of that President.").  Dr. Navarro was so advised when he began his employment.[4]

 The PRA, in fact, provides that covered employees such as Dr. Navarro "may not create or

send a Presidential . . . record using a non-official electronic message account unless the President,

---

[4] A White House Counsel memorandum sent early in Dr. Navarro's tenure expressly extended section 2209(a)'s requirement to copy or forward emails to apply to those emails received on a non-official email account. *See* Compl. Ex. 1 at 2, ECF No. 1-2 (instructing White House personnel that "[i]f you ever send or receive email that qualifies as a presidential record using any other account . . . , you must preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days."). The memorandum also confirmed "that [P]residential records are the property of the United States . . . . When you leave EOP employment, you may not take any presidential records with you." *Id.* at 2. Though Dr. Navarro now disputes the White House memorandum's interpretation of the reach of the statute, he does not contend that he was not so advised.

Navarro000113

Vice President, or covered employee (1) copies an official electronic messaging account . . . in the original creation or transmission of the Presidential record . . . ; or (2) forwards a complete copy of the Presidential . . . record to an official messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record." 44 U.S.C. §§ 2209(a)(1)-(2). The Archivist is thereafter required to "make such records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." *Id.* § 2203.

Dr. Navarro asserts that the request for emails regarding his White House duties that were received from others, rather than created by him, is outside the statute's scope, whether or not they were responsive to the emails he generated. This again evidences a misunderstanding of the statute's reach. Indeed, if the statute contemplates creating the full record of a covered employee's work, as it surely does, then wiping out part, if not half, of the record would contravene the intent of the statute. Moreover, contrary to Dr. Navarro's position, the PRA expressly defines Presidential records to include those "created *or received* by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President") (emphasis added); 44 U.S.C. §§ 2202(2), 2203(a)-(b). All the emails in Dr. Navarro's personal email account, whether created or received, are therefore subject to being assessed as potential Presidential records if they arose out of his employment in the administration.

Dr. Navarro's other arguments under section 2209 are equally without merit. He argues that the United States cannot rely on section 2209 because no court has yet interpreted it. *See* MSJ Opp. at 5-7. If applied, this contention would render every new statute unenforceable because no court would ever be able to interpret it a first time absent another court's also-prohibited first interpretation. The circularity of such a novel doctrine is self-evident.

It also has no merit in view of this Circuit's jurisprudence. *See CREW v. Cheney*, 591 F.

Navarro000114

Supp. 2d 194, 216 (D.D.C. 2009) ("[I]t it borders on the absurd to believe that Congress statutorily

defined Vice–Presidential records and required the Vice President to implement steps to preserve

them, but denied any judicial review to prevent the Vice President from using a different definition

for Vice–Presidential records."). In *Am. Historical Ass'n v. Peterson*, 876 F. Supp. 1300, 1315

(D.D.C. 1995), the district court, in an action focused on the records of a former President, the

court rejected the notion that judicial review was unavailable:

> it borders on the absurd to posit that Congress – in passing a statute to preclude former Presidents from disposing of Presidential records at will, and affording Presidents no discretion to restrict access to records after leaving office – intended that a former President's post-term decisions regarding disposal of such records be immune from judicial review.

*Id.* at 1315. This reasoning applies with equal force to the records of a former covered employee.[5]

Accordingly, the Court declines to embrace an argument that would bar all judicial review of new

statutes.

2.   United States' Power to Enforce PRA's Requirements

Dr. Navarro also maintains that because the statute sets out a general disclosure

---

[5] Under *Armstrong v. Bush ("Armstrong I")*, 924 F.2d 282, 290-91 (D.C. Cir. 1991), the decisions of a sitting President with respect to his or her records were deemed not to be subject to judicial review under the PRA, which did not create a private cause of action for enforcement. However, two years later, in *Armstrong v. Executive Office of the President ("Armstrong II")*, 1 F.3d 1274, 1293-94 (D.C. Cir. 1993) (per curiam), the court retreated from that position and held that although "the PRA impliedly precludes judicial review of the President's decisions concerning the creation, management, and disposal of presidential records during his term of office," courts "may review guidelines outlining what is, and what is not, a 'presidential record' " because to hold otherwise would "be tantamount to allowing the PRA to functionally render the FOIA a nullity." The court was clear in stating that "[t]he *Armstrong I* opinion does *not* stand for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review." *Id.* at 1293. (emphasis added). Subsequently, in *Peterson*, the court reviewed an agreement regarding a former President's personal electronic records and held that "judicial review may be available to ensure that Presidential records are not disposed of as personal records at the end of an Administration and that, instead, all Presidential records fall subject to the Archivist's "affirmative duty to make such records available to the public." 876 F. Supp. at 1314.

Navarro000115

requirement with no apparent enforcement mechanism (other than to discipline a wayward employee), there is no power in the United States to enforce the statute and require production of the detained Presidential records by any other method. MSJ Opp. at 7. In short, Defendant suggests that because there is no explicit statutory scheme for compelling the production of Presidential records wrongfully held by a former covered employee, the United States cannot prevail in seeking a writ of replevin. This approach, too, would nullify effectuation of the statute's purpose.

Dr. Navarro's argument appears to be a variation on the motion to dismiss in *CREW*.  In that case, private plaintiffs pled several causes of action, but did not plead a cause of action under the PRA, although their subsequent motion papers did suggest that they were requesting the Court to imply a private cause of action under the PRA. 593 F. Supp. 2d at 217.

> Although the PRA certainly creates ministerial obligations for the President and Vice–President, and although Plaintiffs are undoubtedly correct that the PRA was enacted to ensure the preservation of Presidential records for "scholars, journalists, researchers and citizens of our own and future generations," (quoting 124 Cong. Rec. H34894 (daily ed. Oct. 10, 1978) (Statement of Rep. Brademas)), the statute nevertheless does not contain language evincing a Congressional intent to allow suits by private plaintiffs proceeding directly thereunder. The Supreme Court has explained that the private right of action inquiry must focus on whether the *statutory text* "[is] 'phrased in terms of the persons benefitted.'" Here, Plaintiffs submit that the PRA defines "the persons benefitted" in 44 U.S.C. § 2202, the provision stating that *"[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records."*

*Id.* at 218 (cleaned up).

Here, Dr. Navarro suggests that the United States may not maintain an action to vindicate the purposes of the PRA.  As the above makes clear, the United States—which "shall reserve and retain complete ownership, possession, and control of Presidential records"—is precisely the plaintiff to bring an action under the statute, as it did here in seeking a writ of replevin for Presidential records wrongfully retained.

Although the PRA sets out a statutory scheme, it is not in the Congress' ambit to envision

Navarro000116

every manner in which a person might seek to evade the requirements of a statute. And clearly, while the statute seeks to make plain that all Presidential records are to be provided to NARA, Congress did not delineate provisions to cover a situation where a former covered employee would (a) maintain a private, encrypted email account with official emails, (b) not follow the prescribed transfer of those emails to the official account, and (c) refuse to return those emails that constitute Presidential records.  Enforcement of the statute by the government to assert its ownership rights militates that it must be free to utilize those legal processes available to it whether or not they are expressly provided for by statute   In this instance, the United States correctly invokes the Court's judicial power to require the return of the wrongfully retained emails.

3.   Vagueness

Dr. Navarro also asserts that the statute is "vague" and unsettled and therefore "there exist genuine disputes of material fact as to whether any alleged actions Dr. Navarro engaged in were even a violation of the PRA." MSJ Opp. at 7.   Apart from the legal objections raised in his Statement of Undisputed Material Fact Response, Dr. Navarro asserts no credible challenge to the statutory scheme as it applies to his actions. The undisputed material facts and the clear language of the statute make it plain that the United States has made out an unchallenged factual case that Dr. Navarro wrongfully retains Presidential records that are the property of the United States. Absent some other compelling reason not to issue a writ of replevin, Dr. Navarro must return the withheld Presidential records.

4.   Applicable Deadline for Compliance

Dr. Navarro contends that because the statute did not contemplate these circumstances, and therefore did not set out any deadline by which Presidential records held in a personal email account are to be returned, the United States may not have the Court compel their return under a

15

writ of replevin. Rather, Dr. Navarro maintains that he has "asserted a privilege validly delaying the time within which he must produce the records sought by the Archivist." MSJ Opp. at 10; *see also* MTD at 6. In its present posture, this excuse, even if valid, has no obvious date of termination and therefore runs counter to the intent and provisions of the PRA.

It bears note that under the PRA Dr. Navarro's obligation to copy from or forward from his personal account to the official account was "no later than" twenty (20) days after the original creation or transmission.[6] Plainly, he did neither during his tenure in the White House, nor has he forwarded Presidential record emails in the years since. In light of the statute's expectations and the lack of any cognizable justification for his delay in complying with the statute, the Court declines to accept the proposition that compliance is indefinitely delayed.

### B. Fifth Amendment Production Privilege

Dr. Navarro asserts that his refusal to return the emails in question was justified because he "reasonably believed that the production of records to the United States risked the implication of his Fifth Amendment right against self-incrimination." MSJ Opp. at 3. But he goes no further, and does not explain in any way why production of the requested Presidential records would tend to incriminate him. He merely says so. It is precedent of long standing that he "is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified[.]" *See Hoffman v. United States*, 341 U.S. 479, 486 (1951) (citation omitted). "To sustain the privilege, it need only be evident from the implications of the question, in the

---

[6] The PRA requires the President, the Vice President, and Covered Employees to "cop[y] their "official electronic messaging account" when sending a communication using a non-official account or to "forward[] a complete copy" of an email sent on their non-official account to their "official electronic messaging account . . . not later than 20 days after the original creation or transmission" of the record. 44 U.S.C. §§ 2209(a)(1), (a)(2).

16

setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'" *Id.* at 486-87.

In this setting, Dr. Navarro has been requested to return to the United States emails from his personal email account that constitute Presidential records and which were in all instances prepared during his tenure at the White House from 2017 to 2021.  Producing these pre-existing records in no way implicates a compelled testimonial communication that is incriminating.  *See United States v. Doe,*  465 U.S. 605, 612 n.10 ("If the party asserting the Fifth Amendment privilege has voluntarily compiled the document, no compulsion is present and the contents of the document are not privileged."); *Fisher v. United* States, 425 U.S. at 408 ("The Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a Testimonial Communication that is incriminating.").  Such "pre-existing, voluntarily prepared documents" are not covered by the Fifth Amendment.  *See United States v. Hubbell*, 167 F.3d 552, 567-69 (D.C. Cir, 1999), *aff'd*, 530 U.S. 27 (2000).

Indeed, the production of these pre-existing emails "'does not compel oral testimony,' nor would it 'compel the [recipient] to restate, repeat, or affirm the truth of the contents of the documents sought.'" *SEC v. Karroum*, Misc. A. No. 15-590 (JEB), 2015 WL 8483246 *3 (D.D.C. Dec. 9, 2015) (quoting *Fisher v. United States*, 425 U.S. 391, 409 (1976)).  In other words, the mere act of production is "not testimonial in nature." *Id.*

**C.  Replevin**

Finally, the Court agrees with the United States that the District of Columbia's replevin

Navarro000119

statute provides a cause of action for the return of Dr. Navarro's unlawfully retained documents. Replevin "is, in general, an action in which the owner, or a person who has a general or special interest in some personalty either taken or detained by another, seeks to recover possession in specie, and, occasionally, the recovery of damages as an incident of the proceedings." Replevin, 7 American Law of Torts § 24:17 (West 2022).   Federal Rule of Civil Procedure 64 expressly contemplates that federal courts will issue writs of replevin, or other corresponding or equivalent remedies, specifying that the law of a forum state will govern except insofar as federal law applies.

District of Columbia law creates an action for replevin, allowing a Plaintiff "to recover personal property to which the plaintiff is entitled, that . . . [has] been wrongfully taken by or to be in the possession of and wrongfully detained by the defendant."   D.C. Code 16-3701.4. The "essence" of a replevin action under D.C. law is the "wrongful withholding of the property in question." *Hunt v. DePuy Orthopedics, Inc.,* 729 F. Supp. 2d 231, 232 (D.D.C. 2010). Where, as here, a party has wrongfully detained property belonging to the United States, the United States has sued for the return of the property.  *See, e.g.*, *United States v. McElvenny,* 02-cv-3027, 2003 WL 1741422, at*1 (S.D.N.Y. Apr. 1, 2003) (seeking a writ of replevin for map of Cuba bearing notations made by President John F. Kennedy during the Cuban Missile Crisis and a collection of President Kennedy's papers regarding federal involvement in the integration of the University of Mississippi).

Courts in this Circuit considering a claim of replevin under the D.C. Code look to D.C. law, rather than any federal common law, to determine whether a party has stated a viable replevin claim.  *BMO Harris Bank N.A. v. Dist. Logistics, LLC*, Civ. A. No. 20-3425 (KBJ/RMM), 2021 WL 7448012, at *4 (D.D.C. July 23, 2021). In the District of Columbia, replevin is a cause of action, "brought to recover personal property to which the plaintiff is entitled, that is alleged to

Navarro000120

have been wrongfully taken by or to be in the possession of and wrongfully detained by the defendant[.]" *BMO*, 2021 WL 7448012, at *4 (quoting *Hunt v. DePuy Orthopedics*, 729 F. Supp. 2d 231, 232 (D.D.C. 2010) (citing D.C. Code § 16-3701))).

> The District of Columbia's replevin statute provides in relevant part:

> The plaintiff sues the defendant for (wrongly taking and detaining) (unjustly detaining) the plaintiff's goods and chattels, to wit: (describe them) of the value of [specified amount of] dollars. And the plaintiff claims that the same be taken from the defendant and delivered to him; or, if they are eloigned, that he may have judgment of their value and all mesne profits and damages, which he estimates at [specified amount of] dollars, besides costs.

> D.C. Code § 16-3702 (emphasis added).  Defendant contends that the United States has failed to plead a replevin action because it does not set forth the "value of" the Presidential records detained by Dr. Navarro. MTD at 8, ECF No. 9.

Yet Dr. Navarro provides no support for the proposition that Courts must dismiss replevin actions whenever the plaintiff does not plead specific monetary damages. That information and the documents at present are solely in Dr. Navarro's possession. Its value becomes relevant only when the property at issue cannot be returned to the plaintiff and the alternative remedy sought is monetary damages. The remedy sought here is explicitly and solely the return of the wrongfully withheld property; the monetary value of the property is therefore irrelevant.

Pursuant to D.C. Code § 16–3702, a replevin plaintiff must demand *either* of two remedies: "[that the property] be taken from the defendant and delivered to him; *or, if they are eloigned*, that he may have judgment of their value and all mesne profits and damages, which he estimates at [a certain amount of] dollars, besides costs." D.C. Code § 16–3702 (emphasis added). The statute's use of the disjunctive makes plain that monetary value of property only becomes relevant when the property cannot be returned to the plaintiff, when compensation is the sole available remedy. This is consistent with the common law tradition that "[t]he primary relief sought in a replevin is

19

the return of the identical property, and damages are merely incidental." 66 Am. Jur. 2d Replevin § 1.

Moreover, Defendant's reliance on *BMO Harris* is misplaced.  In *BMO*, the bank failed to meet *either* requirement of the D.C. statute.  It neither stated the value of the equipment at issue nor did it claim that the equipment should be taken and delivered to it.  *Id.* at *9.  Here, the United States has plainly sought that emails be taken from Dr. Navarro and delivered to it. Having met one of the two prongs of the statute, the failure to state a monetary value for the emails—which remain in Defendant's control—is unnecessary to state a claim.

Dr. Navarro also contends that the emails are not subject to replevin, on the dubious ground that his possession was the "result of an innocent oversight and therefore not willful." As support, he maintains that once the "process" is complete (presumably at some future date following the audit of his emails, and the resolution of the House of Representatives' subpoena and his indictment for contempt of Congress), the records will be provided.  MSJ Opp. at 8.  In the context of his counsel's admission that there are between 200 and 250 Presidential records in the 1,700 emails reviewed, *see* Bosenko Decl. ¶ 9, this merely supports the view that the retention of the records is wrongful. The contention also fails as a threshold matter, as Dr. Navarro's *mens rea* is irrelevant. The clear record and undisputed fact that he created or received the emails on his private email account relating to and while performing duties for the administration, and neither included them in his official emails nor returned them to NARA upon request, therefore wrongfully detaining them, is the sole relevant inquiry.

Dr. Navarro's final argument is that Presidential records are not subject to replevin law because they are not personal property.  "Personal property" is the complement to "real property," and it is well-established that personal property encompasses "[a]ny moveable or intangible thing

20

that is subject to ownership and not classified as real property." *Property*, Black's Law Dictionary (11th ed. 2019). The history of the PRA makes it plain that Presidential records plainly fall into this broad definition, whether they are physical objects (like the map sought in *United States v. McElvenny*) or electronic records (like the emails in *Karroum*). Therefore, in *Nixon v. United States,* the D.C. Circuit—prior to the enactment of the PRA—held that presidential materials were the President's personal property. 978 F.2d 1269, 1284 (D.C. Cir. 1992). The passage of the PRA in 1978 changed the ownership of Presidential records, converting them from being the personal property of the president into the personal property of the United States. See 44 U.S.C. § 2202. Their fundamental character as Presidential records is as personal property. That these records are electronic as opposed to paper make no difference to their character. *See Armstrong*, 1 F.3d at 1283 (emails are records under the Presidential Records Act and therefore constitute personal property).

Dr. Navarro's contrary argument is based on a district court case finding that airline frequent flyer miles are not personal property, *see* MSJ Opp. at 8 (citing *Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 143 (D.D.C. 2008)); MTD 9-10 (same). The Court is unpersuaded. Frequent flyer miles are different in kind from Presidential records. The *Ficken* court's finding that frequent flyer miles "amounted to credit with the airline" and represented an "intangible right" rather than "personal property," 578 F. Supp. 2d at 143, is distinct. Presidential records are not intangible credits issued by a third-party, but, as discussed above, personal property wholly within the ambit of the statutory scheme.

### IV.    CONCLUSION

For the foregoing reasons, Court **GRANTS** the United States' [7] Motion for Summary Judgment and **DENIES** Defendant's [9] Motion to Dismiss. An appropriate Order setting out the

Navarro000123

relief awarded accompanies this Memorandum Opinion.

Date:  March 9, 2023

<div style="text-align: right">

/s/
_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

</div>

Navarro000124

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

*Plaintiff,*

—v.—

PETER K. NAVARRO,

*Defendant.*

Case No. 1:22-cv-2292

## STATUS REPORT[1]

### Plaintiff's Position

On August 3, 2022, Plaintiff initiated this lawsuit seeking the return of Presidential Records Act ("PRA") materials belonging to the government that were in Defendant's possession. *See* Compl., ECF No. 1. On March 9, 2023, the Court granted summary judgment in favor of Plaintiff, ordering the return of certain PRA materials forthwith, and ordering the parties to coordinate regarding a schedule for the production of the remaining PRA materials. On April 8, 2023, the parties filed a Joint Status Report setting out a proposed schedule.

By Minute Order on April 12, 2023, this Court ordered, *inter alia*, that

[T]he Court adopts the parties' proposed schedule in their 24 Joint Status Report. Defendant shall complete all searches for Presidential records on or before May 8, 2023, and the parties shall file another joint status report on or before May 15, 2023 proposing a schedule and deadlines setting forth the timing and manner by which Defendant will produce the remaining Presidential records in his possession.

---

[1] The Court's April 12, 2023 Minute Order directed the parties to file a joint status report proposing a schedule and deadlines for production; however, as explained in detail in this filing, the parties are at an impasse. Accordingly, Plaintiff has drafted its own position statement. Earlier today, Plaintiff's counsel sent an email to Defendant's counsel regarding whether to file a combined status report or separate reports and asking for a response by 6:00pm. As of the time of this filing, Defendant's counsel had not responded to that email.

Navarro000125

Apr. 12, 2023, Minute Order.  Notwithstanding this Court's orders, Defendant continues to thwart the United States' ongoing efforts to effectuate this Court's March 9, 2023, Judgment and Order and several subsequent, related production orders.  By his own admission, Defendant has failed to comply with this Court's order that he complete all searches for Presidential records on or before May 8, 2023.  Moreover, the limited information available to Plaintiff suggests that the search/searches that have been conducted to date are woefully underinclusive.  Based on the information provided by Defendant's counsel, it appears that—contrary to the process agreed to by the parties—Defendant has conducted a single search for emails exchanged between the ProtonMail account identified in the Complaint and email addresses ending in .gov or .mil.[2]  Defendant had to know that this search was underinclusive, as his own document production included a substantial number of PRA communications for which neither the sender nor recipient had a .gov or .mil email domain.  It also fails to comply with the search procedures set out in the parties' Joint Status Report, which explicitly contemplated additional searches.  Moreover, Defendant's document production revealed that Defendant used at least four personal email accounts[3] to conduct official business; however, Defendant has offered no indication that each of these email accounts has been searched.  To the contrary, when Plaintiff reached out last week raising these various concerns and seeking additional information about the nature and extent of Defendant's searches, Defendant expressly refused to provide such information.  Instead, Defendant insisted that it was Plaintiff's obligation to propose searches, despite Defendant's earlier commitment to search all email, and his acknowledgment that any searches proposed by Plaintiff were preliminary and non-exclusive.

Given Defendant's apparently inadequate search and refusal to provide further information, the Court should impose a strict schedule and deadlines by which Defendant will produce the remaining Presidential records in his possession.  Unless and until Defendant explains the scope and

---

[2] Defendant has now produced the "the already identified 200-250 Presidential records in his possession," which were located during a search process conducted by Defendant's prior counsel.
[3] In addition to the ProtonMail account referenced in the Complaint, the Government is now aware that Dr. Navarro used at least three others: a second ProtonMail account, a Gmail account, and a .com account.  Plaintiff can provide the addresses to the Court upon request.

methodology of any search(es) he performed, Plaintiff will be unable to ascertain whether Defendant has complied with this Court's March 9, 2023, Judgment and Order or subsequent production orders. Accordingly, Plaintiff respectfully requests that the Court enter an order requiring Defendant to provide the Court with additional information about the searches that he has conducted, the accounts on which he conducted official business, and a plan for an adequate search of those accounts by May 24, 2023.   Plaintiff proposes responding to that filing by May 31, 2023.

In support of this request, Plaintiff provides the following information:

1.    On April 8, 2023, pursuant to this Court's order, the parties filed a Joint Status Report. In that Joint Status Report, Defendant represented that he "ha[d] begun the process of conducting searches to capture *all* Presidential Records Act (PRA) records in his possession."   Jt. Status Report ¶ 1, ECF No. 24 (emphasis added).

2.    Specifically, Defendant represented that would search "all email accounts on which he conducted official business, which includes, but is not necessarily limited to, his ProtonMail account." *Id.*

3.    Defendant further represented that these searches would involve, at minimum, a three-step process. In the JSR, Defendant represented that he would "first search his email for all correspondence with a .gov or .mil domain," and would then "use these results to conduct a search for any emails with those individuals' personal email accounts, as well as a search of text messages and chats (if any exist)."   *Id.* ¶ 2. Defendant further represented that he would "also search for all electronic messages (and/or accompanying attachments) that he has sent to or received from anyone that relate to his official duties."   *Id.* ¶ 3.

4.    The parties agreed that Defendant would complete "*all* searches for PRA material by May 8, 2023."   *Id.* ¶ 4 (emphasis added).

5.    On April 12, 2023, this Court entered an order adopting the parties' proposed schedule. In particular, the Court ordered that "Defendant shall complete *all* searches for Presidential records on or before May 8, 2023."   Apr. 12, 2023 Minute Order (emphasis added). The Court further ordered the parties to file another joint status report on or before May 15, 2023 "proposing a schedule

Navarro000127

and deadlines setting forth the timing and manner by which Defendant will produce the remaining Presidential records in his possession." *Id.*

6.      On May 8, 2023—the date on which Defendant was ordered to have conducted all searches for PRA material—Defendant's counsel sent an email to Plaintiff's counsel regarding the status of its searches. *See* May 8, 2023, Email from S. Woodward to L. Reeves, attached hereto as Exhibit A. In that email, Defendant's counsel represented the following:

> We have identified roughly another 800 records exchanged with a ".gov" or a ".mil" account that we are reviewing. We would propose a rolling production of roughly 200 emails a week for the next month to review and produce these records. We will also agree to conduct any targeted searches that you all request based on what you see in these emails (e.g., a search for a specific recipient that may not utilize a ".gov" or ".mil" email account but with whom we see Dr. Navarro corresponding).

Ex. A.

7.      Although the email provided limited information regarding Defendant's searches for PRA material, it suggested that Defendant had not completed the searches described in the Joint Status Report, let alone completed "all searches" for Presidential records. At most, it appears that Defendant has conducted only the first step of the process described in the parties' JSR—i.e., a search for correspondence with a .gov or .mil domain. Based on this email, it does not appear that Defendant took the next step of "us[ing] these results to conduct a search for any emails with those individuals' personal email accounts, as well as a search of text messages and chats (if any exist)," or that Defendant took any further steps to "search for all electronic messages (and/or accompanying attachments) that he has sent to or received from anyone that relate to his official duties." Additionally, the email provided no indication that Defendant searched "all email accounts on which he conducted official business."

8.      On May 10, 2023, Plaintiff's counsel sent an email seeking additional information regarding the searches conducted by Defendant. *See* May 10, 2023, Email from L. Reeves to S. Woodward, attached hereto as Exhibit B. In that email, Plaintiff's counsel explained that, based on the information provided, it appeared that Defendant's searches were "not adequate or reasonably calculated to capture all PRA material in [Defendant's] possession." *Id.* Thus, Plaintiff's counsel

explained that Defendant was not in compliance with the Court's minute order, asked questions aimed at assessing the extent of Defendant's compliance, and asked how Defendant's counsel planned to remedy the concerns outlined in the email. *Id.*

9.      On May 11, 2023, Defendant's counsel responded. *See* May 11, 2023, Email from S. Woodward to L. Reeves, attached hereto as Exhibit C. The email appears to confirm that the only search conducted by Defendant was a search for correspondence with a .gov or .mil email domain, that Defendant made no effort to conduct additional searches aimed at identifying PRA material, and that Defendant has no intention of initiating additional searches on his own:

> [W]ith respect to the Court's April 12, 2023, Minute Order regarding our obligation to complete all "searches" by May 8, 2023, your Proposed Order, which the Court adopted, required us to search for all correspondence with a .gov or a .mil domain. We have done that. Any suggestion that our searches were not adequate or reasonably calculated to capture correspondence the subject of the PRA strains credulity given that you proposed the search we performed.

Ex. C; *see also id.* "As explained in our emails to you, and which you appear to acknowledge above, at your request we searched for any correspondence with a user/custodian that had a .mil or a .gov account. If you have another search you believe would better identify records subject to the PRA, please let us know and we'll run it.").

10.      It is not clear from correspondence to date whether Defendant searched "all email accounts on which he conducted official business," as the parties agreed in the Joint Status Report.

11.      Finally, Defendant's counsel refused to provide any of the information sought by the Plaintiff to assess the adequacy of Defendant's searches, insisting that requesting such information amounted to an unreasonable search under the Fourth Amendment. *See* Ex. C.

12.      Although Plaintiff has only limited information regarding the searches conducted by Defendant for PRA material, it appears that such searches were woefully underinclusive. Neither the Joint Status Report nor the Court's order indicated that Defendant need only search one email account for correspondence with a .gov or .mil domain. Rather, the JSR (and by extension the Court's order) explicitly contemplated that Defendant would "*first* search . . . for all correspondence with a .gov or .mil domain," Jt. Status Report ¶ 2 (emphasis added) and would then use those search results to

conduct further searches for correspondence with those individuals, in addition to conducting other searches as needed for "all electronic messages (and/or accompanying attachments) that he has sent to or received from anyone that relate to his official duties," *id.* ¶ 3. In other words, Defendant was obligated to conduct searches aimed at capturing *all* PRA material in his possession, not simply those emails including a .gov or .mil email address.

13.    As Plaintiff's counsel noted in the May 10, 2023 email, the PRA material produced by Defendant to date indicates that a search for .gov and .mil email addresses is almost certainly underinclusive. Of the emails that Defendant has previously identified as PRA material and produced to the National Archives, 40 emails did not include a sender or recipient with a .gov or .mil email address. Thus, Defendant's domain-based search would have missed a significant portion of the PRA material identified to date. Additionally, the PRA materials to date indicate that Defendant used at least four non-official email accounts to conduct official business during his government tenure. Thus, to the extent that Defendant has only searched the ProtonMail account listed in the Complaint, he has not complied with his obligations under the Court's minute order.

14.    Defendant's counsel's offer to "conduct any targeted searches that [Plaintiff] request[s] based on what [Plaintiff] see[s] in these emails" does not excuse Defendant's failure to conduct an adequate search. As an initial matter, Defendant's proposal came much too late. The Court ordered Defendant to conduct *all* searches by May 8, 2023—not to conduct a cursory initial search by May 8 and then to conduct subsequent searches at some indeterminate future time. Plaintiff has been seeking the return of these PRA materials for nearly a year and a half, and Defendant has continuously engaged in dilatory tactics to avoid his obligations under the PRA. Defendant should not be permitted to stall further by flouting the agreed-upon process and this Court's order.

15.    Setting aside timing considerations, it is Defendant's responsibility to craft searches that will uncover the PRA materials in his possession. Only Defendant knows which and how many personal email accounts he may have used to conduct official business, as well as with whom he may have corresponded and on what topics. Defendant agreed to search "for all electronic messages (and/or accompanying attachments) that he has sent to or received from anyone that relate to his

official duties," and it is his responsibility to conduct searches that will identify such information, or to review all his personal email to determine which are related to official White House business.[4]

16.      In view of Defendant's failure to complete his searches for PRA material by May 8, 2023, the Court should impose a strict schedule at this time.

17.      Plaintiff respectfully requests that the Court order Defendant, by May 24, 2023, to provide the Court and Plaintiff with a description of the search(es) conducted to date for PRA material, including, but not limited to identifying the email account(s) searched and confirming whether those email accounts comprise the full universe of Defendant's personal accounts that were used to conduct official business. Defendant should also identify a plan, including a timetable, to search those accounts to identify and produce PRA records.

18.      Once Defendant has provided such information, Plaintiff proposes responding by May 31, 2023.


Dated:  May 15, 2023                                Respectfully submitted,

                                                    BRIAN M. BOYNTON
                                                    Principal Deputy Assistant Attorney
                                                    General

                                                    BRIAN D. NETTER
                                                    Deputy Assistant Attorney General

                                                    ELIZABETH J. SHAPIRO
                                                    Deputy Branch Director
                                                    Federal Programs Branch

                                                    */s/ Alexandra R. Saslaw*
                                                    LEE REEVES
                                                    ALEXANDRA SASLAW
                                                    Trial Attorneys
                                                    U.S. Department of Justice

---

[4] Of course, Plaintiff reserves the right to challenge the adequacy of such searches in the event that they do not appear reasonably calculated to identify PRA material in Defendant's possession.

Civil Division, Federal Programs
Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 514-4520
Email: alexandra.r.saslaw@usdoj.gov

*Counsel for Plaintiff*

# Exhibit A

**Reeves, Lee  (CIV)**

---

**Subject:**                    [EXTERNAL] RE: Navarro: Presidential Records transfer to NARA

---

**ro**   Stanley Woodward <stanley@brandwoodwardlaw.com>
**S  n**   Monday, May 8, 2023 1:21 PM
**o**   Reeves, Lee (CIV) <Lee.Reeves2@usdoj.gov>
    'Gary Stern' <garym.stern@nara.gov>; 'Hannah Bergman' <Hannah.Bergman@nara.gov>; Saslaw, Alexandra R. (CIV)
<Alexandra.R.Saslaw@usdoj.gov>; 'Mark Nobile' <mark@brandwoodwardlaw.com>; 'Stan Brand'
<stanleymbrand@gmail.com>
**S**        Re: [EXTERNAL] RE: Navarro: Presidential Records transfer to NARA

Lee - as you're aware our status report is due today.  We have identified roughly another 800 records
exchanged with a ".gov" or a ".mil" account that we are reviewing.  We would propose a rolling production of
roughly 200 emails a week for the next month to review and produce these records.  We will also agree to
conduct any targeted searches that you all request based on what you see in these emails (e.g., a search for a
specific recipient that may not utilize a ".gov" or ".mil" email account but with whom we see Dr. Navarro
corresponding).

Let us know if that is acceptable on your end and we will draft a proposed status report for your review.

Thanks,

Stanley

Navarro000134

# Exhibit B

**Reeves, Lee  (CIV)**

**Subject:**          FW: [EXTERNAL] RE: Navarro: Presidential Records transfer to NARA
**Attachments:**   [EXTERNAL] RE: Navarro: PRA; [EXTERNAL] RE: Navarro: PRA; export_20230510-165031.xls

**From:** Reeves, Lee (CIV) <Lee.Reeves2@usdoj.gov>
**Sent:** Wednesday, May 10, 2023 3:33 PM
**To:** stanley@brandwoodwardlaw.com
**Cc:** Gary Stern <garym.stern@nara.gov>; Hannah Bergman <Hannah.Bergman@nara.gov>; Saslaw, Alexandra R. (CIV)
<Alexandra.R.Saslaw@usdoj.gov>; Mark Nobile <mark@brandwoodwardlaw.com>; Stan Brand
<stanleymbrand@gmail.com>
**Subject:** RE: [EXTERNAL] RE: Navarro: Presidential Records transfer to NARA

Stanley,

Circling back as promised on your email below.  A bit of background may be helpful to understand our perspective on
your response and proposed course of action.  By email dated July 8, 2022, Dr. Navarro's prior counsel informed us that
his searches of Dr. Navarro's ProtonMail account had uncovered over 30,000 emails from 800 domains.  Subsequently,
by email dated July 22, 2022, Dr. Navarro's counsel further informed us that he had uncovered 1,700 documents that
might be covered by the PRA using the initial search parameters provided by NARA—parameters that NARA made clear
were not intended to be inclusive or exhaustive.  *See* attached emails (Att. 1 & 2).

Given this, we are surprised and concerned at your suggestion that your client has only located 800 records that are
responsive based on your search(es).  Although you have not provided sufficient information for us to assess the nature
or content of the search(es) that you have performed, the information that you have provided suggests that they are not
adequate or reasonably calculated to capture all PRA material in your client's possession.

A review of the emails you provided in your first production indicates that the search you conducted is underinclusive.
There are 40 emails in the production where the correspondence is entirely on .com accounts (*See* the attached
spreadsheet, Att. 3). A search for emails to/from only .gov and .mil accounts would not capture these messages or
others like them.

Your client is therefore not in compliance with the Court's April 12 Minute Order stating that your client "shall complete
all searches for Presidential records on or before May 8, 2023."

With respect to your suggestion that the Government provide "targeted searches that you all request based on what
you see in these emails," the answer to this is that the burden is on Dr. Navarro, not the United States, to go through the
full universe of Dr. Navarro's records in a systematic, methodical way to cull out responsive material, which must then
be evaluated to assess whether it in fact falls under the PRA.  Only your client has access to the full universe of material
that he possesses and knowledge of what it may contain or be referencing.  It is not the Government's obligation to
design subsequent (and untimely, based on the Court's deadline of May 8) searches intended to remedy inadequacies in
your client's initial search(es), just as it is not the requester's burden to design the Government's searches in a FOIA
case.

As you may recall, I asked by email dated April 5, 2023 that you provide a tally of the number of records that you were
reviewing in an effort to avoid precisely this sort of situation in which you appear not to have searched some portion of
your client's emails (including attachments).  I again reiterate that request, and ask that you provide that information to
me ASAP.  Please also confirm all of the email accounts Dr. Navarro uses or has used to send or receive material that
may fall within the ambit of the PRA.  All accounts will need to be searched fully and accounted for with respect to the
District Court's Judgment and various production orders.

Navarro000136

In summary, please let me know by COB tomorrow the answers to the following:

1. Please identify any and all accounts that Dr. Navarro uses or has used that may contain PRA material. The initial production demonstrates Dr. Navarro used at least four separate email accounts, not just the single ProtonMail account noted in the Complaint.

2. Please provide a tally of the number of emails contained in all accounts listed in response to #1 above.

3. Please provide the search terms and methodology that your client used that yielded the approximately 800 records noted below.

In addition to the answers to these questions, please also let me know by COB tomorrow how you plan to remedy the concerns outlined above, as the Government will need that information to prepare its position statement for the status report due Monday, May 15.

If a call would be beneficial, or if you need clarification about any of the above, please let me know.

Thanks,

Lee

_____

**Lee Reeves** | Trial Attorney
U.S. Department of Justice, Civil Division, Federal Programs Branch
1100 L St. NW | Washington, DC 20005
Tel: (202) 616-0773

# Exhibit C

**Reeves, Lee  (CIV)**

---

**Subject:**                    [EXTERNAL] RE: Navarro: Presidential Records transfer to NARA

---

**ro**    Stanley Woodward <stanley@brandwoodwardlaw.com>
**S n**   Thursday, May 11, 2023  :2  PM
 **o**    Reeves, Lee (CIV) <Lee.Reeves2@usdoj.gov>
      Gary Stern <garym.stern@nara.gov>; Hannah Bergman <Hannah.Bergman@nara.gov>; Saslaw, Alexandra R. (CIV)
<Alexandra.R.Saslaw@usdoj.gov>; Mark Nobile <mark@brandwoodwardlaw.com>; Stan Brand
<stanleymbrand@gmail.com>
**S**         Re: [EXTERNAL] RE: Navarro: Presidential Records transfer to NARA

Lee -

 irst, with respect to the Court's April 12, 2023, Minute    rder regarding our obligation to complete all "searches" by
May 8, 2023, your Proposed    rder, which the Court adopted, required us to search for all correspondence with a .gov or
a .mil domain.  We have done that.  Any suggestion that our searches were not adequate or reasonably calculated to
capture correspondence the subject of the PRA strains credulity given that you proposed the search we performed.

Second, your reference to 30k emails from 800 domains is wholly irrelevant.  Those numbers reflect the total number of
emails contained within Dr. Navarro's email without any filtering for date restrictions, custodians, or subject matter.  We
hope it is undisputed that the only records relevant to this process would have been created or exchanged between
 anuary 20, 201 , and  anuary 20, 2021, and have restricted our searches accordingly.  To that end, as we believe Mr.
Irving communicated to you (Complaint    3 ), the 1, 00 emails you reference were *potentially* subject to the
PRA.   ollowing his review of the same, he identified only 2  0 that he concluded were subject to the PRA, and those
records have now been produced to you.   f note, that means only 1     of the emails he reviewed, again based on
search terms you provided, were actually subject to the PRA.

Third, this is far from a    IA request and any comparison thereto is misplaced.  To whit, Dr. Navarro is a private
citizen.     IA requests are directed to the Executive Branch of the    nited States Government.

With respect to your specific requests:

1.  We decline.  Nothing in the Court's    rders, or any case law or regulation with which we're familiar permits the
government to compel Dr. Navarro to provide testimony, which is what your request amounts to.  If you're aware of any
email account you have cause to believe contains presidential records covered by the PRA, please identify the same and
we'll collect and search it.

2.  We decline.  The   ourth Amendment precludes the government from conducting unreasonable searches.   our
request amounts to just such a search - surely the government would not suggest that it could enter Dr. Navarro's
residence and rifle through his filing cabinets to count the number of paper files within his possession, custody, or
control.  Nor does the PRA authorize the government to invade his privacy to determine how many personal or
otherwise non-official emails he may have exchanged during his tenure with the Trump Administration.  To that end, as
we note above, only 1     of the communications Mr. Irving identified as a result of your proposed search terms were
actually determined by him to be records subject to the PRA.  Therefore, the total number of records he possesses is
irrelevant.

3.  As explained in our emails to you, and which you appear to acknowledge above, at your request we searched for any
correspondence with a user custodian that had a .mil or a .gov account.  If you have another search you believe would
better identify records subject to the PRA, please let us know and we'll run it.

Thanks,

Stanley


**r nd    ood   rd**
www.brandwoodwardlaw.com
1.202.    .    (o)

1.202.302.  0   (m)

1.202.    .0113 (f)