**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 23-5062**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

PETER K. NAVARRO,

Defendant-Appellant.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLEE**

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

GERARD SINZDAK
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff
  Civil Division, Room 7710
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 353-9039*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Appellant, who was a defendant in district court, is Peter K. Navarro.  Appellee, who was plaintiff in the district court, is the United States of America.  There are no amici or intervenors.

### B.    Rulings Under Review

Defendant-appellant seeks review of the March 9, 2023 memorandum opinion and order denying defendant's motion to dismiss and granting the United States' motion for summary judgment.  (Dkt. Nos. 15, 16).  The rulings were issued by Judge Colleen Kollar-Kotelly in Case No. 1:22-cv-02292.  The district court's opinion is not published in the federal reporter but is available at 2023 WL 2424625.

### C.    Related Cases

This case has not previously been before this Court.  There are no related cases of which counsel is aware.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ..................................................................... 1

STATEMENT OF JURISDICTION ............................................ 3

STATEMENT OF THE ISSUE .................................................. 4

PERTINENT STATUTES AND REGULATIONS ...................... 4

STATEMENT OF THE CASE ................................................... 4

I.     The Presidential Records Act ...................................... 4

II.    Factual and Procedural Background ............................ 7

    A.    Factual Background ............................................. 7

    B.    District Court Proceedings ................................. 10

    C.    Navarro's Emergency Motion for a Stay Pending
        Appeal ................................................................ 13

    D.    Proceedings Concerning Compliance with the District
        Court's Judgment .............................................. 15

SUMMARY OF ARGUMENT .................................................. 17

STANDARD OF REVIEW ...................................................... 20

ARGUMENT .......................................................................... 20

THE DISTRICT COURT CORRECTLY ORDERED NAVARRO TO RETURN
    PROPERTY THAT INDISPUTABLY BELONGS TO THE UNITED
    STATES ................................................................................ 20

CONCLUSION ...................................................................... 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                          **Page(s)**

*Alabama Ass'n of Realtors v. Department of Health & Human Servs.*,
    141 S. Ct. 2485 (2021) ............................................................31, 31-32

*Armstrong v. Bush*,
    924 F.2d 282 (D.C. Cir. 1991)...............................................................5

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
    501 U.S. 104 (1991) ........................................................................26, 27

*Citizens for Responsibility & Ethics in Washington v. Trump*,
    924 F.3d 602 (D.C. Cir. 2019)...............................................................4

*Cotton v. United States*,
    52 U.S. (11 How.) 229 (1850)....................................................2, 19, 25

*Fox v. Government of D.C.*,
    794 F.3d 25 (D.C. Cir. 2015)...............................................................20

*Isbrandtsen Co. v. Johnson*,
    343 U.S. 779 (1952) ...........................................................................27

*Leopold v. Central Intelligence Agency*,
    987 F.3d 163 (D.C. Cir. 2021)...............................................................3

*National Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012).............................................................21

*Nixon v. Administrator of Gen. Servs.*,
    433 U.S. 425 (1977) ...........................................................................28

*Nixon v. United States*,
    978 F.2d 1269 (D.C. Cir. 1992)..............................................................4

iv

*Rex Trailer Co. v. United States*,
  350 U.S. 148 (1956) ............................................................. 25

*States v. McElvenny*,
  No. 02-cv-3027, 2003 WL 1741422 (S.D.N.Y. Apr. 1, 2003) ............... 26

*Thompson v. District of Columbia*,
  832 F.3d 339 (D.C. Cir. 2016).............................................. 20

*United States v. Digital Prods. Corp.*,
  624 F.2d 690 (5th Cir. 1980) ............................................... 25

*United States v. Hubbell*,
  167 F.3d 552 (D.C. Cir. 1999), *aff'd*, 530 U.S. 27 (2000) ..................... 12

*United States v. Kearns*,
  595 F.2d 729 (D.C. Cir. 1978)......................................... 28, 30

*United States v. Lahey Clinic Hosp., Inc.*,
  399 F.3d 1 (1st Cir. 2005) .................................................. 26

*United States v. Lindberg Corp.*,
  882 F.2d 1158 (7th Cir. 1989) ............................................. 25

*United States v. Marion Cty. Sch. Dist.*,
  625 F.2d 607 (5th Cir. 1980) .............................................. 27

*United States v. Moffitt, Zwerling & Kemler, P.C.*,
  83 F.3d 660 (4th Cir. 1996) ............................................27-28

*United States v. Steenerson*,
  50 F. 504 (8th Cir. 1892) .................................................. 25

**Statutes:**

Presidential Records Act of 1978,
  44 U.S.C. § 2201 *et seq.* ................................................. 1, 4
    44 U.S.C. § 2201 ...................................................... 5

v

44 U.S.C. § 2201(2) ..........................................................5, 22

44 U.S.C. § 2202 .............................. 1, 6, 18, 21, 29

44 U.S.C. § 2203(g)(1) ...................................................7, 29

44 U.S.C. § 2204 ...............................................................7

44 U.S.C. § 2205(2)(A)-(C) .............................................7

28 U.S.C. § 1291 ...............................................................3

28 U.S.C. § 1292(a)(1) ......................................................3

28 U.S.C. § 1331 ...............................................................3

28 U.S.C. § 1345 ...............................................................3

44 U.S.C. § 2209 ........................................................5, 28, 29

44 U.S.C. § 2209(a) ........................................................29

44 U.S.C. § 2209(a)(1)-(2) .............................................6, 30

44 U.S.C. § 2209(b) .........................................................23

44 U.S.C. § 2209(c)(1) ......................................................6

D.C. Code §§ 16-3701 *et seq.*..........................................4

D.C. Code § 16-3701 ...............................1, 4, 18, 20

D.C. Code § 16-3702 ........................................18, 20

**Rule:**

Fed. R. Civ. P. 64 .....................................................19, 26

**Legislative Material:**

H.R. Rep. No. 95-1487, pt. 1 (1978) ...........................28

**Other Authority:**

77 C.J.S. *Replevin* § 8 (2023)...................................................................20

# GLOSSARY

| | |
|---|---|
| Act | Presidential Records Act |
| NARA | National Archives and Records Administration |

**INTRODUCTION**

The district court properly issued a writ of replevin requiring former Presidential advisor Dr. Peter Navarro to return all Presidential records in his possession to the United States. Under the laws of the District of Columbia, replevin is available to any plaintiff whose property has "been wrongfully taken by" or is "in the possession of and wrongfully detained by the defendant." D.C. Code § 16-3701. Those elements are satisfied here. Indeed, as this Court recognized in its order denying Navarro's motion for an emergency stay and as his opening brief confirms, Navarro has conceded all relevant facts. He acknowledges that, at the time the United States filed this suit, he possessed Presidential records covered by the Presidential Records Act of 1978, 44 U.S.C. § 2201 *et seq*., that those records are the property of the United States, *id*. § 2202 (vesting the United States with "complete ownership" of Presidential records), that he wrongfully failed to forward the records to his official account while he was a government employee, and that he has no valid justification for refusing to return the government's property.

In his opening brief, Navarro does not dispute that the United States properly established the necessary elements for replevin. Instead, Navarro broadly argues that the United States may not recover any Presidential records in his possession because the Presidential Records Act does not provide a cause of action to compel their return. That argument is without merit. *See* Order Denying Emergency Motion for Stay at 1 (Apr. 12, 2023).

The Supreme Court long ago established that the United States, like any property owner, may avail itself of state and local remedies to protect its property rights, *see Cotton v. United States*, 52 U.S. (11 How.) 229, 231-32 (1850), as the United States did here. Nothing in the text of the Presidential Records Act suggests any intent to preclude the government from relying upon these well-established remedies. To the contrary, as its text reflects, Congress enacted the Presidential Records Act to ensure that Presidential records would, at all times, remain in the custody and control of the United States and be appropriately preserved and available for access by the public and the government. Navarro's contrary argument that Congress implicitly rendered the United States powerless to compel the return of Presidential records

2

cannot be squared with the statute's text or purpose.  This Court should affirm.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this civil action commenced by the United States under 28 U.S.C. § 1331 and 28 U.S.C. § 1345.  The government moved for summary judgment, requesting that the court order Navarro to return all Presidential records in his possession, custody, or control.  The district court granted summary judgment in the government's favor on March 9, 2023.  Dkt. Nos. 15, 16 (App. 102-24).  The court's accompanying order specified that Navarro shall produce any documents that his counsel has identified as Presidential records prior to the court's judgment "forthwith," and that Navarro must conduct additional searches to identify—and produce— any other Presidential records still in his possession.  Navarro filed a timely notice of appeal on March 22, 2023.  Dkt. No. 17.  This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 1292(a)(1); *see also Leopold v. Central Intelligence Agency*, 987 F.3d 163, 169 (D.C. Cir. 2021) (holding that "orders requiring 'the disclosure of documents' are appealable injunctions").

3

## STATEMENT OF THE ISSUE

Whether the district court properly determined on summary judgment that the District of Columbia replevin statute, D.C. Code §§ 16-3701 *et seq.*, provides a cause of action for the return of Presidential records that are the property of the United States.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### I.     The Presidential Records Act

Prior to the Nixon Administration, Presidential records were generally regarded as the President's personal property. *See Nixon v. United States*, 978 F.2d 1269, 1277 (D.C. Cir. 1992). "[I]n the wake of Watergate and the ensuing struggle over Congress's authority to access former-President Nixon's records," *Citizens for Responsibility & Ethics in Washington v. Trump*, 924 F.3d 602, 603 (D.C. Cir. 2019), Congress enacted the Presidential Records Act of 1978, 44 U.S.C. § 2201 *et seq.*, "to establish the public ownership of presidential records and ensure the preservation of presidential records for public access after the

4

termination of a President's term in office," *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991).

Under the Presidential Records Act, the term "Presidential records" means, with certain conditions and exceptions not relevant here,

> documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2).  Email and other electronic messages, including messages sent and received on official and non-official electronic message accounts, constitute Presidential records to the same extent as hard copy documents.  *See id.* § 2201 (Presidential records include "electronic" correspondence either "created" or "received"); *see also id.* § 2209.

The Act specifies that these Presidential records are the property of the federal government: "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of

5

this chapter."  44 U.S.C. § 2202.  To effectuate this requirement, the

Presidential Records Act provides explicit direction regarding the

proper handling of Presidential records on non-official electronic

accounts.  It requires the President, the Vice President, and "covered

employee[s]"[1] to "cop[y] their "official electronic messaging account"

when sending a communication using a non-official account or to

"forward[] a complete copy" of any Presidential record on their non-

official account to their "official electronic messaging account . . . not

later than 20 days after the original creation or transmission of the

record."  *Id.* § 2209(a)(1)-(2).

The Act further requires that the Archivist of the United States—

*i.e.*, the National Archives and Records Administration (NARA)—must

"assume responsibility for the custody, control, and preservation" of all

Presidential records at the end of a Presidential Administration and

"make such records available to the public as rapidly and completely as

---

[1] "Covered employee" means the immediate staff of the President
or the Vice President, "a unit or individual of the Executive Office of the
President whose function is to advise and assist the President," or "a
unit or individual of the Office of the Vice President whose function is to
advise and assist the Vice President."  44 U.S.C. § 2209(c)(1).  There is
no dispute that Navarro was a covered employee at all relevant times.

6

possible consistent with the provisions of this chapter." 44 U.S.C. § 2203(g)(1). An outgoing president can designate certain categories of the Presidential records of his Administration as restricted for up to 12 years. *Id.* § 2204. However, this designation does not eliminate all access. During the restricted period, Congress, the courts, and the incumbent President may request special access to the restricted Presidential records. *Id.* § 2205(2)(A)-(C).

## II.    Factual and Procedural Background

### A.    Factual Background

Navarro was an employee in the Executive Office of the President and served as an advisor to then-President Trump in various roles from January 2017 to January 2021. Dkt. No. 16, at 2 (App. 104). From the date of his appointment to the date he left the White House's employment, Navarro was a covered employee under the Presidential Records Act. *Id.* at 3 (App. 105); *see also* Br. 5.

During his employment, Navarro received instructions from the White House regarding his obligations under the Presidential Records Act. For example, in February 2017, the White House Counsel's Office issued a memorandum to White House personnel regarding the use of

7

non-official email accounts to conduct official business.  Dkt. No. 16, at 4 (App. 106).  The memorandum read, in relevant part:  "If you ever send or receive email that qualifies as a [P]residential record using any other account [*i.e.*, other than the official government account], you must preserve that email by copying it to your official [Executive Office of the President] email account or by forwarding it to your official email account within twenty (20) days."  *Id.* (first and second alterations in original) (quoting Dkt. No. 1-2 (Memorandum for All Personnel, from Deputy White House Counsel Stefan C. Passantino, through Counsel to the President Donald F. McGahn (Feb. 22, 2017)).  The memorandum also confirmed that "[P]residential records are the property of the United States . . . When you leave [Executive Office of the President] employment, you may not take any presidential records with you."  *Id.* (first and second alterations in original) (quoting Dkt. 1-2, at 4).

While serving as a presidential advisor, Navarro used several non-official email accounts—including a Proton Mail account—to send and receive messages in the course of discharging his official duties.  Dkt. No. 16, at 3 (App. 105).  In December 2021, NARA learned that Navarro had used the Proton Mail account to conduct official business and that

he possessed emails that qualified as Presidential records. *Id*. at 4

(App. 106). However, NARA was unable to locate any records in its

possession that had been forwarded from Navarro's Proton Mail

account. *See id.* In light of this information, NARA wrote to Navarro

requesting that he return any Presidential records in his possession and

offering to work with him to facilitate the transfer of Presidential

records. *See id.*

Navarro did not respond to NARA's letter or its further entreaties.

Dkt. No. 16, at 4 (App. 106). On June 1, 2022, counsel for the

Department of Justice wrote Navarro to request return of the records,

stating that the Department would bring suit if he did not do so. *Id*.

Two weeks later, Navarro's counsel contacted the Department of

Justice and represented that they had retained a document review and

analysis firm to aid them in evaluating the extent to which Navarro had

any Presidential records in his possession, custody, or control. Dkt. No.

16, at 5 (App. 107). To assist and expedite Navarro's search for records,

NARA requested that Navarro prioritize the return of any Presidential

records responsive to a list of search terms that it provided. *Id*. In

response, Navarro's counsel informed NARA that those search terms

generated over 1,700 documents and that between 200 and 250 of those documents were Presidential records.  *Id.*

Navarro did not produce those documents.  Instead, by letter dated July 29, 2022, he stated that he would not produce any Presidential records unless he was granted immunity for the act of returning such records.  Dkt. No. 16, at 5 (App. 107).

## B.    District Court Proceedings

On August 3, 2022, the United States filed a complaint in the United States District Court for the District of Columbia seeking to recover the Presidential records in Navarro's possession through a writ of replevin.  The United States subsequently moved for summary judgment.  Navarro opposed that motion and filed a motion to dismiss, arguing principally that the Presidential Records Act does not create a cause of action for the recovery of Presidential records and that the United States was implicitly precluded from using replevin to recover its property.  Navarro also asserted that production of the Presidential records in his possession would violate his right against self-incrimination.

10

On March 9, 2023, the district court granted summary judgment in favor of the United States and denied Navarro's motion to dismiss. Dkt. No. 16 (App. 102-24).  After noting that there was no genuine dispute that Navarro possessed Presidential records belonging to the United States—indeed, he had admitted as much—the court held that the United States could pursue the return of that wrongfully detained property through a suit brought under the District of Columbia's replevin statute.  Dkt. No. 16, at 13-15, 17-21 (App. 115-17, 119-23).  In so holding, the court explained that the Presidential Records Act unambiguously establishes that the United States owns all Presidential records, *see id.* at 21 (App. 123), and that Congress's decision not to create an independent cause of action to compel the production of Presidential records does not preclude the United States from availing itself of existing forms of legal recourse for the recovery of property, *id.* at 13-15 (App. 115-17).

The court also rejected Navarro's argument that he was entitled to indefinitely delay producing the Presidential records.  Dkt. No. 16, at 15-16 (App. 117-18).  The court stressed that an interpretation of the Presidential Records Act that allowed individuals (especially former

employees who had flouted their obligations under the Presidential Records Act) to withhold records from the United States for as long as they see fit would run "counter to the intent and provisions of the [Presidential Records Act]," which vests exclusive possession and control of such records in the United States and requires employees to ensure that all records are copied expeditiously to their official accounts. *Id.* at 16 (App. 118). The court thus found no cognizable justification for Navarro's argument that, having failed to comply with the statute during his tenure as a presidential advisor, he was now entitled to indefinitely possess the records he wrongfully failed to return. *Id.*

Finally, the court rejected Navarro's claim that producing the Presidential records in his possession would violate his Fifth Amendment right against self-incrimination. Dkt. No. 16, at 16-17 (App. 118-19). The court emphasized that the contents of "pre-existing, voluntarily prepared documents" are not testimonial in nature and therefore not covered by the Fifth Amendment. *Id.* at 17 (App. 119) (quoting *United States v. Hubbell*, 167 F.3d 552, 567 (D.C. Cir. 1999) (per curiam), *aff'd*, 530 U.S. 27 (2000)). And Navarro did "not explain in

12

any way why production of the requested Presidential records would tend to incriminate him," which the court found entirely insufficient to sustain his assertion of privilege. *Id.* at 16 (App. 118). Accordingly, the court granted summary judgment in the government's favor.

The court's order also provided details regarding the steps necessary to comply with its judgment. In particular, the court ordered that Navarro return the 200 to 250 emails already identified as Presidential records "forthwith." Dkt. No. 15, at 1 (App. 102) (emphasis omitted). The court also ordered the parties to meet and confer regarding proper methodologies to identify any remaining Presidential records in Navarro's possession, and to file a joint status report "explaining how they intend the Court to enforce the judgment entered herein." *Id.*

### C. Navarro's Emergency Motion for a Stay Pending Appeal

Navarro filed a notice of appeal and moved for an emergency stay of the district court's order in this Court. This Court denied that motion on April 12, 2023, holding that Navarro had "not demonstrated a substantial likelihood of success on the merits," Order 1, Apr. 12, 2023, that Navarro had not shown that returning the United States' property

13

would inflict any irreparable harm, and that the balance of interests favored return of the property, *id.* at 2.

In so holding, this Court rejected Navarro's argument that the Presidential Records Act does not create an independent cause of action. That argument, this Court explained, "is beside the point," because the United States asserted a cause of action under the District of Columbia's replevin statute. Order 1, Apr. 12, 2023. And though this Court's order "d[id] not prejudge any potential merits arguments regarding the government's use of replevin in this case," this Court found that Navarro's emergency motion for stay had not "adequately demonstrated that the United States cannot proceed under" the District of Columbia statute. *Id.*

This Court also rejected Navarro's assertion that returning the records would violate his Fifth Amendment right against self-incrimination. Order 2, Apr. 12, 2023. This Court emphasized that, "[b]ecause the records were voluntarily created, and [Navarro] has conceded both that they are in his possession and that they are the property of the United States, the action of physically returning the

14

United States' records to it will not implicate his protection against self-incrimination." *Id.*

### D. Proceedings Concerning Compliance with the District Court's Judgment

While this appeal remained pending, litigation concerning Navarro's compliance with the district court's judgment continued. On April 12, 2023, after this Court denied Navarro's request for an emergency stay pending appeal, the district court ordered that Navarro produce the already identified 200 to 250 Presidential records in his possession before April 14, 2023. District Court Minute Order, Apr. 12, 2023. The court further ordered that Navarro complete searches for additional documents before May 8, 2023. *Id.* In response to the court's order, Navarro produced the 229 emails he had previously identified as Presidential records.

Navarro did not, however, complete the additional searches by the court's deadline. As a result, on May 19, 2023, the district court entered an order to "further effectuate the Court's judgment" by requiring Navarro to "search for and identify all Presidential records generated across any and all of his personal account on which he transacted official business." Dkt. No. 28, at 2. The order further specified that, at

a minimum, Navarro must search for (1) the "names of officials with email addresses ending in .gov or .mil that have already been produced as Presidential records to date," and (2) "subject matters that relate to his official duties that have appeared in the Presidential records produced to date." *Id.* The court's order made clear that these two searches were the bare minimum necessary to identify Presidential records in his possession, and that merely conducting these searches would not necessarily satisfy Navarro's obligations to search for and identify *all* Presidential records sent or received on his personal email accounts.

On May 25, 2023, after conducting the two searches ordered by the court, Navarro transmitted 211 additional Presidential records to the United States. On May 27, 2023, Navarro filed a status report asserting that he "believes he has now fully complied with the Court's Order and Judgment." Dkt. No. 29, at 3-4. In response, the government filed a motion to enforce the judgment, asserting that it could not ascertain whether Navarro had adequately complied with the court's judgment, because his status report did not contain sufficient

information about the methodology used to identify Presidential records remaining in his possession.

On August 31, 2023, the district court granted the government's motion to enforce the judgment and ordered Navarro to file under seal (1) a notice listing all search terms used, the metadata fields searched, and the email accounts searched, and (2) a random sample of 50 emails from Navarro's personal email accounts that he deemed not be Presidential records in his last review.  Dkt. No. 32, at 1.  The court further specified that any ruling directing Navarro to show cause why he should not be held in contempt of the court's judgment would be delayed pending review of those submissions.  *Id.* at 2.  Navarro asserts that he provided the ordered information to the district court on October 16, 2023.  On December 20, the district court entered a sealed order requesting further information from the government regarding its request to enforce the judgment but has taken no further action with respect to that request.  Dkt. No. 34.

## SUMMARY OF ARGUMENT

It is undisputed that, while serving as a senior White House advisor from January 2017 until January 2021, Navarro used at least one private email account to conduct official business.  It is likewise

undisputed that Navarro was at the time subject to the Presidential

Records Act, that the official records he generated using his private

email account are Presidential records, that he wrongfully failed to

preserve the records while an employee, and that those records are the

property of the United States.  *See* 44 U.S.C. § 2202 (vesting the United

States with "complete ownership" of Presidential records).  The district

court therefore properly issued a writ of replevin under the laws of the

District of Columbia requiring Navarro to return the Presidential

records in his possession—at least 400 emails—to the United States.

*See* D.C. Code §§ 16-3701, 13702 (providing that replevin is available to

any plaintiff whose property has "been wrongfully taken by" or is "in the

possession of and wrongfully detained by the defendant").

In his opening brief, Navarro does not dispute that the United

States satisfied the elements of replevin under the laws of the District

of Columbia.  Instead, he argues only that by failing to create an

independent cause of action in the Presidential Records Act permitting

the United States to compel the production of Presidential records,

Congress implicitly precluded the United States from availing itself of

state-law remedies to secure the return of Presidential records that have been wrongfully withheld from the Archivist.

Navarro's argument is without merit. Nothing in the Presidential Records Act supports Navarro's suggestion that Congress intended to bar the United States from seeking the return of its property from a recalcitrant former employee. To the contrary, as its text reflects, the Act was designed to ensure that Presidential records would always remain in the custody and control of the United States. Moreover, the Presidential Records Act was enacted against a well-established history of the United States vindicating its property rights using the same state-law remedies available to private individuals. *See, e.g.*, *Cotton v. United States*, 52 U.S. (11 How.) 229, 232 (1850); Fed. R. Civ. P. 64 (authorizing federal courts to issue writs of replevin "under the law of the state where the court is located"). It is thus of no event that Congress did not create a separate cause of action for the return of Presidential records; if Congress intended to preclude the government from invoking such well-established remedies to secure the return of Presidential records, it would have said so explicitly. This Court should affirm.

19

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Thompson v. District of Columbia*, 832 F.3d 339, 344 (D.C. Cir. 2016).

## ARGUMENT

### THE DISTRICT COURT CORRECTLY ORDERED NAVARRO TO RETURN PROPERTY THAT INDISPUTABLY BELONGS TO THE UNITED STATES

**A.** The district court properly granted the government's motion for summary judgment on its replevin claim seeking return of Presidential records that Navarro possesses. Under the laws of the District of Columbia, a plaintiff may "recover personal property to which [it] is entitled, that . . . ha[s] been wrongfully taken by or to be in the possession of and wrongfully detained by the defendant." D.C. Code § 16-3701; *see also* D.C. Code § 16-3702.[2] Navarro does not challenge the district court's conclusion that the United States satisfied the elements of the D.C. replevin statute. Any such challenge is therefore forfeited. *See Fox v. Government of D.C.*, 794 F.3d 25, 30 (D.C. Cir.

---

[2] Personal property here means movable property, as opposed to real property. *See* 77 C.J.S. *Replevin* § 8 (2023) ("Replevin is only for the recovery of personal property, and it may not be maintained to recover real property.").

20

2015) (holding that an argument inadequately raised in opening brief is waived); *National Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) (same).

In any event, any such challenge would entirely lack merit. Indeed, Navarro has conceded all relevant facts with respect to the United States' replevin claim. He does not dispute that the documents at issue here—emails that Navarro created or received in the course of conducting official activities in his capacity as a Presidential advisor— are Presidential records that belong exclusively to the United States. Dkt. No. 23, at 4-5 (The records are "not his private property, as he now seems to contend, but the government's, as he previously conceded and as the Court has held."); Dkt. No. 16, at 6-7 (App. 108-09); Order 1, Apr. 12, 2023; *see also* Br. 9-10. In no uncertain terms, the Presidential Records Act provides that the "United States shall reserve and retain complete ownership, possession, and control" of all "Presidential records." 44 U.S.C. § 2202. The Presidential Records Act defines "Presidential records" to encompass all documentary materials "created or received" by the President, his immediate staff, or "a unit or individual of the Executive Office of the President whose function is to

21

advise or assist the President, in the course of conducting activities
which relate to or have an effect upon the carrying out of the
constitutional, statutory, or other official or ceremonial duties of the
President." *Id.* § 2201(2).

There is also no dispute that, at the time the United States filed
this lawsuit, Navarro wrongfully possessed hundreds of Presidential
records, despite repeated requests for their return. *See* Order 1, Apr.
12, 2023; *see also* Dkt. No. 1-5 ¶ 9 (Decl. of Bosanko); Navarro Br. 9
(acknowledging that he possessed Presidential records). After NARA
learned that Navarro had used non-official email accounts to send and
receive messages in the course of discharging his official duties, it wrote
to Navarro requesting that he return any Presidential records in his
possession and offered to work with him to identify and transfer those
records. To assist and expedite Navarro's search for Presidential
records, NARA requested that he prioritize the return of Presidential
records responsive to a list of search terms that it provided. Dkt. No.
16, at 5 (App. 107). In response, Navarro informed NARA that those

22

search terms generated over 1,700 documents and admitted that at least 200 of those documents were Presidential records.[3]

Nevertheless—despite attempts by NARA to work cooperatively with him for over a year to secure the return of the government's property—Navarro continued to wrongfully withhold the Presidential records he possesses and resisted efforts to identify or return other emails in his possession that qualified as Presidential records belonging to the United States.  Navarro provides no legitimate justification for his refusal to return property in which he has no possessory interest. Indeed, Navarro concedes that he was legally obligated to have "copied or forwarded" any Presidential records on his personal email accounts to an official email account while he was an employee of the federal government, and that he failed to do so.  Br. 16 (quoting 44 U.S.C. § 2209(b)).  And while he previously argued that his Fifth Amendment right against self-incrimination entitled him to withhold the documents, he no longer asserts that justification—which this Court rightly

---

[3] In response to subsequent orders by the district court requiring Navarro to conduct further searches to comply with the court's judgment, Navarro subsequently identified an additional 211 emails that he concedes qualify as Presidential records.  *See supra* p. 16.

23

rejected, *see* Order 2, Apr. 12, 2023—nor does he provide any other reason for refusing to return the government's property.  The district court thus properly concluded that there were no material disputes of fact and that the government was entitled to a writ of replevin requiring Navarro to produce any Presidential records on his non-official email accounts.

**B.**  As noted, Navarro does not contest the district court's conclusion that the United States satisfied the elements for replevin under the laws of the District of Columbia.  Instead, he argues that the United States is without a means to secure its property because the Presidential Records Act does not contain an independent cause of action.

As this Court already recognized, however, this argument "is beside the point."  Order 1, Apr. 12, 2023.  The district court's judgment does not rely upon any cause of action under the Presidential Records Act.  Instead, "[a]s in myriad cases between private parties, replevin provides a cause of action for the return of wrongfully detained property."  Dkt. No. 23, at 4-5; *id.* at 6-8 ("[T]he Court does not and did not hold, and Plaintiff does not propose, that the [Presidential Records

Act] provides the cause of action for the return of the unlawfully detained property.").

Navarro does not seriously dispute that the United States may generally avail itself of replevin and other state and local causes of action to secure its property rights.  As the Supreme Court held nearly two centuries ago,

> the United States . . . may bring suits to enforce their contracts and protect their property, in the State courts, or in their own tribunals administering the same laws.  As an owner of property in almost every State of the Union, they have the same right to have it protected by the local laws that other persons have.

*Cotton v. United States*, 52 U.S. (11 How.) 229, 231 (1850); *see also Rex Trailer Co. v. United States*, 350 U.S. 148, 151 (1956) ("The Government has the right to make contracts and hold and dispose of property, and, for the protection of its property rights, it may resort to the same remedies as a private person.").  Consistent with this principle, the United States has regularly used replevin to recover its property, *see, e.g.*, *United States v. Digital Prods. Corp.*, 624 F.2d 690, 695 (5th Cir. 1980); *United States v. Lindberg Corp.*, 882 F.2d 1158,1159 (7th Cir. 1989); *United States v. Steenerson*, 50 F. 504, 505-06 (8th Cir. 1892), including to recover Presidential materials wrongfully withheld, *United*

*States v. McElvenny*, No. 02-cv-3027, 2003 WL 1741422, at *1 (S.D.N.Y. Apr. 1, 2003) (seeking writ of replevin for map of Cuba bearing notations made by President Kennedy during the Cuban Missile Crisis and a collection of President Kennedy's papers regarding federal involvement in the integration of the University of Mississippi); *see also* Fed. R. Civ. P. 64 (expressly authorizing federal courts to issue writs of replevin "under the law of the state where the court is located").

It is thus of no event that the Presidential Records Act does not create an independent cause of action requiring former employees to produce Presidential records belonging to the United States. "[W]here a common-law principle is well established, . . . courts may take it as given that Congress has legislated with an expectation that the principle will apply except 'when a statutory purpose to the contrary is evident.'" *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108, (1991); *see also, e.g.*, *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 16 (1st Cir. 2005) ("Statues are presumed not to divest the United States of pre-existing rights, such as the ability to collect wrongfully paid monies, absent a clear congressional command."). As discussed, the Presidential Records Act was enacted against the well-

26

established principle that the United States, like any property owner, may rely upon state-law causes of action to vindicate its property rights. Congress had no need to create a redundant cause of action in the Presidential Records Act granting the United States the right to sue to recover its property.

There is no merit to Navarro's argument that, in failing to include an express cause of action allowing the United States to sue to recover its property, Congress intended to foreclose the United States from doing so. As noted, statutes are presumed to incorporate longstanding, background legal principles unless a "statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Ass'n*, 501 U.S. at 108 (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). That presumption applies with particular force to principles addressing the rights and remedies available to the federal government. *See, e.g., United States v. Marion Cty. Sch. Dist.*, 625 F.2d 607, 611 (5th Cir. 1980) ("Congress may nullify the [federal government's] right" to sue to enforce a contract, "but, as the Supreme Court has repeatedly emphasized, courts are entitled to conclude that Congress has done so only if the evidence of Congress' intent is extremely, even

27

unmistakably, clear."); *United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 667-68 (4th Cir. 1996) ("[C]ommon law actions are available to the government to supplement those remedies found in federal statutes, as long as the statute does not expressly abrogate those rights.  This principle has been affirmed and re-affirmed many times.") (citing cases); *United States v. Kearns*, 595 F.2d 729, 732-33 (D.C. Cir. 1978).

Nothing in the text of 44 U.S.C. § 2209 or the Presidential Records Act's other provisions remotely suggests that Congress intended to bar the United States from seeking to recover Presidential records that have been wrongfully withheld from the Archivist.  To the contrary, the Act's text and purpose are entirely consistent with the United States's authority to file replevin actions to recover Presidential records in the possession of third parties.  As its text makes clear, Congress enacted the Presidential Records Act to "establish the public ownership" of Presidential records and to ensure their "preservation and public availability."  H.R. Rep. No. 95-1487, pt. 1, at 2 (1978); *see also Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 432-33 (1977) (noting that Congress enacted the Presidential Records Act's predecessor statute to

prevent the possible destruction of tape recordings made by President Nixon). To those ends, the Act, among other things, vests "complete ownership, possession, and control" of Presidential records in the United States, 44 U.S.C. § 2202; transfers custody and control of such records to the Archivist at the conclusion of a President's Administration, *id.* § 2203(g)(1); and requires all records created on non-official email accounts to be copied to official accounts shortly after their creation, *id.* § 2209(a).

These provisions establish Congress's clear interest in ensuring the preservation and public ownership of Presidential records, which strongly supports the view that the United States possesses the authority to recover Presidential records from private hands. By contrast, Navarro's suggestion that Congress intended for private parties to withhold Presidential records (including records obtained through the flouting of the Act's requirements) at their whim cannot be squared with the Act's text of purpose.

Navarro does not advance his contrary argument through analysis of the requirements of 44 U.S.C. § 2209, which governs the use of non-official email accounts to send or receive Presidential records. It is

29

beyond dispute that Navarro flouted his obligation to copy Presidential records from his non-official account to his official account within 20 days of their creation or transmission. *See* 44 U.S.C. § 2209(a)(1)-(2). Navarro's failure to comply with his Presidential Records Act obligations explains why the United States is not already in possession of the relevant records and underscores the wrongfulness of his refusal to surrender the records. But his failure to comply with these provisions does not change the fact that the emails in question remain the United States' property—a point which he has conceded. It is that property interest that the United States seeks to vindicate through replevin.

Moreover, while § 2209(b) authorizes the government to take disciplinary action against current employees who violate the Presidential Records Act's provisions governing the use of private email accounts to conduct official business, that provision cannot plausibly be read as implicitly prohibiting the United States from suing to recover any documents that a current or former employee has wrongfully retained. *See, e.g.*, *Kearns*, 595 F.2d at 732–33 (rejecting "argument that since Congress enacted criminal statutes covering bribery and

30

conflicts of interest without creating a civil remedy, we must infer that Congress chose not to allow civil actions like this one"). As noted, the Act's fundamental purpose is to establish the United States' ownership and possession of all Presidential records, in order to safeguard their preservation and future availability to the government and the public. Section 2209(b) furthers that goal by authorizing the government to take employment actions against those employees who fail to comply with the Act's requirements regarding the preservation of records created using private email accounts. It would be illogical and at odds with the basic purposes of the Act to interpret that provision—which is designed to ensure that Presidential records are properly preserved—as somehow limiting the government's longstanding right to sue to recover property that has been wrongfully taken or withheld.

Finally, Navarro's reliance (Br. 18-29) upon *Alabama Association of Realtors v. Department of Health and Human Services*, 141 S. Ct. 2485 (2021) (per curiam) and other cases invoking the major questions doctrine is wholly misplaced. He cites those cases for the proposition that Congress is typically expected to "speak clearly when authorizing an agency to exercise powers of vast economic and political

31

significance." Br. 18 (quoting *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489). But this case does not involve agency regulation of any kind, much less any attempt to wield "vast economic [or] political powers." Instead, the United States simply seeks to vindicate its property rights using the same remedies available to private individuals, as centuries of precedent establish it is entitled to do.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*
GERARD SINZDAK

*/s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
*Attorneys, Appellate Staff*
*Civil Division, Room 7710*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-9039*

January 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,112 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

**ADDENDUM**

# TABLE OF CONTENTS

44 U.S.C. § 2201 ........................................................................... A1

44 U.S.C. § 2202 ........................................................................... A3

44 U.S.C. § 2203 ........................................................................... A4

44 U.S.C. § 2209 ........................................................................... A7

**44 U.S.C. § 2201**

**§ 2201. Definitions**

As used in this chapter—

**(1)** The term "documentary material" means all books, correspondence, memoranda, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, and motion pictures, including, but not limited to, audio and visual records, or other electronic or mechanical recordations, whether in analog, digital, or any other form.

**(2)** The term "Presidential records" means documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. Such term—

  **(A)** includes any documentary materials relating to the political activities of the President or members of the President's staff, but only if such activities relate to or have a direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President; but

  **(B)** does not include any documentary materials that are (i) official records of an agency (as defined in section 552(e) of title 5, United States Code); (ii) personal records; (iii) stocks of publications and stationery; or (iv) extra copies of documents produced only for convenience of reference, when such copies are clearly so identified.

**(3)** The term "personal records" means all documentary materials, or any reasonably segregable portion therof, of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. Such term includes—

  **(A)** diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or

A1

utilized for, or circulated or communicated in the course of, transacting Government business;

**(B)** materials relating to private political associations, and having no relation to or direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President; and

**(C)** materials relating exclusively to the President's own election to the office of the Presidency; and materials directly relating to the election of a particular individual or individuals to Federal, State, or local office, which have no relation to or direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President.

**(4)** The term "Archivist" means the Archivist of the United States.

**(5)** The term "former President", when used with respect to Presidential records, means the former President during whose term or terms of office such Presidential records were created.

A2

**44 U.S.C. § 2202**

**§ 2201. Ownership of Presidential records**

The United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of this chapter.

**44 U.S.C. § 2203**

**§ 2203. Management and custody of Presidential records**

**(a)** Through the implementation of records management controls and other necessary actions, the President shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law.

**(b)** Documentary materials produced or received by the President, the President's staff, or units or individuals in the Executive Office of the President the function of which is to advise or assist the President, shall, to the extent practicable, be categorized as Presidential records or personal records upon their creation or receipt and be filed separately.

**(c)** During the President's term of office, the President may dispose of those Presidential records of such President that no longer have administrative, historical, informational, or evidentiary value if--

    **(1)** the President obtains the views, in writing, of the Archivist concerning the proposed disposal of such Presidential records; and

    **(2)** the Archivist states that the Archivist does not intend to take any action under subsection (e) of this section.

**(d)** In the event the Archivist notifies the President under subsection (c) that the Archivist does intend to take action under subsection (e), the President may dispose of such Presidential records if copies of the disposal schedule are submitted to the appropriate Congressional Committees at least 60 calendar days of continuous session of Congress in advance of the proposed disposal date. For the purpose of this section, continuity of session is broken only by an adjournment of Congress sine die, and the days on which either House is not in session because of an adjournment of more than three days to a day certain are excluded in the computation of the days in which Congress is in continuous session.

**(e)** The Archivist shall request the advice of the Committee on Rules and Administration and the Committee on Governmental Affairs of the

Senate and the Committee on House Oversight and the Committee on Government Operations of the House of Representatives with respect to any proposed disposal of Presidential records whenever the Archivist considers that--

> **(1)** these particular records may be of special interest to the Congress; or

> **(2)** consultation with the Congress regarding the disposal of these particular records is in the public interest.

**(f)** During a President's term of office, the Archivist may maintain and preserve Presidential records on behalf of the President, including records in digital or electronic form. The President shall remain exclusively responsible for custody, control, and access to such Presidential records. The Archivist may not disclose any such records, except under direction of the President, until the conclusion of a President's term of office, if a President serves consecutive terms upon the conclusion of the last term, or such other period provided for under section 2204 of this title.

**(g)(1)** Upon the conclusion of a President's term of office, or if a President serves consecutive terms upon the conclusion of the last term, the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President. The Archivist shall have an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions of this chapter.

> **(2)** The Archivist shall deposit all such Presidential records in a Presidential archival depository or another archival facility operated by the United States. The Archivist is authorized to designate, after consultation with the former President, a director at each depository or facility, who shall be responsible for the care and preservation of such records.

> **(3)** When the President considers it practicable and in the public interest, the President shall include in the President's budget transmitted to Congress, for each fiscal year in which the term of office of the President will expire, such funds as may be necessary for carrying out the authorities of this subsection.

A5

**(4)** The Archivist is authorized to dispose of such Presidential records which the Archivist has appraised and determined to have insufficient administrative, historical, informational, or evidentiary value to warrant their continued preservation. Notice of such disposal shall be published in the Federal Register at least 60 days in advance of the proposed disposal date. Publication of such notice shall constitute a final agency action for purposes of review under chapter 7 of title 5, United States Code.

**44 U.S.C. § 2209**

## § 2209. Disclosure requirement for official business conducted using non-official electronic messaging accounts

**(a) In general.**—The President, the Vice President, or a covered employee may not create or send a Presidential or Vice Presidential record using a non-official electronic message account unless the President, Vice President, or covered employee—

    **(1)** copies an official electronic messaging account of the President, Vice President, or covered employee in the original creation or transmission of the Presidential record or Vice Presidential record; or

    **(2)** forwards a complete copy of the Presidential or Vice Presidential record to an official electronic messaging account of the President, Vice President, or covered employee not later than 20 days after the original creation or transmission of the Presidential or Vice Presidential record.

**(b) Adverse actions.**—The intentional violation of subsection (a) by a covered employee (including any rules, regulations, or other implementing guidelines), as determined by the appropriate supervisor, shall be a basis for disciplinary action in accordance with subchapter I, II, or V of chapter 75 of title 5, as the case may be.

**(c) Definitions.**—In this section:

    **(1) Covered employee.**—The term "covered employee" means--

        **(A)** the immediate staff of the President;

        **(B)** the immediate staff of the Vice President;

        **(C)** a unit or individual of the Executive Office of the President whose function is to advise and assist the President; and

        **(D)** a unit or individual of the Office of the Vice President whose function is to advise and assist the Vice President.

    **(2) Electronic messages.**—The term "electronic messages" means electronic mail and other electronic messaging systems that are used for purposes of communicating between individuals.

**(3) Electronic messaging account.**—The term "electronic messaging account" means any account that sends electronic messages.