[NOT YET SCHEDULED FOR ORAL ARGUMENT]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

PETER NAVARRO,

Defendant-Appellant.

No. 23-5062

**UNITED STATES' OPPOSITION TO
DEFENDANT'S EMERGENCY MOTION FOR STAY**

BRIAN M. BOYNTON
*Principal Deputy Assistant
Attorney General*

GERARD SINZDAK
JENNIFER L. UTRECHT
*Attorneys, Appellate Staff
Civil Division, Room 7710
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-9039*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

STATEMENT ....................................................................................... 4

    I.    The Presidential Records Act ...................................... 4

    II.   Factual and Procedural Background .......................... 7

ARGUMENT ...................................................................................... 13

I.    Defendant Is Unlikely to Prevail on the Merits ............................ 13

II.   The Remaining Equitable Factors Weight Against
     an Injunction Pending Appeal ....................................... 22

CONCLUSION ................................................................................... 27

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Alabama Ass'n of Realtors v. Department of Health & Human Servs.,*
  141 S. Ct. 2485 (2021) ........................................................ 21

*Armstrong v. Bush,*
  924 F.2d 282 (D.C. Cir. 1991) ........................................... 4

*Baltimore City Dep't of Soc. Servs. v. Bouknight,*
  493 U.S. 549 (1990) ........................................................... 24

*Citizens for Responsibility & Ethics in Washington v. Trump,*
  924 F.3d 602 (D.C. Cir. 2019) ........................................... 4

*Cotton v. United States,*
  52 U.S. 229 (1850) ........................................................ 2, 17

*Fisher v. United States,*
  425 U.S. 391 (1976) ........................................................... 23

*Nixon v. Administrator of Gen. Servs.,*
  433 U.S. 425 (1977) ........................................................... 20

*Nixon v. United States,*
  978 F.2d 1269 (D.C. Cir. 1992) .......................................... 4

*Nken v. Holder,*
  556 U.S. 418 (2009) .................................................... 13, 25

*Rex Trailer Co. v. United States,*
  350 U.S. 148 (1956) ........................................................... 17

*United States v. Digital Prods. Corp.,*
  624 F.2d 690 (5th Cir. 1980) ............................................. 17

*United States v. Doe,*
  465 U.S. 605 (1984) ........................................................... 23

*United States v. Hubbell,*
  167 F.3d 552 (D.C. Cir. 1999), *aff'd,*
  530 U.S. 27 (2000) .................................... 3, 12, 23-24, 24

*United States v. Lindberg Corp.,*
   82 F.2d 1158 (7th Cir. 1989) ........................................................ 17

*United States v. McElvenny,*
   No. 02-cv-3027, 2003 WL 1741422 (S.D.N.Y. Apr. 1, 2003) .............. 17

*United States v. Steenerson,*
   50 F. 504 (8th Cir. 1892) ................................................................ 17

**Statutes:**

Presidential Records Act of 1978:
   44 U.S.C. § 2201 *et seq.* ........................................................... 4
     44 U.S.C. § 2201 ................................................................ 5
     44 U.S.C. § 2201(2) ......................................................... 5, 14
     44 U.S.C. § 2202 ....................................... 1, 5, 14, 15, 16, 19, 20
     44 U.S.C. § 2203(g)(1) ..................................................... 6, 20
     44 U.S.C. § 2204 .................................................................. 6
     44 U.S.C. § 2204(b)-(c) ......................................................... 7
     44 U.S.C. § 2205(2)(A)-(C) ................................................... 7

44 U.S.C. § 2209 ....................................................... 5, 19, 20

44 U.S.C. § 2209(a) ............................................................. 21

44 U.S.C. § 2209(a)(1) .......................................................... 6

44 U.S.C. § 2209(a)(1)-(2) .................................................... 19

44 U.S.C. § 2209(a)(2) .......................................................... 6

44 U.S.C. § 2209(c)(1) ........................................................... 6

D.C. Code 16-3701 ............................................................. 15

**Rules:**

Fed. R. Civ. P. 64 ................................................................ 17

Fed. R. Civ. P. 81(d)(2) .................................................... 22

**Legislative Material:**

H.R. Rep. No. 95-1487, pt. 1 (1978) ...................................... 20

**Other Authority:**

77 C.J.S. Replevin § 8 (2023) ............................................... 15

## INTRODUCTION

Defendant-Appellant Peter K. Navarro's emergency motion for a stay pending appeal should be denied. It is undisputed that, while serving as a senior White House advisor from January 2017 until January 2021, Navarro used at least one private email account to conduct official business. It is likewise undisputed that Navarro was at the time subject to the Presidential Records Act (PRA), that the official records he generated using his private email account are Presidential records, and that those records are the property of the United States. *See* 44 U.S.C. § 2202 (vesting the United States with "complete ownership" of Presidential records). The district court therefore properly issued a writ of replevin requiring Navarro to return the Presidential records in his possession—at least 200 emails—to the United States.

Navarro has no likelihood of succeeding on the merits of his appeal. Though he acknowledges that he is in sole possession of Presidential records that belong to the United States, he argues that the PRA does not provide the United States with a cause of action to compel their production. That argument is without merit. The

Supreme Court long ago established that the United States, like any property owner, may avail itself of state law remedies to protect its property rights. *See Cotton v. United States*, 52 U.S. 229, 231-32 (1850). Thus, while the PRA establishes the United States' property interest in the records, replevin provides the United States with the relevant cause of action.

Moreover, nothing in the PRA supports Navarro's suggestion that Congress intended to bar the United States from seeking the return of its property from a recalcitrant former employee. To the contrary, as its text reflects, Congress enacted the PRA to ensure that Presidential records would always remain in the custody and control of the United States to be appropriately preserved and available for access by the public and the government. Navarro's suggestion that Congress rendered the United States powerless to compel the return of Presidential records cannot be squared with the statute's text or purpose. That is all the more plain where, as here, the United States is not already in possession of the relevant documents only because Navarro flouted his obligation to forward Presidential records to his official email account during his tenure as a White House employee.

Navarro has also failed to show that he will be irreparably harmed if he cannot continue to retain records owned by the United States. The district court properly rejected Navarro's unsupported assertion that producing the records would violate his Fifth Amendment right against self-incrimination. Because the emails were voluntarily created, their contents are not testimonial and are therefore not protected by the Fifth Amendment. And even if the mere act of surrendering the documents could be construed as incriminating in some unspecified manner, the Fifth Amendment would nonetheless be inapplicable because Navarro has acknowledged that the records exist and that he possesses them. *See, e.g., United States v. Hubbell*, 167 F.3d 552, 568 (D.C. Cir. 1999) (per curiam) (the act-of-production privilege does not apply "[w]here the government already has the knowledge that would otherwise be conveyed"), *aff'd*, 530 U.S. 27 (2000).

Finally, the balance of equities and public interest weigh in favor of the Archivist's efforts to collect and safeguard the complete records of every modern presidential administration, and against Navarro's years-long flouting of his PRA obligations and his continued withholding of

materials that rightfully belong to the United States.  Accordingly, the
Court should deny the motion for stay pending appeal.

## STATEMENT

## I.     The Presidential Records Act

Prior to the Nixon Administration, Presidential records were
generally regarded as the President's personal property.  *See Nixon v.
United States*, 978 F.2d 1269, 1277 (D.C. Cir. 1992).  "[I]n the wake of
Watergate and the ensuing struggle over Congress's authority to access
former-President Nixon's records," *Citizens for Responsibility & Ethics
in Washington v. Trump*, 924 F.3d 602, 603 (D.C. Cir. 2019), Congress
enacted the Presidential Records Act, 44 U.S.C. § 2201 *et seq.*, "to
establish the public ownership of presidential records and ensure the
preservation of presidential records for public access after the
termination of a President's term in office," *Armstrong v. Bush*, 924
F.2d 282, 290 (D.C. Cir. 1991).

Under the PRA, the term "Presidential records" means, with
certain conditions and exceptions not relevant here, "documentary
materials, or any reasonably segregable portion thereof, created or
received by the President, the President's immediate staff, or a unit or

individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."  44 U.S.C. § 2201(2).  Email and other electronic messages, including messages sent and received on official and non-official electronic message accounts, constitute Presidential records to the same extent as hard copy documents.  *See id.* § 2201 (Presidential records include "electronic" correspondence either "created or received."); *see also id.* § 2209.

The Act specifies that these Presidential records are the property of the federal government: "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of this chapter."  44 U.S.C. § 2202.  To effectuate this requirement, the PRA provides explicit direction regarding the proper handling of Presidential records on non-official electronic accounts.  It requires the

President, the Vice President, and Covered Employees[1] to "cop[y]" their "official electronic messaging account" when sending a communication using a non-official account or to "forward[] a complete copy" of any Presidential record on their non-official account to their "official electronic messaging account . . . not later than 20 days after the original creation or transmission" of the record. *Id.* § 2209(a)(1), (a)(2).

The PRA further requires that the Archivist of the United States—*i.e.*, the National Archives and Records Administration (NARA)—must "assume responsibility for the custody, control, and preservation" of all Presidential records at the end of a Presidential Administration and "make such records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." 44 U.S.C. § 2203(g)(1). An outgoing president can designate certain categories of the Presidential records of his administration as restricted for up to 12 years. *Id.* § 2204. However, this designation

---

[1] "Covered Employee" means the immediate staff of the President or the Vice President, "a unit or individual of the Executive Office of the President whose function is to advise and assist the President," or "a unit or individual of the Office of the Vice President whose function is to advise and assist the Vice President." 44 U.S.C. § 2209(c)(1). There is no dispute that Navarro was a covered employee at all relevant times.

6

does not eliminate all access.  During the restricted period, Congress,
the courts, and the incumbent President may request special access to
the restricted Presidential records.  *Id.* § 2205(2)(A)-(C).

## II.     Factual and Procedural Background

**A.**  Navarro was an employee in the Executive Office of the
President and served as an advisor to then-President Trump in various
roles from January 2017 to January 2021.  Dkt. No. 16, at 2.  From the
date of his appointment to the date he left the White House's
employment, Navarro was a covered employee under the Presidential
Records Act.  *Id.* at 3.

During his employment, Navarro received instructions from the
White House regarding his PRA obligations.  For example, in February
2017, the White House Counsel's Office issued a memorandum to White
House personnel regarding the use of non-official email accounts to
conduct official business.  Dkt. No. 16, at 4.  The memorandum read, in
relevant part:  "If you ever send or receive email that qualifies as a
[P]residential record using any other account [*i.e.*, other than the official
government account], you must preserve that email by copying it to
your official [Executive Office of the President] email account or by

7

forwarding it to your official email account within twenty (20) days."

*Id.* (first and second alterations in original) (quoting Memorandum for

All Personnel, from Deputy White House Counsel Stefan C. Passantino,

through Counsel to the President Donald. F. McGahn (Feb. 22, 2017)

(WHCO Memorandum)).  The memorandum also confirmed that

"[P]residential records are the property of the United States . . . When

you leave [Executive Office of the President] employment, you may not

take any presidential records with you."  *Id.* (first and second

alterations in original) (quoting WHCO Memorandum).

While serving as a presidential advisor, Navarro used at least one

non-official email account, namely a ProtonMail account, to send and

receive messages in the course of discharging his official duties.  Dkt.

No. 16, at 3.  In December 2021, NARA learned that Navarro had used

the ProtonMail account to conduct official business and that he

possessed emails that qualified as Presidential records.  *Id.* at 4.

However, NARA was unable to locate any records in its possession that

had been forwarded from Navarro's ProtonMail account.  *Id.*  In light of

this information, NARA wrote to Navarro requesting that he return any

Presidential records in his possession and offering to work with him to facilitate the transfer of Presidential records. *Id.*

Navarro did not respond to NARA's letter or its further entreaties. Dkt. No. 16, at 4. On June 1, 2022, counsel for the Department of Justice wrote Navarro to request return of the records, stating that the Department would bring suit if he did not do so. *Id.*

Two weeks later, Navarro's counsel contacted the Department and represented that they had retained a document review and analysis firm to aid them in evaluating the extent to which Navarro had Presidential records in his possession, custody, or control. Dkt. No. 16, at 5. To assist and expedite Navarro's search for records, NARA requested that Navarro prioritize the return of any Presidential records responsive to a list of search terms that it provided. *Id.* In response, Navarro's counsel informed NARA that those search terms generated over 1,700 documents and that between 200 and 250 of those documents were Presidential records. *Id.*

Navarro did not produce these documents. Instead, by letter dated July 29, 2022, he stated that he would not produce any

Presidential records unless he was granted immunity for the act of returning such records.  Dkt. No. 16, at 5.

**B.**  On August 3, 2022, the United States filed a complaint in the United States District Court for the District of Columbia seeking to recover the Presidential records in Navarro's possession through a writ of replevin.  The United States subsequently moved for summary judgment.  Navarro opposed that motion and filed a motion to dismiss, arguing principally that the PRA did not create a cause of action for the recovery of Presidential records and that the United States was implicitly precluded from using replevin to recover its property.  Navarro also asserted that production of Presidential records would violate his right against self-incrimination.

On March 9, 2023, the district court granted summary judgment in favor of the United States and denied Navarro's motion to dismiss.  After noting that there was no genuine dispute that Navarro possessed Presidential records belonging to the United States—indeed, he had admitted as much—the court held that the United States could pursue the return of that wrongfully detained property through a suit brought under the District of Columbia's replevin statute.  Dkt. No. 16, at 13-15.

10

In so holding, the court explained that the PRA unambiguously establishes that the United States owns all Presidential records, and that Congress's decision not to create an independent cause of action to compel the production of Presidential records does not preclude the United States from availing itself of existing forms of legal recourse for the recovery of property. *Id.*

The court also rejected Navarro's argument that he was entitled to indefinitely delay producing the Presidential records. Dkt. No. 16, at 15-16. The court stressed that an interpretation of the PRA that allowed individuals (especially former employees who had flouted their obligations under the PRA) to withhold records from the United States for as long as they see fit would run "counter to the intent and provisions of the PRA," which vests exclusive possession and control of such records in the United States and requires employees to ensure that all records are copied expeditiously to their official accounts. *Id.* at 16. The court thus found no cognizable justification for Navarro's argument that, having failed to comply with the statute during his tenure as a Presidential advisor, he was now entitled to indefinitely possess the records he wrongfully failed to return. *Id.*

Finally, the court rejected Navarro's claim that producing the Presidential records in his possession would violate his Fifth Amendment right against self-incrimination. Dkt. No. 16, at 16-17. The court emphasized that the contents of "pre-existing, voluntarily prepared documents" are not testimonial in nature and therefore not covered by the Fifth Amendment. *Id.* at 17 (quoting *United States v. Hubbell*, 167 F.3d 552, 567 (D.C. Cir. 1999) (per curiam), *aff'd*, 530 U.S. 27 (2000)). And Navarro did "not explain in any way why production of the requested Presidential records would tend to incriminate him," which the court found entirely insufficient to sustain his assertion of privilege. *Id.* at 16.

Because Navarro has no right to possess Presidential records belonging to the United States, the district court ordered that he return the records "forthwith." Dkt. No. 15, at 1. To date, Navarro has not complied with this order. Instead, two weeks after the district court's order, on March 22, 2023, Navarro filed a motion asking the district court to stay its judgment pending his appeal. The district court denied that motion on March 28, 2023. Navarro now moves for an emergency stay in this Court.

## ARGUMENT

Navarro's motion for an emergency stay pending appeal should be denied.  He has failed to satisfy any of the factors governing the issuance of the extraordinary relief he seeks:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I.    Defendant Is Unlikely to Prevail on the Merits.

**A.**  The district court granted the government's motion for summary judgment on its replevin claim seeking return of Presidential records that Navarro concedes he possesses.  Dkt. No. 16, at 1, 21-22.  The court then ordered Navarro to return those records to the government "forthwith."  Dkt. No. 15.  Navarro has no likelihood of prevailing in his appeal of the district court's straightforward conclusion that he must surrender property in his possession that indisputably belongs to the United States.

13

The documents at issue here are the property of the United States.  In no uncertain terms, the Presidential Records Act provides that the "United States shall reserve and retain complete ownership, possession, and control" of all "Presidential records."  44 U.S.C. § 2202.  The PRA defines "Presidential records" to encompass all documentary materials "created or received" by the President, his immediate staff, or "a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."  *Id.* § 2201(2).

Navarro acknowledges that the documents the United States seeks are Presidential records.  They are documentary materials he created or received while serving as a Presidential advisor and in the course of conducting official activities in that capacity.  Dkt. No. 16, at 5.  Navarro has additionally admitted that he possesses at least 200 such records, *id.* at 8-9, and that those records rightfully belong to the United States, Dkt. No. 23, at 4-5 ("The records are not his private property, as he now seems to contend, but the government's, as he

14

previously conceded and as the Court has held.").[2]  Nevertheless—despite attempts by NARA to work cooperatively with him for over a year to secure the return of the government's property—Navarro continues to wrongfully withhold them.

Applying well-established law, the district court correctly concluded that the United States is entitled to recover the documents through a replevin action brought pursuant to the District of Columbia's replevin statute.  Dkt. No. 16, at 18.  Under D.C. Code 16-3701, a plaintiff may "recover personal property to which [it] is entitled, that . . . ha[s] been wrongfully taken by or to be in the possession of and wrongfully detained by the defendant."  D.C. Code 16-3701.[3]  Each of these elements is readily satisfied.  Indeed, Navarro has conceded all

---

[2]  Although Navarro briefly states, without any explanation, that the "Presidential Records Act is hardly a statute governing the ownership of property," Mot. 5, that conclusory statement cannot be squared with his later admission that "ownership of Presidential records is addressed by the PRA," Mot. 10, and that the statute expressly specifies that the United States "shall reserve and retain complete ownership . . . and control of Presidential records," Mot. 9 (quoting 44 U.S.C. § 2202).

[3]  Personal property here means movable property, as opposed to real property.  *See* 77 C.J.S. Replevin § 8 (2023) ("Replevin is only for the recovery of personal property, and it may not be maintained to recover real property.").

relevant facts: he has agreed that all Presidential records are the rightful property of the United States, 44 U.S.C. § 2202, and he has admitted that he continues to possess Presidential records that belong to the United States, despite requests for the return of that property. The district court thus concluded that there were no material disputes of fact and that the government is entitled to a writ of replevin requiring Navarro to surrender the records.[4]

**B.** In seeking a stay pending appeal, Navarro argues (Mot. 7) that the question of whether the United States can use the District of Columbia's replevin statute to secure the return of Presidential records is a difficult question of "first impression." That is entirely incorrect.

It has long been established that the United States may avail itself of replevin to protect its property rights. As the Supreme Court held nearly two centuries ago, "the United States . . . may bring suits to enforce their contracts and protect their property, in the State courts, or

---

[4] Navarro states in passing and without elaboration (Mot. 15) that the District of Columbia's replevin statute is "strictly construed." The import of that assertion is unclear. In any event, as explained above and in the district court's decision, the United States properly plead and established a claim for replevin under D.C. law. *See* Dkt. No. 16, at 19-20.

16

in their own tribunals administering the same laws.  As an owner of property in almost every State of the Union, they have the same right to have it protected by the local laws that other persons have." *Cotton v. United States*, 52 U.S. 229, 232 (1850); *see also Rex Trailer Co. v. United States*, 350 U.S. 148, 151 (1956) ("The Government has the right to make contracts and hold and dispose of property, and, for the protection of its property rights, it may resort to the same remedies as a private person.").

Consistent with this principle, the United States has regularly used replevin to recover its property, *see, e.g.*, *United States v. Digital Prods. Corp.*, 624 F.2d 690, 695 (5th Cir. 1980); *United States v. Lindberg Corp.*, 882 F.2d 1158, 1159 (7th Cir. 1989); *United States v. Steenerson*, 50 F. 504, 505-06 (8th Cir. 1892), including to recover Presidential materials wrongfully withheld, *United States v. McElvenny*, No. 02-cv-3027, 2003 WL 1741422, at *1 (S.D.N.Y. Apr. 1, 2003) (seeking writ of replevin for map of Cuba bearing notations made by President Kennedy during the Cuban Missile Crisis and a collection of President Kennedy's papers regarding federal involvement in the integration of the University of Mississippi); *see also* Fed. R. Civ. P. 64

17

(expressly authorizing federal courts to issue writs of replevin "under the law of the state where the court is located").[5]

Navarro therefore misses the mark when he argues that the United States is without a means to secure its property because the PRA does not create an independent cause of action. Mot. 13-14. The United States is not relying on a cause of action under the PRA. It is not seeking to enforce the Act against Navarro or to penalize him for his failure to comply with the Act's procedural requirements. Instead, as the district court recognized, the United States brought this action to secure the return of its rightful property. It is thus "the law of replevin that provides the [government's] cause of action" in this case. Dkt. No. 23, at 6-8; *see also id.* ("[T]he Court does not and did not hold, and Plaintiff does not propose, that the PRA provides the cause of action for the return of the unlawfully detained property."). The PRA establishes

---

[5] Navarro asserts (Mot. 15) that Rule 64 did not authorize the district court's order in this case because the rule purportedly applies only to "pre-judgment remedies." Mot. 15. That dubious assertion misses the point. The government did not rely on Rule 64 as the basis for this action. That the rule expressly authorizes district courts to issue replevin pursuant to state law simply underscores the well-established principle that federal courts may rely on state-law remedies to protect the interests of property holders such as the United States.

18

the United States' property interest, while the District of Columbia's replevin statute provides the cause of action the government is using to vindicate that interest. *See id.* at 4-5 ("As in myriad cases between private parties, replevin provides a cause of action for the return of wrongfully detained property.").

For this reason, Navarro's analysis of the requirements of 44 U.S.C. § 2209—which governs use of non-official email accounts to send or receive Presidential records—is beside the point. It is beyond dispute that Navarro flouted his obligation to copy Presidential records from his non-official account to his official account within 20 days of their creation or transmission. *See* 44 U.S.C. § 2209(a)(1)-(2). Navarro's failure to comply with his PRA obligations explains why the United States is not already in possession of the relevant records and underscores the wrongfulness of his refusal to surrender the records. But ultimately, replevin does not depend upon whether Navarro complied with this provision while serving as a Presidential advisor. Instead, what matters is that the PRA designates all Presidential records as the rightful property of the United States, 44 U.S.C. § 2202—

19

a point which Navarro concedes.  It is that property interest that the United States seeks to vindicate.

To the extent that Navarro suggests that 44 U.S.C. § 2209 or the PRA more generally impliedly precludes the United States using replevin to secure possession of Presidential records, he is plainly wrong.  Nothing in the Act's provisions suggests Congress intended to bar the United States from seeking to recover Presidential records that have been withheld from the Archivist.

As its text makes clear, Congress enacted the PRA to "establish the public ownership" of Presidential records and to ensure their "preservation and public availability."  H.R. Rep. No. 95-1487, pt. 1, at 2 (1978); *see also Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 432-33 (1977) (noting that Congress enacted the PRA's predecessor statute to prevent the possible destruction of tape recordings made by President Nixon).  To those ends, the Act, among other things, vests "complete ownership, possession, and control" of Presidential records in the United States, 44 U.S.C. § 2202; transfers custody and control of such records to the Archivist at the conclusion of a President's Administration, *id.* § 2203(g)(1); and requires all records created on

20

non-official email accounts to be copied to official accounts shortly after their creation, *id.* § 2209(a). These provisions establish Congress's clear interest in ensuring the preservation and public ownership of Presidential records, which strongly supports the view that the United States possesses the authority to recover Presidential records from private hands. By contrast, Navarro's suggestion that private parties can withhold Presidential records (including records obtained through the flouting of the PRA's requirements) at their whim cannot be squared with the PRA's text or purpose.

Navarro does not advance his argument through reliance on *Alabama Association of Realtors v. Department of Health & Human Services*, 141 S. Ct. 2485 (2021). He cites that case for the proposition that Congress is typically expected to "speak clearly when authorizing an agency to exercise powers of vast economic and political significance." Mot. 17 (quoting *Alabama Ass'n*, 141 S. Ct. at 2489). But here, no agency seeks to wield "vast economic [or] political" powers. The United States simply seeks to vindicate its property rights using the same remedies available to private individuals, as centuries of precedent establish it is entitled to do.

Nor is it significant (Mot. 16) that this action was brought under the laws of the District of Columbia.  As the district court explained, the fact that the District of Columbia is a federal district and not a state "is a distinction without a difference for these purposes."  Dkt. No. 23, at 8. The Federal Rules of Civil Procedure define "state" to include the District of Columbia, Fed. R. Civ. P. 81(d)(2), and "a half-century of Supreme Court and Circuit precedent instruct[s] the federal courts to treat District of Columbia law as state law" for these purposes.  Dkt. No. 23, at 8-9 (citing cases).

## II.    The Remaining Equitable Factors Weigh Against an Injunction Pending Appeal.

**A.**  Navarro has also failed to show that the district court's order will imminently and irreparably injure him.  He contends (Mot. 20) that surrendering the documents will harm him because "the production of such records could potentially incriminate him in future criminal actions."  But, as in district court, Navarro makes no effort to explain why the act of returning records that belong to the United States would constitute impermissible testimonial self-incrimination or otherwise meet the requirements of a Fifth Amendment privilege.  As the district court recognized, Navarro's failure to explain why producing the records

would tend to incriminate him is reason alone to dismiss his privilege claim.  *See* Dkt. No. 23, at 10.

The district court's order does not, in any event, implicate Navarro's Fifth Amendment rights.  Navarro and others voluntarily created the records at issue here.  Accordingly, the contents of the records, even if incriminating, are not protected.  *See United States v. Doe*, 465 U.S. 605, 612 n.10 (1984) ("If the party asserting the Fifth Amendment privilege has voluntarily compiled the document, no compulsion is present and the contents of the document are not privileged.").  And while the act of producing documents may be considered testimonial where the very act of production "tacitly concedes the existence of the papers demanded and their possession or control by" the party invoking the privilege, *Fisher v. United States*, 425 U.S. 391, 409-11 (1976), that is not the case here.  As noted above, Navarro has admitted that he possesses at least 200 Presidential records, which renders any testimonial implication from their production a "foregone conclusion" to which the Fifth Amendment provides no defense.  *Id.* at 411; *see also United States v. Hubbell*, 167 F.3d 552, 568 (D.C. Cir. 1999) (per curiam) (finding that the act-of-

23

production privilege does not apply "[w]here the government already has the knowledge that would otherwise be conveyed"), *aff'd*, 530 U.S. 27 (2000).

Furthermore, even if Navarro's production of Presidential records could be deemed testimonial, the Fifth Amendment does not apply because the documents sought are "vested with [a] public character" and required to be maintained by law. *Baltimore City Dep't of Soc. Servs. v. Bouknight*, 493 U.S. 549, 557 (1990); *see also Hubbell*, 530 U.S. at 35 ("[T]he fact that incriminating evidence may be the byproduct of obedience to a regulatory requirement, such as filing an income tax return, maintaining required records, or reporting an accident, does not clothe such required conduct with the testimonial privilege." (footnotes omitted)).  Navarro's claim of privilege is thus wholly without merit. *See Bouknight*, 493 U.S. at 556-57.

Nor is Navarro correct to assert (Mot. 20) that the district court's order compels the production of records which cannot thereafter be returned.  In the unlikely event that this Court concludes that he was not obligated to return the records that concededly belong to the United States (or that he was permitted to return them at his leisure), the

records could be returned to him.  He therefore has not met his burden of demonstrating that irreparable harm would result from the production of the Presidential records in his possession.

**B.**  The balance of equities and the public interest, which "merge" where relief is sought against the federal government, *Nken*, 556 U.S. at 435, also counsel against the extraordinary relief that Navarro seeks. As noted above, Congress enacted the PRA to ensure that Presidential records like those at issue here would be preserved for posterity and made available to the public, the current President, Congress, and the Judiciary as soon as possible.

Navarro has for years stymied the Archivist's efforts to safeguard the official records of the Trump Administration, first by failing to comply with his PRA obligations while employed in the White House and now by refusing to surrender documents that concededly belong to the United States.  The public interest clearly lies in effectuating the purposes of the PRA by immediately securing the Presidential records that remain in Navarro's possession and ensuring that the historical record of the prior administration is complete.  Indeed, as already noted, had Navarro complied with his PRA obligations and copied the

Presidential records in his private account to his official one within

twenty days of their creation, the United States would already be in

possession of the relevant documents.  The equities do not support

allowing Navarro to further delay what should have occurred long ago.[6]

---

[6] Navarro suggests (Mot. 22) that he should not be required to return the documents until any "criminal proceedings and government inquiries" related to him are complete.  It is unclear what bearing that suggestion has on his request for a stay pending appeal.  But it highlights Navarro's concession that the records belong to the United States and also the likelihood that he will not return the documents for the foreseeable future if he is not compelled to do so.

## CONCLUSION

For these reasons, this Court should deny Defendant's emergency

motion to stay the district court's order pending appeal.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

GERARD SINZDAK
  */s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7710*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9039*

APRIL 2023

27

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing response complies with the requirements of Federal Rule of Appellate Procedure 27(d) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font. I further certify that this response complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5,111 words according to the count of Microsoft Word.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht
